## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------------x
                                              :
*In re*                                       :      **Chapter 11**
                                              :
**VERTIS HOLDINGS, INC.,** *et al.*,          :      **Case No. 08-_____ (   )**
                                              :
                                              :      **(Jointly Administered)**
          **Debtors.**                        :
                                              :
-------------------------------------------------------------x

### DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PAY PREPETITION CLAIMS OF CERTAIN CREDITORS IN THE ORDINARY COURSE OF BUSINESS

Vertis Holdings, Inc. ("Vertis Holdings") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, "Vertis" or the "Debtors"),[1] hereby move for an order (the "Proposed Order") pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing, but not directing, the Debtors to pay prepetition claims of certain creditors in the ordinary course of business (the "Motion"). In support of the Motion, the Debtors submit the Declaration of Jeffery J. Stegenga in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief (the "Stegenga Declaration") and the Affidavit of Service and Vote Certification of Financial Balloting Group LLC (the "FBG Affidavit"), both filed contemporaneously herewith, and respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four (4) digits of each Debtor's federal tax identification number, are Vertis Holdings (1556), Vertis, Inc. (8322), Webcraft, LLC (6725), Webcraft Chemicals, LLC (6726), Enteron Group, LLC (3909), Vertis Mailing, LLC (4084), and USA Direct, LLC (5311).

## Background

1.     On the date hereof (the "<u>Commencement Date</u>"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "<u>Vertis Debtors' Reorganization Cases</u>").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Further, a motion pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") for joint administration of the Debtors' chapter 11 cases is pending before this Court.

2.     Prior to the Commencement Date, the Debtors solicited votes on the Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of Vertis Holdings, Inc., *et al.*, proposed by Vertis Holdings, Inc., *et al.* and ACG Holdings, Inc., *et al.* (the "<u>Vertis Prepackaged Plan</u>") through their disclosure statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code (the "<u>Disclosure Statement</u>").  As discussed more fully below, the Vertis Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

## Vertis' Businesses

3.     Vertis is one of the leading commercial printers, providing advertising inserts, newspaper products, direct mail services and related services to grocery stores, drug stores and other retail chains, general merchandise producers and manufacturers, financial and insurance service providers, newspapers and advertising agencies.  By offering an extensive list of solutions across a broad spectrum of media, Vertis enables its clients to reach target customers with the most effective message.

4.    Vertis operates primarily through two reportable business segments: advertising inserts ("Advertising Inserts") and direct mail ("Direct Mail"). In addition, Vertis also provides premedia and related services ("Premedia") as well as media planning and placement services ("Media Services").

5.    Advertising Inserts provides a full array of targeted advertising insert products and services. The products and services include targeted advertising insert programs for retailers and manufacturers, newspaper products (TV magazines, Sunday magazines, color comics and special supplements), and consumer research. Vertis is one of the leading providers of advertising inserts, newspaper TV listing guides and Sunday comics in the United States. In 2007, Vertis produced more than 31 billion advertising inserts, with the Advertising Insert segment accounting for approximately 66.7% of Vertis' total revenue for 2007.

6.    Direct Mail provides a full array of targeted direct marketing products and services. The products and services include highly customized one-to-one marketing programs, direct mail production with varying levels of personalization, data design, collection and management to identify target audiences, mailing management services, automated digital fulfillment services, effectiveness measurement and response management, and warehousing and fulfillment services. Revenue from the Direct Mail segment accounted for approximately 26.4% of Vertis' total revenue for 2007.

7.    Premedia, Media Services and other technologies assist clients with advertising campaigns, including digital content management, graphic design and animation, digital photography, compositing and retouching, in-store displays, billboards and building wraps, consulting services, newspaper advertising development and media

planning, and placement and software solutions that deliver messages through alternative media channels such as emails, texting, personalized "URLs" and the Internet. Premedia, Media Services and other technologies accounted for the remainder of Vertis' total revenue for 2007.

8.     Vertis Holdings is the parent corporation of Vertis, Inc. The other Debtors are wholly-owned direct or indirect subsidiaries of Vertis, Inc. (collectively, the "Vertis Subsidiary Debtors"). All business operations are carried out by Vertis, Inc., the Vertis Subsidiary Debtors, and Vertis Inc.'s non-debtor subsidiaries. Each of the Debtors is either a Delaware corporation or Delaware limited liability company. Vertis' principal executive offices are located at 250 West Pratt Street, Baltimore, Maryland 21201.

9.     As of May 31, 2008, Vertis, Inc. and the Vertis Subsidiary Debtors had approximately 5,414 employees in North America and their unaudited consolidated financial statements reflected $1.3 billion of revenue for the prior 12-month period, assets of approximately $523 million and liabilities of approximately $1.4 billion. As of May 31, 2008, Vertis Holdings' unaudited consolidated financial statements reflected assets of approximately $523 million and liabilities of approximately $1.7 billion.

## The Proposed Vertis Prepackaged Plan

10.     The Vertis Prepackaged Plan contemplates a comprehensive financial restructuring of the Debtors' existing equity and debt structures and effectuates a merger (the "Merger") of the Debtors and ACG Holdings, Inc. ("ACG Holdings"), American Color Graphics, Inc ("ACG"), American Images of North America, Inc., Sullivan Marketing, Inc., and Sullivan Media Corporation (collectively, the "ACG

Debtors"). As a result of the Merger, ACG Holdings and its subsidiaries will become wholly-owned direct and indirect subsidiaries of Vertis.

11.    Prior to the Commencement Date, the ACG Debtors also solicited votes on the ACG Debtors' proposed joint prepackaged chapter 11 plans of reorganization (the "ACG Prepackaged Plan," and, collectively with the Vertis Prepackaged Plan, the "Prepackaged Plans"). The ACG Debtors have, contemporaneously with the commencement of the Vertis Debtors' Reorganization Cases, commenced voluntary cases under chapter 11 of the Bankruptcy Code seeking confirmation of the ACG Prepackaged Plan (the "ACG Debtors' Reorganization Cases"). The ACG Debtors are co-proponents of the Vertis Prepackaged Plan in the Vertis Debtors' Reorganization Cases and the Vertis Debtors are co-proponents of the ACG Prepackaged Plan in the ACG Debtors' Reorganization Cases. The Prepackaged Plans provide that they will become effective simultaneously with each other and the consummation of the Merger.

12.    The Vertis Prepackaged Plan and Disclosure Statement were filed on the Commencement Date. As set forth in the FBG Affidavit, the proposed Vertis Prepackaged Plan has been accepted in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code by all classes entitled to vote.[2] Specifically,

---

[2] Although the holder of the Vertis Term Loan Claim and the Vertis Holdings Term Loan Guarantee Claim (as defined in the Disclosure Statement) voted to reject the Vertis Prepackaged Plan, the Vertis Prepackaged Plan provides that such votes shall be disregarded and such claims will be unimpaired if the Debtors opt to pay the Vertis Term Loan Claim in full on the Effective Date. As the Debtors have decided to pay the holder of the Vertis Term Loan Claim in full in cash on the Effective Date, the classes consisting of the Vertis Term Loan Claim and the Vertis Holdings Term Loan Guarantee Claim are not entitled to vote.

100% of the classes consisting of Vertis Holdings General Unsecured Claims, Vertis Second Lien Notes Claims and Vertis Senior Subordinated Notes Claims, both by number and by amount that voted on the Vertis Prepackaged Plan, voted to accept the Vertis Prepackaged Plan. The class consisting of Vertis Senior Notes Claims voted to accept the Vertis Prepackaged Plan by 98.6% in amount and 98.3% in number of those voting on the Vertis Prepackaged Plan.

13.     The ACG Prepackaged Plan was filed on the Commencement Date. As set forth in the Affidavit of Service and Vote Certification of Financial Balloting Group LLC filed concurrently with the ACG Debtors' chapter 11 petitions, the proposed ACG Prepackaged Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code. Specifically, the holders of ACG Second Lien Notes Claims voted to accept the ACG Prepackaged Plan by 99.9% in amount and 95.3% in number of those voting on the ACG Prepackaged Plan.

14.     On the effective date of the Prepackaged Plans (the "Effective Date"), Vertis shall issue the following securities: (i) new second lien notes of Vertis in the same principal amount as its existing second lien notes (i.e., $350 million) (the "New Vertis Second Lien Notes"); (ii) new senior notes of Vertis in the total principal amount of $200 million (the "New Vertis Senior Notes," and, together with the New Vertis Second Lien Notes, the "New Vertis Notes"); (iii) one class of common stock of Vertis Holdings (the "New Common Stock"); and (iv) new warrants, which may be exercised, subject to certain terms and conditions described in more detail below, to purchase a number of shares of New Common Stock equal to an aggregate of 11.5% of the number

of outstanding shares of New Common Stock as of the Effective Date at an exercise price of $0.01 per share (the "New Warrants"). The New Vertis Notes will be guaranteed by all of Vertis' domestic subsidiaries following consummation of the Merger.

15. The foregoing securities will be distributed under the Prepackaged Plans as follows: (i) holders of Vertis, Inc. 9 3/4% Senior Secured Second Lien Notes due 2009 will receive New Vertis Second Lien Notes in the same principal amount as their existing notes; (ii) holders of Vertis, Inc. 10 7/8% Senior Notes due 2009 will receive $107 million of New Vertis Senior Notes and 57.04% of the outstanding shares of the New Common Stock; (iii) holders of Vertis, Inc. 13 1/2% Senior Subordinated Notes due 2009 will receive $27 million of New Vertis Senior Notes, 10% of the outstanding shares of the New Common Stock and the New Warrants; and (iv) holders of American Color Graphics, Inc. 10% Senior Second Secured Notes due 2010 will receive $66 million of the New Vertis Senior Notes and 32.96% of the New Common Stock.

16. In addition, the Vertis Prepackaged Plan provides for the payment in full of (i) allowed administrative expense claims, (ii) federal, state, and local tax claims, and (iii) certain other priority non-tax claims, and leaves holders of general unsecured claims against the Vertis Debtors (other than Vertis Holdings) unimpaired. Furthermore, as permitted by the Vertis Prepackaged Plan, the Vertis Term Loan Claim will be paid in full on the Effective Date, leaving both it and the Vertis Holdings Term Loan Guarantee Claim unimpaired. Holders of general unsecured claims against Vertis Holdings, which are claims arising under that certain Mezzanine Note and Warrant Purchase Agreement, originally dated as of December 7, 1999, by and among Vertis Holdings and various purchasers and under certain management services agreements, will

receive their pro rata share of $3.232 million and an aggregate of $1,048,149 (plus up to $25,000 in legal expenses) in accordance with, and in exchange for the obligations provided in, certain side letter agreements. The existing common stock of Vertis Holdings will be cancelled with no distribution.

17.     The restructuring contemplated by these prepackaged chapter 11 cases will reduce the Vertis Debtors' leverage and enhance the Vertis Debtors' long-term growth prospects and competitive position. In addition to reducing their debt, the Vertis Debtors expect to improve their operating performance and enhance their value through the realization of significant cost-saving Merger-related synergies.

## Jurisdiction

18.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

19.     By this Motion, the Debtors request pursuant to sections 105(a) and 363(b) of the Bankruptcy Code entry of an order substantially in the form attached hereto as Exhibit "A" (i) authorizing but not directing the Debtors, subject to the procedures set forth herein, to pay, in the ordinary course of business, the allowed, fixed, liquidated, noncontingent, and undisputed prepetition claims (the "Payable Claims") of holders of Vertis General Unsecured Claims and Vertis Other Secured Claims[3] (each as

---

[3] Certain of the Debtors' prepetition trade creditors, such as shippers and mechanics, may be secured creditors because of their capacity to assert liens on the Debtors' property.

defined in the Vertis Prepackaged Plan) (collectively the "Prepetition Creditors") and (ii) scheduling a hearing on this Motion.

20.     The Debtors propose that the Proposed Order authorize the Debtors to pay the Payable Claims (i) on the condition that by accepting payment, the Prepetition Creditor agrees to maintain or reinstate trade terms during the pendency of these chapter 11 cases that are at least as favorable as those existing on the Commencement Date or (ii) on terms satisfactory to the Debtors in their business judgment. The Debtors also propose that if a Prepetition Creditor, after receiving a payment on account of its prepetition claim, does not maintain or reinstate trade terms at least as favorable as those existing on the Commencement Date during the pendency of these chapter 11 cases, or does not maintain terms agreed to by the Debtors, then any payments of prepetition claims made to such Prepetition Creditor after the Commencement Date may be either, in the Debtors discretion, (i) deemed applied to postpetition amounts payable to such Prepetition Creditor or (ii) an unauthorized postpetition transfer recoverable by the Debtors upon a motion by the Debtors to enforce the terms requested herein.

21.     As part of their cash management system, the Debtors maintain a disbursement account at Bank of America and certain other regional disbursement accounts in localities where Bank of America does not operate (collectively, the "Disbursement Accounts"). The Debtors draw upon funds in their Disbursement Accounts to satisfy obligations arising from Payable Claims. The Debtors request that the Court authorize Bank of America or such other banks or financial institutions, as applicable, to receive, honor, process, and pay any and all checks drawn, or electronic

fund transfers requested or to be requested, on the Debtors' general disbursement account to the extent that such checks or electronic fund transfers relate to any Payable Claims.

### The Payable Claims

22.    As described above, the Debtors have solicited from certain of their creditors acceptance of the Vertis Prepackaged Plan. Under the Vertis Prepackaged Plan, Vertis General Unsecured Claims and Vertis Other Secured Claims are unimpaired, and the holders of such claims will receive payment in full, in cash. In their Disclosure Statement, the Debtors indicated their intention to seek authority to pay their Prepetition Creditors in the ordinary course of business to protect their relations with trade creditors. Vertis Disclosure Statement § II(C) p. 32. In light of the overwhelming support of the Debtors' major creditor constituencies for the Vertis Prepackaged Plan, the Debtors seek authority to pay Prepetition Creditors, in the ordinary course of business, amounts that they will be entitled to receive upon consummation of the Vertis Prepackaged Plan.

23.    In the ordinary course of their businesses, the Debtors incur numerous obligations to vendors that provide, among other things, vital supplies and services necessary to the Debtors' production and maintenance processes, telecommunications services, utility services, professional services, shipping services, equipment, and other goods and services necessary to operate the Debtors' businesses. Allowing the payment of the Payable Claims on the terms set forth herein will allow for a smooth reorganization in these prepackaged cases. The Debtors estimate that, as of the Commencement Date, they owe a total of approximately $58 million on account of

undisputed Payable Claims.[4] Of those claims, the Debtors estimate that approximately

$32 million would also be entitled to administrative priority status pursuant to section

503(b)(9) of the Bankruptcy Code because they relate to goods delivered to the Debtors

in the ordinary course of business within twenty (20) days of the Commencement Date.

Furthermore, $7.2m of the Payable Claims may be secured. Approximately $3.2m of

these claims arise from capital projects with vendors that may be able to assert mechanics

liens on the Debtors' property and not less than $4m arise from shippers who may be able

to assert possessory liens on the Debtor's property. The Debtors estimate that

approximately $52 million of Payable Claims will become due and payable within the

first twenty (20) days of these chapter 11 cases.

24.     The Debtors seek to pay the Payable Claims in the ordinary course

of business to ensure uninterrupted operations and to allow for a seamless transition

through these chapter 11 cases. The Debtors' ability to maintain and develop their

relationships with essential vendors that supply goods and provide services to the Debtors

in the ordinary course of the Debtors' businesses is essential to minimize disruption to the

Debtors' operations during these chapter 11 cases and preserve their enterprise value for

the benefit of all parties in interest.

25.     Absent continuity of payment of the Payable Claims in the

ordinary course of business, the Debtors' businesses will be harmed. The Debtors'

inability to maintain existing terms with vendors could cause production disruptions if

---

[4] This figure does not include the value of goods in transit and not received by the Debtors as of the Commencement Date because amounts due for such goods will be paid in the ordinary course as administrative expense priority claims.

suppliers cease providing goods and services even for a short period of time, imperiling the Debtors' restructuring efforts and damaging the goodwill of their customers. The nature of the Debtors' businesses—printing newspaper inserts and advertising specials for customers—is such that delay would be unacceptable. Advertising inserts must be ready in time to be inserted into publications that are distributed to the public on timed schedules and often contain specials that apply for only a limited time. In light of the vigorous competition in the printing industry, the Debtors cannot risk alienating or losing valuable customers.

### Payment of the Payable Claims is Warranted

26.     The Debtors believe that the relief requested is reasonable and necessary under the circumstances. The cost of paying the Prepetition Creditors is a modest sum for a company with costs of production in excess of $1 billion during 2007, and payment of the Prepetition Creditors as provided above will allow the Debtors to manage against a disruption in the Debtors' ability to obtain the goods and services necessary to the operation of their businesses.

27.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under 11 U.S.C. § 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992)

(citing *Ionosphere Clubs*, 98 B.R. at 177). The uninterrupted supply of goods and services, on current trade terms, and the continuing support of their vendors, are imperative to the ongoing operations and viability of the Debtors. Accordingly, the relief requested herein is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor . . . ." *Ionosphere Clubs*, 98 B.R. at 176.

28.     The Court may also authorize the Debtors' payment of the Payable Claims pursuant to section 363(b) of the Bankruptcy Code. Section 363(b)(1) authorizes courts, after notice and hearing, to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also Ionosphere Clubs*, 98 B.R. at 175 ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances."). For a court to apply section 363(b), the debtor must "articulate some business justification, other than mere appeasement of major creditors . . . ." *Id.* (ruling that the debtor's payment of prepetition claims was necessary to protect its business and to ensure a successful reorganization).

29.     The Debtors submit that payment of Payable Claims is necessary and appropriate, and may be authorized under sections 105(a) and 363(b) of the Bankruptcy Code pursuant to the "doctrine of necessity." The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to

continued operation of the debtor); *Ionosphere Clubs*, 98 B.R. at 176 (authorizing the payment of prepetition employee wages and benefits while noting the judicial power to "authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for the payment of pre-petition claims" under the doctrine of necessity and noting that the Supreme Court, the United States Circuit Court of Appeals for the Third Circuit, and the District Court of Delaware all accept the authority of the bankruptcy court "to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan). Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

30.     Courts have routinely authorized payment of prepetition claims in the context of prepackaged chapter 11 cases in this and other districts. *In re Hilex Poly Co. LLC*, Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008); *In re Holley Performance Prods., Inc.*, Case No. 08-10256 (PJW) (Bankr. D. Del. Mar. 5, 2008); *In re DJK Residential LLC*, Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. Feb. 5, 2008); *In re Remy Worldwide Holdings, Inc.*, Case No., 07-11481 (KJC) (Bankr. D. Del. October 10, 2007); *In re IWO Holdings, Inc.*, Case No. 05-10009 (PJW) (Bankr. D. Del. Feb. 9, 2005); *In re M T S, Inc.*, Case No. 04-10394 (PJW) (Bankr. D. Del. Feb. 10, 2004)

(interim order). In fact, the Bankruptcy Court for the Southern District of New York has incorporated a motion to pay prepetition claims of creditors whose claims will be paid in full in its prepackaged bankruptcy guidelines for first-day motions. S.D.N.Y. General Order 203 § VI.C.16.

31. In addition, in other large, traditional chapter 11 cases, courts have authorized the payment of unsecured prepetition claims (even when no plan has been proposed or where a proposed plan impairs general unsecured claims) pursuant to the "necessity of payment" doctrine. *See, e.g., In re Leiner Health Prods. Inc.*, Case No. 08-10446 (KJC) (Bankr. D. Del. Apr. 8, 2008) (final order authorizing payment of critical vendors, including critical vendors with section 503(b)(9) claims); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Feb. 13, 2008) (two final orders, one authorizing payment of section 503(b)(9) claims at the outset of the case and the other authorizing payment of critical vendor claims at the outset of the case).

32. The Debtors' major creditor constituents have reached agreement on a reorganization plan and the paramount goal of the parties in interest during these cases is protecting the value of the Debtors' businesses by preventing operational disruptions. The relief requested herein preserves the value of the Debtors' estates by (i) ensuring that the Debtors have access to the goods and services that they need to remain stable and (ii) enabling the Debtors to maintain good relationships with their trade creditors for the benefit of the reorganized debtors when they emerge from chapter 11. The Debtors do not seek authority to pay all Payable Claims immediately, but only to pay in the ordinary course of business undisputed amounts that come due on terms consistent

with prepetition practice. Thus, the Debtors submit that the relief requested is narrowly tailored to facilitate their fast-tracked chapter 11 reorganization process.

33. The relief sought is vital for the Debtors' successful reorganization. The Debtors submit that good relations with their trade creditors is essential to the continued operation of their businesses during the pendency of their chapter 11 cases. Because of distress in the paper and printing industries—and particularly because of the bankruptcy of one the Debtors' major competitors—some of the Debtors' suppliers will suffer distress if they have to wait for payment from the Debtors. In addition, because markets for paper and ink, vital supplies for the Debtors, are undersupplied, some suppliers may simply choose to sell their supplies to buyers that can pay them immediately. In addition, the Debtors could not find alternate suppliers that would supply sufficient volumes to make up for the loss of certain paper and ink vendors, and in the case of ink, sourcing new supplies raises a series of technical issues that would be impossible to overcome in a short period of time. Other vendors supply very specialized parts or services that the Debtors cannot replace without compromising the quality of their products, or manage logistical systems that are too complex to adapt to a new service supplier quickly. Given these constraints, the Debtors cannot afford to lose their suppliers.

34. Furthermore, if Prepetition Creditors agree to continue supplying the Debtors postpetition under current trade terms, the Debtors will avoid unnecessary expense during these cases. Current trade terms will help the Debtors' maintain their liquidity, and will facilitate their ability to sustain operations while reorganizing. Such terms also allow the Debtors to avoid the inherent operational inefficiencies of paying

cash on demand and managing billing processes for numerous vendors that require cash in advance or shorten their trade terms to less than a week.

35.     In addition, the relief requested herein allows the Debtors to avoid the expense required to analyze each Payable Claim to determine which amounts are payable as postpetition administrative expenses, which amounts are subject to administrative priority under section 503(b)(9), and which amounts should be held back until effectuation of the Vertis Prepackaged Plan. Finally, paying the Prepetition Creditors in the ordinary course of business minimizes disruption to the Debtors' operations by preventing the initiation of reclamation claims, adversary proceedings and other motions filed by the Prepetition Creditors seeking payment of their prepetition claims. Because the Debtors' prepackaged cases are advancing under a compressed schedule, and because the Payable Claims are unimpaired under the Vertis Prepackaged Plan, paying the Payable Claims in the ordinary course of business renders a savings to the Debtors' estates both monetarily and operationally by preserving liquidity, and enabling the Debtors to operate smoothly during these cases. Such relief enables the Debtors to focus on consummating the Vertis Prepackaged Plan for the benefit of the Debtors, their estates, and their creditors. Under these circumstances, approval of the requested relief is appropriate.

36.     The Debtors submit that no parties in interest will be prejudiced by the relief requested herein, as the Vertis Prepackaged Plan provides for the unimpairment of all Vertis General Unsecured Claims and Vertis Other Secured Claims. The relief requested merely expedites the treatment and distribution that is afforded to the Payable

Claims held by Prepetition Creditors under the Vertis Prepackaged Plan to protect the

Debtors' businesses and preserve the value of the Debtors' estates.

## Reservation of Rights

37.     Nothing contained herein is intended or shall be construed as (i) an

admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors'

or appropriate party in interest's rights to dispute any claim, or (iii) an approval or

assumption of any agreement, contract, program, policy or lease under section 365 of the

Bankruptcy Code. Likewise, if this Court grants the relief sought herein, any payment

made pursuant to the Court's order is not intended and should not be construed as an

admission to the validity of any claim or a waiver of the Debtors' rights to dispute such

claim subsequently. Finally, the relief requested herein shall not oblige the Debtors to

accept any services, to accept the shipment of goods, or prevent the Debtors from

returning or rejecting goods.

### Request For Authority For Banks to Honor and
### Pay Checks Issued and Electronic Funds Transferred to Prepetition Creditors

38.     The Debtors further request that the Court authorize and direct all

applicable banks and other financial institutions to receive, process, honor and pay any

and all checks drawn or electronic funds transferred to pay the Payable Claims, whether

such checks were presented prior to or after the Commencement Date; *provided,*

*however,* that such checks or electronic transfers are identified by the Debtors as relating

directly to the authorized payment of the Payable Claims. The Debtors also seek

authority to issue new postpetition checks or effect new electronic fund transfers, on

account of the Payable Claims to replace any prepetition checks or electronic fund

transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases. The Debtors submit that they have sufficient liquidity to pay such amounts as they become due in the ordinary course of the Debtors' businesses.

## The Debtors Satisfy Bankruptcy Rule 6003

39.     Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty (20) days after the Commencement Date. FED. R. BANKR. P. 6003. As described above and in the Stegenga Declaration, the Debtors' business operations require the uninterrupted provision of goods and services from the Prepetition Creditors. The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

40.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## The Relief Requested is Appropriate

41.     The requested relief is further supported by the prepackaged nature of these cases. As set forth above and in greater detail in the Stegenga Declaration and the FBG Affidavit, the Debtors and the ACG Debtors solicited votes on the Prepackaged Plans from all classes of holders of claims entitled to vote to accept or reject the Prepackaged Plans. The votes tabulated and received from these classes demonstrate

overwhelming acceptance of the Prepackaged Plans. The most critical and complex task required to effectuate a successful reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has already been accomplished. Thus, the Debtors respectfully submit that given the backdrop of these prepackaged chapter 11 cases, the relief requested herein is appropriate inasmuch as such relief will assist the Debtors to move towards expeditious confirmation of the widely-supported Prepackaged Plans with the least possible disruption or harm to their businesses. Moreover, the relief requested is supported by the Debtors' major creditor groups. Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

### Notice

42.     No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (i) the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors (on a consolidated basis); (iii) Winston & Strawn LLP, 35 W. Wacker Drive, Chicago, Illinois 60601, Attn: Brian I. Swett, Esq., and Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166, Attn: William D. Brewer, Esq., as counsel to the agent under the Debtors' postpetition senior secured credit agreement and prepetition senior secured credit agreement; (iv) Emmet, Marvin & Martin, LLP, 120 Broadway, 32nd Floor, New York, New York 10271, Attn: Edward P. Zujkowski, Esq., as counsel to The Bank of New York, as indenture trustee under the 9 3/4% Indenture, the 10 7/8% Indenture, and the 13 1/2% Indenture; (v) Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022, Attn: Ira

Dizengoff, Esq. and David Simonds, Esq., and Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, DE 19899-1709, Attn: David M. Fournier, Esq., as co-counsel to the Vertis Informal Committee;[5] (vi) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attn: Kristopher M. Hansen, Esq. and Jayme T. Goldstein, Esq., as counsel to the Vertis Second Lien Noteholder Group; (vii) Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, New York 10019, Attn: Martin J. Bienenstock, Esq., as counsel to those certain holders of notes under the 13 1/2% Indenture that are signatories to the Restructuring Agreement; (viii) Ropes & Gray LLP, One International Place, Boston, MA 02110, Attn: Steven T. Hoort, Esq., as counsel to certain Vertis shareholders; (ix) Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, New York, New York 10110, Attn: Paul R. DeFilippo, Esq., and Manton, Sweeney, Gallo, Reich & Bolz LLP, 92-25 Queens Blvd., Rego Park, New York 11374, Attn: Frank Bolz, Esq., as counsel to CLI; (x) Simpson Thatcher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attn: Mark J. Thompson, Esq., as counsel to the Evercore Parties; (xi) Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022-4611, Attn: Paul M. Basta, Esq., and Kirkland & Ellis LLP, Aon Center, 200 East Randolph Drive, Chicago, Illinois 60601, Attn: Ray C. Schrock, Esq. and Chad J. Husnick, Esq., as counsel to the ACG Debtors; and (xii) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Abhilash M. Raval, Esq., and Debra Alligood

---

[5] Capitalized terms used and not otherwise defined in this section shall have the meanings ascribed to them in the Vertis Prepackaged Plan.

White, Esq., as counsel to the ACG Informal Committee ((i) through (xii), collectively, the "Notice Parties"). The Debtors submit that no other or further notice need be provided.

## No Previous Request

43.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the

Proposed Order granting the relief requested herein and such other and further relief as

the Court may deem just and appropriate.

Dated: July 15, 2008
       Wilmington, Delaware

                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                (212) 310-8000
                Gary T. Holtzer
                Stephen A. Youngman

                -and-

                RICHARDS, LAYTON & FINGER, P.A.
                One Rodney Square
                P.O. Box 551
                Wilmington, Delaware 19899
                (302) 651-7700
                By: _____
                Mark D. Collins (No. 2981)
                Michael J. Merchant (No. 3854)

                ATTORNEYS FOR THE DEBTORS
                AND DEBTORS IN POSSESSION

# Exhibit A

## Proposed Order

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| *In re* | : | **Chapter 11** |
|  | : |  |
| **VERTIS HOLDINGS, INC., *et al.*,** | : | **Case No. 08-_____ ( )** |
|  | : |  |
|  | : | **(Jointly Administered)** |
| Debtors. | : |  |
|  | : |  |

---------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS
### 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR
### AUTHORIZATION TO PAY PREPETITION CLAIMS OF
### CERTAIN CREDITORS IN THE ORDINARY COURSE OF BUSINESS

Upon the motion, dated July 15, 2008 (the "Motion"), of Vertis Holdings,

Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and

debtors in possession (collectively, the "Debtors"),[1] for entry of an order, pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code,[2] authorizing, but not directing the

Debtors to pay certain prepetition creditors in the ordinary course of business, as is more

fully set forth in the Motion, and upon the Stegenga Declaration and the FBG Affidavit;

and this Court having jurisdiction to consider the Motion and the relief requested therein

pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

---

[1] The Debtors in these cases, along with the last four (4) digits of each Debtor's federal tax identification number, are Vertis Holdings (1556), Vertis, Inc. (8322), Webcraft, LLC (6725), Webcraft Chemicals, LLC (6726), Enteron Group, LLC (3909), Vertis Mailing, LLC (4084), and USA Direct, LLC (5311).

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

proper notice of the Motion having been provided to the Notice Parties, and it appearing

that no other or further notice need be provided; and this Court having determined that

the relief sought in the Motion is in the best interests of the Debtors, their creditors, and

all parties in interest; and this Court having determined that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and upon all of the

proceedings had before this Court and after due deliberation and sufficient cause

appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b) of the Bankruptcy

Code, the Debtors are authorized, but not directed, to pay in the ordinary course of

business, the allowed, fixed, liquidated, noncontingent, and undisputed prepetition

amounts owed to Prepetition Creditors on account of Payable Claims consistent with the

terms of such obligations existing on the date of the commencement of these cases (the

"Commencement Date"), *provided, however*, that as a condition to payment hereunder,

such Prepetition Creditors continue to supply goods and services to the Debtors during

the pendency of these cases on trade terms that are at least as favorable as those existing

on the Commencement Date or on terms satisfactory to the Debtors in their business

judgment; and it is further

ORDERED that in the event that a Prepetition Creditor does not maintain

or reinstate trade terms at least as favorable as those existing on the Commencement Date

during the pendency of these cases, or does not maintain trade terms agreed to by the

Debtors, any payments made pursuant to this Order after the Commencement Date shall

be, in the Debtors' sole discretion, either (i) deemed applied to postpetition amounts

payable to such Prepetition Creditor or (ii) recoverable by the Debtors as unauthorized postpetition transfers under section 549 of the Bankruptcy Code or other applicable bankruptcy or non-bankruptcy law; and it is further

ORDERED that during the pendency of these cases the Debtors are only authorized to pay those Payable Claims that become due and owing (without regard to any acceleration of payment arising as a result of the commencement of these chapter 11 cases); and it is further

ORDERED that the undisputed obligations of the Debtors for goods and services received by the Debtor after the Commencement Date shall be afforded administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code and are not Payable Claims addressed by this Order; and it is further

ORDERED that nothing in this Order nor any action taken by the Debtors in furtherance of the implementation hereof shall be deemed an approval of the assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that nothing in this Order shall impair the ability of the Debtors or appropriate party in interest to contest any invoice of any creditor pursuant to applicable law or otherwise dispute, contest, setoff, or recoup any claim, or assert any rights, claims or defenses related thereto; and it is further

ORDERED that Bank of American and all applicable banks or financial institutions are authorized, when requested by the Debtors in the Debtors' sole discretion, to receive, process, honor and pay all checks drawn on or direct deposit and funds transfer instructions relating to the Debtors' accounts and any other transfers that are

related to Payable Claims and the costs and expenses incident thereto; *provided* that sufficient funds are available in the accounts to make such payments; *provided further* that any such bank or financial institution may rely on the representations of the Debtors regarding which checks that were drawn or instructions that were issued by the Debtors before the Commencement Date should be honored postpetition pursuant to an Order of this Court and that any such bank or financial institution shall not have any liability to any party for relying on the representations of the Debtors as provided herein; and it is further

ORDERED that Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: _____, 2008
       Wilmington, Delaware

                              _____
                              **UNITED STATES BANKRUPTCY JUDGE**