## EXHIBIT A

**Exit Financing Commitment Letter - Revolver**

CONFIDENTIAL

July 8, 2008

Vertis, Inc.
250 West Pratt Street
Baltimore, MD 21201
Attention: Barry Kohn
        Chief Financial Officer

Vertis, Inc.
$250 Million Senior Secured Revolving Credit Facility

**Exit Commitment Letter**

Ladies and Gentlemen:

You (as "Borrower") have advised each of General Electric Capital Corporation ("GE Capital") and GE Capital Markets, Inc. ("GECM" and, together with GE Capital, the "Commitment Parties," "we" or "us") that you intend to (i) refinance and restructure the Borrower's senior secured indebtedness and its other secured and unsecured indebtedness (the "Restructuring"); and (ii) effect a merger with ACG Holdings, Inc. ("ACG Holdings" and together with its subsidiaries, the "Acquired Business") through an acquisition of all of ACG Holdings' issued and outstanding capital stock (the "Acquisition"). You have further advised us that you, your subsidiaries and Holdings (as defined below) intend to effect the Restructuring and the Acquisition (collectively, the "Restructuring Transactions") by means of various "prepackaged" cases under chapter 11 of the U.S. Bankruptcy Code (collectively, the "Prepackaged Chapter 11 Cases").

In addition, you have advised us that in anticipation of the consummation of the Restructuring Transactions, you have entered into (i) that certain Restructuring and Lock-Up Agreement dated as of May 22, 2008 (the "Restructuring Agreement") among, inter alia, you, various of your affiliates, the Acquired Business, certain creditors of the Acquired Business, certain holders of your 9 $^{3/4}$% Senior Secured Second Lien Notes due 2009 (the "Vertis Second Lien Notes"), certain holders of your 10 $^{7/8}$% Senior Notes due 2009 (the "Vertis Senior Notes"), and certain holders of your 13 $^{1/2}$% Senior Subordinated Notes due 2009 (the "Vertis Senior Subordinated Notes"); (ii) other agreements with certain holders of Vertis Holdings, Inc.'s ("Holdings") Mezzanine Notes arising from the Mezzanine Note and

Warrant Purchase Agreement, dated as of December 7, 1999, as amended (the "Vertis Holdings Mezzanine Notes") (each, an "Ancillary Noteholders Agreement" and, together with the Restructuring Agreement, the "Ancillary Noteholders Agreements") entered into by you and/or one or more of your affiliates in connection with the Restructuring Agreement; and (iii) that certain Agreement and Plan of Merger dated as of May 22, 2008 (the "Merger Agreement") among you, Holdings, Victory Merger Sub, LLC and ACG Holdings.

You have further advised us that, in connection with the Prepackaged Chapter 11 Cases and pursuant to the terms and conditions of that certain Commitment Letter, dated as of even date herewith, by and among GE Capital and Vertis, Inc. (together with Exhibit A thereto, the "Prepackaged DIP Commitment Letter"), you intend to obtain debtor-in-possession financing in an amount up to $380 million, which will be comprised of a $130 million secured revolving credit facility, a $50 million secured term A facility and an up to $200 million secured term B facility, each on the terms and conditions described in the Prepackaged DIP Commitment Letter (the "DIP Credit Facility").

Finally, you have advised us that, upon and in connection with the emergence of Vertis, Inc. from the Prepackaged Chapter 11 Cases, you intend to refinance all of Borrower's and its subsidiaries' indebtedness under the DIP Credit Facility (the "DIP Payoff" and, collectively with the Restructuring Transactions, the "Emergence Transactions"). You have further advised us that, in connection with the Emergence Transactions, you intend to obtain senior first lien secured facilities in an amount up to $250 million, which will be comprised of a $250 million senior secured revolving credit facility (the "Revolving Credit Facility") on the terms and conditions described in the Exit Term Sheet (collectively, the "Exit Financing"). On the Closing Date and after giving effect to the Emergence Transactions and the Exit Financing, there shall be no outstanding indebtedness of the Borrower or any of its subsidiaries other than: (i) indebtedness under the Exit Financing; (ii) indebtedness under the New Term Loan Facilities (as defined in the Restructuring Agreement); (iii) indebtedness under the New Second-Lien Notes (as defined in the Restructuring Agreement); (iv) indebtedness under the New Senior Notes (as defined in the Restructuring Agreement); and (v) certain existing indebtedness in respect of capital leases and purchase money financing for equipment of up to $10 million in the aggregate.

GE Capital (in such capacity, the "Initial Lender") is pleased to advise you of its commitment to provide, directly or through an affiliate, the Exit Financing and to act as the sole administrative agent and the sole collateral agent for the Exit Financing, all upon and subject to the general terms and conditions set forth herein, in the Summary of Terms attached hereto as Exhibit A and incorporated herein by reference (collectively, the "Exit Term Sheet" and together with this letter, this "Exit Commitment Letter") and in the Exit Fee Letter (as defined below). GECM (in such capacity the "Lead Arranger") is pleased to agree to act as the sole lead arranger and book-running manager for the Exit Financing. Each capitalized term used in the text of this Exit Commitment Letter without definition shall have the meaning assigned to such term in the Exit Term Sheet.

*Syndication.*

The Initial Lender intends and reserves the right, prior to and after the execution of the Exit Financing Documentation (as defined below), to syndicate all or a portion of its commitments under this Exit Commitment Letter or its loans and commitments under the Exit Financing Documentation, as the case may be, to one or more banks, financial institutions or other institutional lenders pursuant to a syndication to be managed by GECM in consultation with you (the Initial Lender and such financial institutions becoming parties to such Exit Financing Documentation being collectively referred to as the "Lenders"). The syndication of all or a portion of the Initial Lender's commitments under this Exit Commitment Letter and/or its loans and commitments under the Exit Financing is hereinafter referred to as the "Primary Syndication".

The Lead Arranger will commence the Primary Syndication promptly after your acceptance of this Exit Commitment Letter and the Exit Fee Letter (as defined below). It is understood and agreed that GECM will, in consultation with you, manage and control all aspects of the Primary Syndication, including selection of prospective Lenders, determination of when the Lead Arranger will approach prospective Lenders and the time of acceptance of Lenders' commitments, any naming rights, titles or roles to be awarded to Lenders, and the final allocations of the commitments among Lenders. It is further understood and agreed that (i) no additional agents, arrangers or book-running managers shall be appointed, or other titles, names or roles conferred to any Lender or any other person or entity, by you in respect of the Exit Financing, (ii) the amount and distribution of fees among the Lenders will be at the Lead Arranger's discretion, and (iii) no Lender will be offered by, or receive from, you compensation of any kind for its participation in the Exit Financing, except as expressly provided for in this Exit Commitment Letter or the Exit Fee Letter or with the prior written consent of GECM.

You agree to actively assist and cooperate (and use your commercially reasonable efforts to cause each of your affiliates, the Acquired Business and its affiliates and all other necessary persons to assist and cooperate) with the Lead Arranger in connection with the Primary Syndication. Such assistance shall include, without limitation (a) promptly preparing and providing to the Lead Arranger all information with respect to Borrower and its subsidiaries, the Emergence Transactions, the Acquired Business and the other transactions contemplated hereby, including financial information and projections (the "Projections") and copies of due diligence, accounting or similar reports or memoranda prepared at your direction by legal, accounting, tax, environmental or other advisors in connection with the Emergence Transactions (in each case subject to non-disclosure and reliance letters reasonably acceptable to the Lead Arranger), in each case, as the Lead Arranger may reasonably request in connection with the Primary Syndication, (b) participating (and using your commercially reasonable efforts to cause the Acquired Business to participate) in meetings with prospective Lenders and other relevant meetings (including meetings with rating agencies), (c) using your commercially reasonable efforts to provide direct contact during the Primary Syndication between Borrower's and the Acquired Business' senior management, representatives and advisors, on the one hand, and prospective Lenders, on the other hand, and (d) using your commercially reasonable efforts to ensure that the Lead Arranger's syndication efforts benefit from Borrower's and the Acquired Business' existing financial and banking relationships.

At GECM's request, you agree to assist in the preparation of confidential information memoranda, presentations and other Evaluation Material (as defined below) regarding the Borrower, the Acquired Business, the Emergence Transactions and the Exit Financing to be used in connection with the Primary Syndication and to confirm (and to use commercially reasonable efforts to cause the Acquired Business to confirm), prior to such materials being made available to prospective Lenders, the completeness and accuracy of such materials. The Evaluation Material shall include a version of the confidential information memorandum, presentation and other information materials consisting exclusively of information that is either publicly available with respect to Borrower and the Acquired Business and their respective subsidiaries and parent company, or that is not material with respect to Borrower or the Acquired Business or their respective securities for purposes of U.S. federal and state securities laws. You also hereby agree that you will (a) identify in writing (and use commercially reasonable efforts to cause the Acquired Business to identify in writing), and (b) clearly and conspicuously mark (and use commercially reasonable efforts to cause the Acquired Business to clearly and conspicuously mark) such Evaluation Material that does not contain any such material non-public information referred to in the prior sentence as "PUBLIC". You hereby agree that by identifying such Evaluation Material pursuant to clause (a) of the preceding sentence and marking Evaluation Material as "PUBLIC" pursuant to clause (b) of the preceding sentence and/or publicly filing any Evaluation Material with the Securities and Exchange Commission, then the Commitment Parties, Lenders and prospective Lenders shall be entitled to treat such Evaluation Material as not containing any material non-public information with respect to Borrower,

the Acquired Business, their respective subsidiaries and parent company or the Emergence Transactions for purposes of U.S. federal and state securities laws. You further acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any material non-public information: term sheets with respect to the Exit Financing and the Emergence Transactions and administrative materials of a customary nature prepared by the Commitment Parties for prospective Lenders, such as a lender meeting invitation, bank allocation, if any, and funding and closing memorandum. Before distribution of any Evaluation Material, you agree (and agree to use commercially reasonable efforts to cause the Acquired Business) to execute and deliver to us a letter in which you authorize distribution of the Evaluation Material to prospective Lenders and their employees willing to receive material non-public information, and a separate letter in which you authorize distribution of Evaluation Material that does not contain material non-public information and represent that no material non-public information is contained therein.

Until the completion of the Primary Syndication (as determined by GECM in its discretion), Borrower shall not (and Borrower shall cause Borrower's affiliates not to), without the prior written consent of GECM, offer, issue, place, syndicate or arrange any debt or preferred equity securities or debt facilities (including any debtor-in-possession financing, any renewals, restatements, restructuring or refinancings of any existing debt or preferred equity securities or debt facilities), attempt or agree to do any of the foregoing, announce or authorize the announcement of any of the foregoing, or engage in discussion concerning any of the foregoing; provided, however, that, subject to the section hereof entitled "Confidentiality", the foregoing shall not preclude the Borrower, Holdings or their respective subsidiaries from soliciting and engaging in discussions with financial entities in order to: (x) analyze competing debtor-in-possession financing proposals received prior to the date hereof, and (y) arrange for exit financing facilities and other additional financings contemplated by the Restructuring Agreement.

### *Information*

You hereby represent and covenant (and it is a condition to the Initial Lender's commitment hereunder) that (a) all information other than the Projections and general economic or specific industry information developed by, and obtained from, third-party sources (the "Information") that has been or will be made available to the Commitment Parties and/or the Lenders by you, the Acquired Business or any of your respective affiliates or representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (b) the Projections that have been or will be made available to the Commitment Parties by Borrower, the Acquired Business or any of your respective affiliates or representatives have been or will be prepared in good faith based upon reasonable assumptions (it being understood and agreed that financial projections are not a guarantee of financial performance and actual results may differ from financial projections and such differences may be material). You agree that if at any time prior to the closing of the Exit Financing any of the representations in the preceding sentence would be incorrect if the Information or Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information or the Projections, as the case may be, so that such representations will be correct under those circumstances. You understand that in arranging and syndicating the Exit Financing the Lead Arranger may use and rely on the Information and Projections without independent verification thereof.

You hereby authorize and agree, on behalf of yourself, the Acquired Business and your respective affiliates, that the Information, the Projections and all other information provided by or on behalf of you, the Acquired Business and your respective affiliates to the Commitment Parties regarding Borrower, the Acquired Business and your respective affiliates, the Emergence Transactions and the other transactions

contemplated hereby in connection with the Exit Financing (collectively, "Evaluation Material") may be disseminated by or on behalf of the Commitment Parties, and made available, to prospective Lenders and other persons, who have agreed to be bound by customary confidentiality undertakings (including, "click-through" agreements), all in accordance with the Lead Arranger's standard loan syndication practices (whether transmitted electronically by means of a website, e-mail or otherwise, or made available orally or in writing, including at prospective Lender or other meetings). You hereby further authorize (and agree to use commercially reasonable efforts to cause the Acquired Business to authorize) the Lead Arranger to download copies of Borrower's and the Acquired Business' respective logos from their respective websites and post copies thereof on an Intralinks® or similar workspace and use such logos on any confidential information memoranda, presentations and other marketing and materials prepared in connection with the Primary Syndication.

*Exit Fee Letter.*

As consideration for the Commitment Parties' agreements hereunder you agree to pay (or to cause to be paid) to the Initial Lender, the Lead Arranger and such other specified parties, if any, the fees as set forth in the Exit Term Sheet and in the Exit Fee Letter dated the date hereof and delivered herewith with respect to the Exit Financing (the "Exit Fee Letter").

*Conditions.*

The commitment and agreements of the Initial Lender hereunder, and the agreements of the Lead Arranger to provide the services described herein, are subject to the following: (a) the execution and delivery of definitive documentation for the Exit Financing (the "Exit Financing Documentation") consistent with the Exit Term Sheet and otherwise acceptable to the Initial Lender and its counsel, (b) the Initial Lender not becoming aware after the date hereof of any information not previously disclosed to the Initial Lender affecting Borrower, the Acquired Business or your respective subsidiaries or the Emergence Transactions that in the Initial Lender's judgment is inconsistent in a material and adverse manner with any such information disclosed to the Initial Lender prior to the date hereof, and (c) the other conditions set forth in the Exit Term Sheet and the Exit Fee Letter and your compliance in all material respects with the terms and provisions of this Exit Commitment Letter and the Exit Fee Letter. The terms and conditions of the commitment and agreement hereunder and of the Exit Financing are not limited to those set forth herein and in the Exit Term Sheet and the Exit Fee Letter. Those matters that are not covered by the provisions hereof and of the Exit Term Sheet and Exit Fee Letter are subject to the approval and agreement of the Initial Lender and you.

*Expenses.*

By signing this Exit Commitment Letter, regardless of whether the Exit Financing closes, you agree to pay upon demand to the Commitment Parties all reasonable fees and expenses (including, but not limited to, all reasonable costs and fees of external legal counsel, environmental consultants, appraisers, auditors and other consultants and advisors, due diligence reports, recording and transfer fees and taxes, title charges and survey costs) incurred by them in connection with this Exit Commitment Letter, the Exit Fee Letter, the Emergence Transactions, the Exit Financing and the transactions contemplated hereby (and the negotiation, documentation, closing and syndication thereof).

*Confidentiality.*

The Commitment Parties are delivering this Exit Commitment Letter to you with the understanding that you will not disclose the contents of this Exit Commitment Letter, the Exit Fee Letter or the Commitment Parties' involvement with or the Initial Lender's commitment to provide or the Lead Arranger's agreement

to arrange the Exit Financing to any third party (including, without limitation, any financial institution or intermediary) without the Initial Lender's prior written consent other than to those individuals who are your directors, officers, employees or advisors in connection with the Emergence Transactions and the Exit Financing (after you have advised them that such information is confidential and may not be used for any purpose other than in connection with the Prepackaged Chapter 11 Cases and may not be disclosed to any other person); provided, that this Exit Commitment Letter (including the Exit Fee Letter) may also be disclosed to American Color Graphics, Inc. ("ACG") and the holders of the American Color Graphics, Inc. $280,000,000 10% Senior Secured Notes due 2010, the holders of the Vertis Second Lien Notes, the Vertis Senior Notes, the Vertis Senior Subordinated Notes and/or the Vertis Holdings Mezzanine Notes and its/their advisors and, in the case of ACG, its lenders; provided, further, that this Exit Commitment Letter and the Exit Fee Letter may also be disclosed as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which case you agree to inform the Initial Lender promptly thereof); provided, further, that this Exit Commitment Letter and the Exit Fee Letter may also be disclosed to the court presiding over the Prepackaged Chapter 11 Cases and the Exit Commitment Letter (but not the Exit Fee Letter) may be filed with the court presiding over the Prepackaged Chapter 11 Cases; provided, further, that this Exit Commitment Letter and the Exit Fee Letter may be shared with any official committee appointed in the Prepackaged Chapter 11 Cases; provided, further, that, with respect to soliciting and engaging in discussions with financial entities in order to arrange for the other exit financing facilities and other additional financings contemplated by the Restructuring Agreement, the Borrower, Holdings and their subsidiaries may only disclose the maturity date, amount, collateral and provisions relating to prepayment of other exit facilities (and solely the maturity date, amount, collateral and provisions relating to prepayment of other exit facilities) of the Exit Financing; and, provided, further, that, prior to any disclosure by you of information concerning the Commitment Parties, this Exit Commitment Letter or the Exit Fee Letter (including, without limitation, a copy of this Exit Commitment Letter or the Exit Fee Letter) to any person or entity listed in the first or fourth proviso to this sentence, you shall obtain, and agree to obtain, from the applicable persons or entities a confidentiality agreement with respect to such information in form and substance acceptable to GE Capital. The Commitment Parties reserve the right to review and approve, in advance, all materials, press releases, advertisements and disclosures that you prepare or that is prepared on your behalf that contain the Initial Lender's or any affiliate's name or describe the Initial Lender's financing commitment or the Lead Arranger's role and activities with respect to the Exit Financing.

*Indemnity.*

Regardless of whether the Exit Financing closes, you agree to (a) indemnify, defend and hold each of the Commitment Parties, each Lender, and their respective affiliates and the principals, directors, officers, employees, representatives, agents and third party advisors of each of them (each, an "Indemnified Person"), harmless from and against all losses, disputes, claims, expenses (including, but not limited to, attorneys' fees), damages, and liabilities of any kind (including, without limitation, any environmental liabilities) which may be incurred by, or asserted against, any such Indemnified Person in connection with, arising out of, or relating to, this Exit Commitment Letter, the Exit Fee Letter, the Exit Financing, the use or the proposed use of the proceeds thereof, the Emergence Transactions, any other transaction contemplated by this Exit Commitment Letter, any other transaction related thereto and any claim, litigation, investigation or proceeding relating to any of the foregoing (each, a "Claim", and collectively, the "Claims"), regardless of whether such Indemnified Person is a party thereto, and (b) reimburse each Indemnified Person upon demand for all legal and other expenses incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (each, an "Expense"); provided that no Indemnified Person shall be entitled to indemnity hereunder in respect of any Claim or Expense to the extent that the same is found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross

negligence or willful misconduct of such Indemnified Person. Under no circumstances shall the Commitment Parties or any of their respective affiliates be liable for any punitive, exemplary, consequential or indirect damages that may be alleged to result in connection with, arising out of, or relating to, any Claims, this Exit Commitment Letter, the Exit Fee Letter, the Exit Financing, the use or the proposed use of the proceeds thereof, the Emergence Transactions, any other transaction contemplated by this Exit Commitment Letter and any other transaction related thereto. Furthermore, you hereby acknowledge and agree that the use of electronic transmission is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse. You agree to assume and accept such risks by hereby authorizing the transmission of electronic transmissions, and you agree that each of the Commitment Parties or any of their respective affiliates will not have any liability for any damages arising from the use of such electronic transmission systems.

## *Sharing Information; Absence of Fiduciary Relationship.*

You acknowledge that the Commitment Parties and their affiliates may be providing debt financing, equity capital or other services to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. None of the Commitment Parties or any of their respective affiliates will furnish confidential information obtained from you, the Acquired Business and your respective officers, directors, employees, attorneys, accountants or other advisors by virtue of the transactions contemplated by this Exit Commitment Letter or its other relationships with you to other companies. You also acknowledge that none of the Commitment Parties or any of their respective affiliates has any obligation to use in connection with the transactions contemplated by this Exit Commitment Letter, or furnish to you, the Acquired Business and your respective officers, directors, employees, attorneys, accountants or other advisors, confidential information obtained by the Commitment Parties or any of their respective affiliates from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you, on the one hand, and or any of the Commitment Parties, on the other hand, has been or will be created in respect of any of the transactions contemplated by this Exit Commitment Letter, irrespective of whether the Commitment Parties and/or their respective affiliates have advised or are advising you on other matters, and (b) you will not bring or otherwise assert any claim against any of the Commitment Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that none of the Commitment Parties shall have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

## *Assignments and Amendments.*

This Exit Commitment Letter shall not be assignable by you without the prior written consent of us (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons. The Initial Lender may transfer and assign its commitment hereunder, in whole or in part, to any of its affiliates or to any prospective Lender in connection with the Primary Syndication in consultation with you or otherwise. Upon such assignment, the Initial Lender shall be released from the portion of its commitment hereunder that has been so transferred and assigned.

This Exit Commitment Letter may not be amended or waived except by an instrument in writing signed by you and us. The Commitment Parties may perform the duties and activities described hereunder through any of their respective affiliates and the provisions of the paragraph entitled "Indemnity" shall apply with equal force and effect to any of such affiliates so performing any such duties or activities.

*Counterparts and Governing Law.*

This Exit Commitment Letter may be executed in counterparts, each of which shall be deemed an original and all of which counterparts shall constitute one and the same document. Delivery of an executed signature page of this Exit Commitment Letter by facsimile or electronic (including "PDF") transmission shall be effective as delivery of a manually executed counterpart hereof.

The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Exit Commitment Letter, including, without limitation, its validity, interpretation, construction, performance and enforcement.

*Venue and Submission to Jurisdiction.*

The parties hereto consent and agree that either (i) the state or federal courts located in New York County, State of New York, or (ii) the United States Bankruptcy Court for the District of Delaware shall have exclusive jurisdiction to hear and determine any claims or disputes between or among any of the parties hereto pertaining to this Exit Commitment Letter, the Exit Fee Letter, any transaction relating hereto or thereto, any other financing related thereto, and any investigation, litigation, or proceeding in connection with, related to or arising out of any such matters, provided, that the parties hereto acknowledge that any appeals from those courts may have to be heard by a court located outside of such jurisdiction. The parties hereto expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and hereby waive any objection, which either of them may have based upon lack of personal jurisdiction, improper venue or inconvenient forum.

*Waiver of Jury Trial.*

THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS EXIT COMMITMENT LETTER, THE EXIT FEE LETTER, THE EXIT FINANCING AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

*Survival.*

The provisions of this letter set forth under this heading and the headings "Syndication", "Information", "Expenses", "Confidentiality", "Indemnity", "Assignments and Amendments", "Counterparts and Governing Law", "Venue and Submission to Jurisdiction" and "Waiver of Jury Trial" shall survive the termination or expiration of this Exit Commitment Letter and shall remain in full force and effect regardless of whether the Exit Financing closes or the Exit Financing Documentation shall be executed and delivered; provided that in the event the Exit Financing closes or the Exit Financing Documentation shall be executed and delivered, the provisions under the heading "Syndication" shall survive only until the completion of the Primary Syndication.

*Integration.*

This Exit Commitment Letter and the Exit Fee Letter supersede any and all discussions, negotiations, understandings or agreements, written or oral, express or implied, between or among the parties hereto and any other person as to the subject matter hereof.

*Patriot Act.*

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "PATRIOT Act"), each Lender may be required to obtain, verify and record information that identifies Borrower, which information includes the name, address, tax identification number and other information regarding Borrower that will allow such Lender to identify Borrower in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to each Lender.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Please indicate your acceptance of the terms hereof and of the Exit Fee Letter by signing in the appropriate space below and in the Exit Fee Letter and returning to GE Capital on behalf of the Commitment Parties such signature pages by 5:00 p.m., New York time on July 8, 2008. Unless extended in writing by the Commitment Parties, the commitments contained herein shall automatically expire on the first to occur of (a) the date and time referred to in the previous sentence unless you shall have executed and delivered a copy of this Exit Commitment Letter and the Exit Fee Letter as provided above, or (b) 5:00 p.m. New York time on the 90th day following the closing of the DIP Credit Facility. Notwithstanding the foregoing, all commitments and agreements of the Commitment Parties under this Exit Commitment Letter shall terminate in the event that Borrower and Guarantors shall not have obtained, by no later than August 19, 2008, the Exit Facility Order (as defined in the Exit Term Sheet), in form and substance reasonably acceptable to Agent, (i) authorizing Borrower's and Guarantors' performance of their pre-closing obligations and undertakings under this Exit Commitment Letter and the Exit Fee Letter, and (ii) providing that the rights of the Commitment Parties to payment of all costs, fees and expenses and to indemnification under the Exit Financing Documentation shall be entitled to priority as administrative expense claims under section 503(b)(1) of the Bankruptcy Code whether or not the Exit Financing closes.

Sincerely,

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: _____

Name: _____

Title: _____


AGREED AND ACCEPTED
THIS 8TH DAY OF JULY, 2008:


**VERTIS, INC.**

By: _____

Name: _____

Title: _____

**Exhibit A**
**to**
**Exit Commitment Letter**

Vertis, Inc.
$250 Million Senior Secured Revolving Credit Facility

**Summary of Terms**
**July 8, 2008**

**This is the Exit Term Sheet described as Exhibit A in that certain commitment letter dated July 8, 2008, of which this Exhibit A is a part. Each capitalized term used herein without definition shall have the meaning assigned to such term in the commitment letter referenced above.**

| | |
|---|---|
| ***Borrower:*** | Vertis, Inc. ("Borrower"), all of the outstanding stock of which is owned by Vertis Holdings, Inc. ("Holdings" and, together with its subsidiaries, the "Group Members"). |
| ***Guarantors:*** | Holdings and each of Borrower's existing and subsequently acquired or formed direct and indirect subsidiaries (each, a "Subsidiary Guarantor" and collectively, the "Subsidiary Guarantors"; and together with Holdings, the "Guarantors"), other than any Excluded Foreign Subsidiaries (as defined below) and certain non-operative and non-material subsidiaries of ACG. |
| ***Administrative Agent and Collateral Agent:*** | General Electric Capital Corporation ("GE Capital" and, in such capacities, collectively, "Agent"). |
| ***Sole Lead Arranger and Book-Running Manager:*** | GE Capital Markets, Inc. ("GECM"). |
| ***Lenders:*** | GE Capital, Bank of America, N.A. and such other banks, financial institutions or other institutional investors, if any, as may be arranged by GECM in consultation with Borrower. |
| ***Exit Financing:*** | $250 million in senior secured credit facilities comprised of a revolving credit facility of $250 million (the "Revolving Credit Facility" or the "Exit Financing"), consisting of (i) a senior secured last-in first-out revolving credit tranche (the "LIFO Tranche") of $225 million (the "LIFO Tranche Cap") and (ii) a senior secured first-in last-out fully funded tranche (the "FILO Tranche") of $25 million (the "FILO Tranche Cap"). |

Borrowings under the LIFO Tranche may be made from time to time during the period from the Closing Date (as hereinafter defined) until the three year and nine month anniversary of the Closing Date. The FILO Tranche shall be funded in one drawing on the Closing Date (and may not be reborrowed thereafter) and shall be due and payable on the three year and nine month anniversary of the Closing Date. The amount of the Revolving Credit Facility (both the LIFO Tranche and the FILO Tranche) shall be reduced by reserves as Agent may require in its reasonable credit judgment.

    **A. Letters of Credit.** A sub-facility of $60 million of the Revolving Credit Facility will be available for the issuance of letters of credit ("<u>Letters of Credit</u>") for the account of Borrower and Guarantors. No Letter of Credit will have a termination date that is later than (a) 10 days prior to the termination date of the Exit Financing, or (b) 1 year after the date of issuance. Any such Letters of Credit shall reduce availability under the Revolving Credit Facility on a dollar-for-dollar basis.

    **B. Swing Line Loans.** A sub-facility of $35 million will be available to Borrower for swing line loans from GE Capital. Except for purposes of calculating the Commitment Fee (as defined below), any such swing line loans shall reduce availability under the Revolving Credit Facility on a dollar-for-dollar basis.

***Revolving Credit Availability:*** Subject to the "Use of Proceeds" section set forth below: (x) availability under the LIFO Tranche of the Revolving Credit Facility would be limited to the lesser of (a) the LIFO Tranche Cap and (b) the LIFO Tranche Borrowing Base; and (y) availability under the FILO Tranche of the Revolving Credit Facility would be limited to the lesser of (a) the FILO Tranche Cap and (b) the FILO Borrowing Base. Based upon Agent's due diligence to date: (x) the LIFO Borrowing Base is anticipated to be the sum of (i) up to 85% of the net amount of Borrower's and its Subsidiary Guarantors' eligible accounts receivable reflected on the then accounts receivable aging, <u>plus</u> (ii) up to 60% of Borrower's and its Subsidiary Guarantors' eligible raw materials inventory; and (y) the FILO Borrowing Base shall be accretive to the LIFO Borrowing Base and is anticipated to be the sum of (i) up to 9% of the net amount of Borrower's and its Subsidiary Guarantors' eligible accounts receivable reflected on the then accounts receivable aging, plus (ii) up to 60% of Borrower's and its Subsidiary Guarantors' eligible unbilled accounts receivable, plus (iii) up to 60% of Borrower's and its Subsidiary Guarantors' eligible accounts receivable then reflected on the balance sheet and not then reflected on the accounts receivable aging, plus (iv) up to 40% of eligible work-in-progress and finished goods inventory.

- 2 -

Agent will retain the right in its reasonable credit judgment from time to time to establish or modify reserves against availability for both the LIFO Tranche and the FILO Tranche.

If and to the extent that the FILO Borrowing Base is at any time less than $32,500,000, the Agent shall establish a reserve against the LIFO Tranche of the Revolving Credit Facility in the full amount of any shortfall of the FILO Borrowing Base below $32,500,000.

***Use of Proceeds:***
The proceeds of the loans and advances under the Exit Financing (collectively, the "Loans") will be used solely (a) to repay in full in cash all amounts owing under the DIP Credit Facility, (b) to pay fees and expenses incurred in connection with the foregoing and the Exit Financing and allowed administrative expenses in connection with the emergence of the Borrower and the other Group Members from bankruptcy (collectively, the "Transaction Costs"), and (c) for working capital and general corporate and similar purposes.

***Interest[1]:***
Interest will be payable on the unpaid principal amount of all Loans at a rate per annum equal to, at the option of Borrower, (a) the Base Rate (as defined below) plus the Applicable Margin (as defined below), payable monthly in arrears, or (b) so long as no event of default then exists, a per annum rate equal to the Eurodollar Rate (as defined below) plus the Applicable Margin, payable at the end of the relevant interest period, but in any event, at least quarterly.

"Base Rate" means a floating rate of interest per annum equal to the higher of the rate publicly quoted from time to time by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks" or the federal funds rate plus ███████████. "Eurodollar Rate" means, for each interest period, the offered rate for deposits in U.S. dollars in the London interbank market for the relevant interest period which is published by the British Bankers' Association, and currently appears on Reuters Screen LIBOR01 Page, as of 11:00 a.m. (London time) on the day which is 2 business days prior to the first day of such interest period adjusted for reserve requirements. When selecting the Eurodollar Rate option, Borrower will be entitled to choose 1, 2 or 3 month interest periods.

All interest will be calculated based on a 360-day year (or, in the case of Base Rate Loans calculated by reference to the prime rate, a 365/366-day year) and actual days elapsed; provided, that at no time shall the Base Rate be deemed to be below ████ as it relates to the LIFO Tranche of the Revolving Credit Facility and ████ as it relates to the FILO Tranche of the Revolving Credit Facility.

---

[1] Interest rates have been redacted as syndication process is on-going.

NY:1184238.13

The Exit Financing Documentation will set forth appropriate detail describing the exact method of calculation and relevant reserve requirements for the interest rates referred to above as well as Eurodollar Rate breakage provisions, Eurodollar Rate borrowing mechanics and other Eurodollar Rate definitions; provided, that, at no time shall the Eurodollar Rate be deemed to be below ▮▮ as it relates to the LIFO Tranche of the Revolving Credit Facility and ▮▮ as it relates to the FILO Tranche of the Revolving Credit Facility.

The "Applicable Margin" (on a per annum basis) means:

with respect to Loans under the LIFO Tranche of the Revolving Credit Facility, ▮▮ per annum, in the case of Base Rate Loans, and ▮▮ per annum, in the case of Eurodollar Rate Loans; and with respect to Loans under the FILO Tranche of the Revolving Credit Facility, ▮▮ per annum, in the case of Base Rate Loans, and ▮▮ per annum, in the case of Eurodollar Rate Loans.

*Default Rate:*    From and after the occurrence of a payment event of default, or at the election of Agent or the Required Lenders, any other event of default, all amounts under the Exit Financing Documentation shall bear interest at the applicable interest rate (including those obligations which are determined by reference to the rate applicable to any other obligation) plus 2% per annum and the Letter of Credit Fee (as defined below) shall be increased by 2% per annum.

*Fees:*    In addition to the fees payable to GE Capital as specified in the Exit Fee Letter, Borrower shall pay the following fees:

The FILO Tranche of the Revolving Credit Facility will be issued with original issue discount at a price equal to ▮▮ of the maximum amount of the FILO Tranche.

In the event of any prepayment or reduction of the FILO Tranche of the Revolving Credit Facility, a prepayment fee in an amount equal to, in year one, ▮▮, in year two, ▮▮, and in year three, ▮▮, of the amount prepaid or reduced. No prepayment fee would be required in the event of a prepayment or reduction of the FILO Tranche of the Revolving Credit Facility after the third anniversary of the Closing Date, other than in connection with a change in control in which event a prepayment fee of ▮▮ shall apply.

A fee of ▮▮ per annum of the average daily balance of the unused portion of the LIFO Tranche of the Revolving Credit Facility will be payable monthly in arrears (the "Commitment Fee").

- 4 -

A Letter of Credit fee (the "Letter of Credit Fee") will be payable on the average daily undrawn face amount of all outstanding Letters of Credit at a rate per annum equal to the Applicable Margin for Loans under the Exit Financing bearing interest based on the Eurodollar Rate. Such fee will be due and payable monthly in arrears. Borrower shall also pay certain fees, documentary and processing charges to each issuer of Letters of Credit as separately agreed with such issuer or in accordance with such issuer's standard schedule at the time of determination thereof.

All fees will be calculated based on a 360-day year and actual days elapsed.

**Prepayments and Commitment Reductions:**

Borrower shall make the following mandatory prepayments (subject to certain basket amounts and exceptions to be negotiated in the Exit Financing Documentation):

(a) Debt Issuances. Subject to the terms of the Revolver-Term Intercreditor Agreement (as hereinafter defined), prepayments in an amount equal to 100% of the net cash proceeds of issuances or incurrences of any debt obligations of Holdings, Borrower and its subsidiaries.

(b) Asset Sales. Prepayments in an amount equal to 100% of the net cash proceeds of the sale or other disposition of: (i) any Revolving Priority Collateral (including insurance and condemnation proceeds) outside of sales of inventory in the ordinary course of business; and (ii) following the repayment in full of the obligations under the New Term Loan Facilities (as hereinafter defined), any Term Loan Priority Collateral (including insurance and condemnation proceeds) outside of the ordinary course of business with reinvestment rights to be agreed.

In addition, (x) at any time that the aggregate principal amount of the outstanding loans and letters of credit under the LIFO Tranche exceeds the LIFO Tranche Borrowing Base then in effect, then the loans thereunder shall be immediately repaid or, if no such loans are outstanding, letters of credit shall be cash collateralized at 105% of the face amount thereof, in each case in the full amount of such excess, and (y) at any time that the aggregate principal amount of the outstanding loans under the FILO Tranche exceeds the FILO Tranche Borrowing Base then in effect, then a reserve shall immediately be established against the LIFO Tranche of the Revolving Credit Facility in the full amount of such excess.

The documentation for the New Term Loan Facilities (as hereinafter defined) may require prepayments from excess cash

- 5 -

flow (to be defined in a mutually acceptable manner) of up to 75%; provided, that at the time of any such excess cash flow prepayment and pro forma for the making of any such excess cash flow prepayment, (i) there shall exist borrowing availability under the LIFO Tranche of the Revolving Credit Facility of not less than $25 million, (ii) there shall be average daily borrowing availability under the LIFO Tranche of the Revolving Credit Facility for each day in the 90 day period immediately preceding any such excess cash flow prepayment of not less than $25 million, and (iii) there shall be projected average daily borrowing availability under the LIFO Tranche of the Revolving Credit Facility for each day in the 90 day period immediately following any such excess cash flow prepayment of not less than $25 million.

Mandatory prepayments will be applied <u>first</u>, to the outstanding principal balance of the swing line loans, <u>second</u>, to the outstanding principal balance of the LIFO Tranche of the Revolving Credit Facility, which shall not effect any permanent reduction to the LIFO Tranche of the Revolving Credit Facility, <u>third</u>, to cash collateralize Letters of Credit issued under the LIFO Tranche of the Revolving Credit Facility at 105%, and <u>fourth</u>, to the outstanding principal balance of the FILO Tranche of the Revolving Credit Facility, which shall effect a permanent reduction of the FILO Tranche of the Revolving Credit Facility.

Mandatory prepayments shall be accompanied by (A) accrued interest on the amount prepaid to the date of prepayment, (B) any breakage costs in connection with any prepayments of Eurodollar Rate Loans, and (C) any prepayment fees in connection with any prepayment of the FILO Tranche of the Revolving Credit Facility.

Voluntary prepayments and voluntary reductions of the unutilized portion of the commitments under the LIFO Tranche of the Revolving Credit Facility will be permitted at any time provided that such voluntary prepayments are accompanied by (A) accrued interest on the amount prepaid to the date of prepayment, and (B) any breakage costs in connection with any voluntary prepayments of Eurodollar Rate Loans.

Following the first anniversary of the Closing Date, voluntary prepayments and corresponding reductions of the FILO Tranche of the Revolving Credit Facility will be permitted if, and only if: (x) (i) pro forma for the making of any such prepayment borrowing availability under the LIFO Tranche of the Revolving Credit Facility is at least $50,000,000 on the date of making such prepayment and for each of the preceding ninety (90) days and (ii) pro forma for the making of any such prepayment borrowing availability under the LIFO Tranche of

- 6 -

the Revolving Credit Facility is projected to be at least $50,000,000 for each of the succeeding ninety (90) days; and (y) the fixed charge coverage ratio, including pro forma for the making of any such prepayment, is at least an amount to be mutually agreed by the Borrower and the Agent.

*Collateral:*

All obligations of Borrower under the Exit Financing and under any interest rate protection or other hedging arrangements entered into with or supported by a Lender (or any affiliate of a Lender) and of the Guarantors under the guarantees will be secured by perfected liens and security interests in all existing and after acquired tangible and intangible personal and real property and assets (including, without limitation, accounts receivable, inventory, general intangibles (including intellectual property), equipment, intercompany notes, cash, deposit accounts, rights, claims and causes of action and all proceeds of the foregoing) of Borrower and each Guarantor, including, without limitation, 100% (or, in the case of first tier Excluded Foreign Subsidiaries, 66%) of the outstanding equity interests (the "Pledged Stock") in their subsidiaries that are not Excluded Foreign Subsidiaries (the "Collateral"). All intercompany notes will be subordinated to the payment of the obligations under the Exit Financing and the New Term Loan Facilities (as hereinafter defined).

The Exit Financing shall be secured by perfected first-priority security interests in the Revolving Priority Collateral (as hereinafter defined), such first-priority interests being prior to the security interests securing the New Term Loan Facilities.

The Exit Financing will also be secured by perfected second-priority security interests in, and mortgages on, the Term Loan Priority Collateral (as hereinafter defined), such interests and mortgages being second only to the security interests securing the New Term Loan Facilities.

The Revolving Priority Collateral will be free and clear of other liens, claims, and encumbrances, except second-priority liens securing the New Term Loan Facilities, and third-priority liens securing the New Second Lien Notes (as hereinafter defined).

The Term Loan Priority Collateral will be free and clear of other liens, claims and encumbrances, except liens securing the New Term Loan Facilities, second-priority liens securing the Exit Financing, and third-priority liens securing the New Second Lien Notes.

As used herein, the following terms shall have the following meanings: (i) "Revolving Priority Collateral" shall mean all accounts receivable, inventory, maintenance parts, cash,

- 7 -

deposit accounts, chattel paper relating to the foregoing, instruments relating to the foregoing, documents relating to the foregoing, supporting obligations relating to the foregoing, books and records relating to the foregoing, letters of credit and letter of credit rights relating to the foregoing, rights, claims and causes of action relating to the foregoing, insurance relating to the foregoing and all proceeds of the foregoing; (ii) "Term Loan Priority Collateral" shall mean the Collateral other than the Revolving Priority Collateral; (iii) "New Term Loan Facilities" shall have the meaning given to such term in the Restructuring Agreement; and (iv) "New Second Lien Notes" shall have the meaning given to such term in the Restructuring Agreement.

"Excluded Foreign Subsidiary" means any non-U.S. subsidiary of Borrower (a) for which the failure to include such subsidiary as "Excluded Foreign Subsidiary" hereunder would result in materially adverse tax consequences to Borrower, the Guarantors and their subsidiaries (including such subsidiary), taken as a whole, and (b) that has not guarantied or pledged any of its assets or suffered a pledge of more than 66% of its stock, with substantially similar tax consequences, to secure, directly or indirectly, any indebtedness (other than under the Exit Financing) of Borrower or any Guarantor (excluding such subsidiary).

Proceeds of any and all Collateral shall be applied: (i) first, to fees, costs and expenses of the Agent, (ii) second, to the swing line loans, (iii) third, to the LIFO Tranche of the Revolving Credit Facility, (iv) fourth, to all other obligations under the Exit Financing other than the FILO Tranche, and (v) fifth, to the FILO Tranche of the Revolving Credit Facility. In addition, except as expressly permitted in the last paragraph set forth under the heading "Prepayments and Commitment Reductions" above, in no event shall the FILO Tranche be repaid prior to the repayment in full in cash of the LIFO Tranche and all other non-FILO Tranche obligations under the Exit Financing.

| | |
|---|---|
| ***Conditions Precedent to Closing:*** | As set forth in this Exit Term Sheet or in the Exit Commitment Letter under the heading "Conditions to Closing" and in Schedule I hereto and such other conditions precedent as may be usual and customary for transactions of this kind or required by the Agent (the date upon which all such conditions precedent shall be satisfied and the initial funding under the Exit Financing shall take place, the "Closing Date"). |
| ***Conditions Precedent to each Extension of Credit under the Exit Financing:*** | All of the representations and warranties in the Exit Financing Documentation shall be true and correct in all respects on the |

Closing Date, and thereafter, in all material respects; no default or event of default shall be continuing; and delivery of any relevant borrowing notices or letter of credit requests and any other documents or information reasonably requested by Agent.

**Representations and Warranties:** The Exit Financing Documentation will contain such representations and warranties applicable to the Group Members as are usual and customary for facilities of this kind (with customary exceptions and qualifications to be agreed upon), or as may be required by the Agent, including the following:

Valid existence; compliance with law; power to execute; authorization; execution and enforceability of the Exit Financing Documentation and certain related documents (and accuracy of representations and warranties thereunder, status of obligations under the Exit Financing as "senior debt" and no conflict thereof with material agreements or applicable law); ownership of the Group Members; accuracy of financial statements; absence of material adverse effect; solvency; absence of material litigation; taxes; compliance with margin regulations; absence of burdensome restrictions and defaults; inapplicability of Investment Company Act; insurance; labor matters; ERISA; environmental matters; necessary rights to intellectual property; title to and ownership of Collateral; and accuracy of all information provided.

**Affirmative Covenants:** The Exit Financing Documentation shall contain such affirmative covenants applicable to the Group Members as are usual and customary for facilities of this kind (with customary qualifications to be agreed upon) or as may be required by the Agent, including the following:

Preservation of corporate existence; compliance with laws (including environmental laws); payment of taxes and other claims resulting in liens; maintenance of properties, permits, insurance and books and records; access to books and records and visitation rights; use of proceeds; establishment of cash management procedures and entry into cash management agreements providing for springing cash dominion which shall be triggered by (i) a default or event of default or (ii) borrowing availability under the LIFO Tranche of the Revolving Credit Facility being less than $22.5 million at any time, in each case acceptable to Agent; further assurances (including provision of additional collateral and guaranties consistent with the paragraph above entitled "Collateral" and use of commercially reasonable efforts to deliver landlord, mortgagee and bailee waivers).

- 9 -

**Financial Performance Covenant:**    Immediately upon borrowing availability under the LIFO Tranche of the Revolving Credit Facility being less than $22.5 million at any time, the following financial performance covenant (the "Financial Performance Covenant") shall be applicable, being tested based as of the most recent quarter end and quarterly thereafter:

     minimum fixed charge coverage ratio.

Covenant levels to be established as mutually agreed between Borrower and Agent.

Provided, however, that the Financial Performance Covenant shall cease to be applicable (i) after it shall have been in effect at least six (6) months and (ii) if, and only if, borrowing availability under the LIFO Tranche of the Revolving Credit Facility shall be equal to or more than $30 million on each day for a period of at least three (3) consecutive months; provided, further, that should the Financial Performance Covenant cease to be applicable pursuant to the immediately preceding proviso, immediately thereafter upon borrowing availability under the LIFO Tranche of the Revolving Credit Facility being less than $22.5 million at any time the Financial Performance Covenant shall be applicable, being tested as of the most recent quarter end and quarterly thereafter.

**Reporting Requirements:**    The Exit Financing Documentation shall contain such financial and other reporting requirements applicable to the Group Members as are usual and customary for financings of this kind, and such other financial and reporting requirements deemed by Agent to be appropriate for the Emergence Transactions, including, without limitation, the following:

Delivery of monthly and quarterly financial statements and of annual audited financial statements; delivery of management letters; delivery of projections and annual business plan; delivery of borrowing base certificates for both the LIFO Tranche and the FILO Tranche at least weekly; annual insurance reports; quarterly schedules of intercompany loan balances; copies of certain reports send to other parties and with respect to defaults, mandatory prepayment events, litigation, taxes, labor matters, ERISA and environmental events and other information.

**Negative Covenants:**    The Exit Financing Documentation shall contain such negative covenants applicable to the Group Members as are usual and customary for facilities of this kind (with exceptions and baskets to be mutually agreed upon) or as may be required by the Agent, including the following:

- 10 -

Limitations on indebtedness (including guaranties and speculative hedging transactions), liens, investments (including loans), asset dispositions (including sale and leaseback transactions), restricted payments (including dividends, redemptions and repurchases with respect to capital stock, cancellation of debt) and prepayments of indebtedness (including redemptions and repurchases); fundamental corporate changes (including mergers, consolidations, acquisitions, joint ventures or creation of subsidiaries); changes in nature of business; transactions with affiliates; third-party restrictions on indebtedness, liens, investments or restricted payments; modification of constituent documents and certain other agreements; changes in accounting treatment, reporting practices or fiscal year; activities of Holdings; compliance with margin regulations and ERISA and environmental laws; and capital expenditures.

*Events of Default:* The Exit Financing Documentation shall contain such events of default (the occurrence of any one or more of which shall allow Agent and Lenders to terminate the Exit Financing) applicable to the Group Members as are usual and customary for facilities of this kind (with certain customary grace periods and thresholds to be agreed upon) or as may be required by the Agent, including the following:

Failure to pay principal, interest or any other amount when due; representations and warranties incorrect in any material respect when made or deemed made; failure to comply with covenants in the Exit Financing Documentation; cross-default to other indebtedness; failure to satisfy or stay execution of judgments; actual or asserted invalidity or impairment of any part of the Exit Financing Documentation; and change of ownership or control (e.g.: the acquisition by a third party (other than permitted holders as mutually agreed in the Exit Financing Documentation), directly or indirectly, of more than 30% of the voting stock of or economic equity interests in Holdings (unless a permitted holder has more than the percentage held by such third party) or the failure of Holdings to own 100% of the Borrower or the failure of Borrower to own 100% of any of its material domestic subsidiaries).

*Voting Provisions:* Lenders holding more than 50% of total commitments and/or Loans under the Revolving Credit Facility (and, in any event, at lease two (2) Lenders) with certain customary amendments and waivers requiring the vote of supermajority Lenders or all affected Lenders. In addition, GECM and Agent shall have the right, in their discretion, to provide such class voting rights to the holders of the FILO Tranche of the Revolving Credit Facility as GECM and Agent shall determine.

- 11 -

**Miscellaneous:** The Exit Financing Documentation will include (a) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs, withholding taxes, illegality and Eurodollar Rate breakage costs), (b) a waiver of consequential and punitive damages and right to a jury trial, (c) customary agency, set-off and sharing language, (d) a provision requiring the classification in any bankruptcy plan of all claims on account of the Exit Financing in a single class, and (e) other provisions as are usual and customary for facilities of this kind (including indemnity and expense reimbursement provisions).

**Assignments and Participations:** Lenders will be permitted to make assignments in a minimum amount of $5 million of the Revolving Credit Facility (unless such assignment is of a Lender's entire interest in the applicable tranche of the Exit Financing) to other financial institutions acceptable to Agent and, so long as no event of default has occurred and is continuing, Borrower, which acceptances shall not be unreasonably withheld or delayed; provided however, that the approval of Borrower shall not be required in connection with assignments to other Lenders (or to affiliates or approved funds of Lenders). All assignments of a Lender's interest in the Exit Financing will be made via an electronic settlement system designated by Agent. An assignment fee of $3,500 shall be payable to Agent upon the effectiveness of any such assignment.

**Governing Law and Submission to Jurisdiction:** New York

NY:1184238.13

## SCHEDULE I
### to
### Summary of Terms

### Conditions to Closing

The availability of the Exit Financing, in addition to the conditions set forth in the Exit Commitment Letter and the body of the Exit Term Sheet, shall be subject to the satisfaction of the following additional conditions:

1. Equity and Debt Structure. The contemplated equity and debt structure of Holdings, the Borrower and its subsidiaries, including, both before and after giving effect to other Emergence Transactions, shall be in form and substance satisfactory to the Agent (it being agreed that the equity and debt structure contemplated in the Plan (as defined in the Prepackaged DIP Commitment Letter) is satisfactory to the Agent in form and substance). The terms and conditions of and documentation for such equity and debt shall be reasonably satisfactory to Agent.

2. Intercreditor Agreements. The following intercreditor agreements, each in form and substance acceptable to Agent, shall have been entered into: (a) an intercreditor agreement, including, without limitation, with respect to usage and access rights, with the agent and lenders party to the New Term Loan Facilities (as defined in the Restructuring Agreement) (the "Revolver-Term Intercreditor Agreement"); and (b) an intercreditor agreement with the holders of the New Second-Lien Notes (as defined in the Restructuring Agreement) which shall in all events be on terms and conditions that do not increase, enhance or otherwise improve the intercreditor rights currently available to the holders of the Vertis Second Lien Notes.

3. Collateral Due Diligence. The Agent shall have received and be satisfied with the results of (i) inventory appraisals, with respect to both Borrower and the Acquired Business, prepared by an appraiser retained by the Agent at Borrower's expense and (ii) a field examination, with respect to both Borrower and the Acquired Business, conducted by the Agent and/or its representatives at Borrower's expense of the Borrower's and its subsidiaries', businesses, financial conditions, operations and assets.

4. Absence of Litigation. There shall not exist any action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that has or could reasonably be expected to have a material adverse effect on Holdings, Borrower, and their respective subsidiaries, taken as a whole, the Emergence Transactions or any of the other transactions contemplated hereby.

5. No Material Adverse Effect. Since December 31, 2007, and except as otherwise disclosed, there have been no events, circumstances, developments or other changes in facts that would, in the aggregate, have a Material Adverse Effect. "Material Adverse Effect" means an effect that results in or causes, or could reasonably be expected to result in or cause, a material adverse change in any of (a) the condition (financial or otherwise), business, performance, operations or property of Holdings, Borrower, and their respective subsidiaries, taken as a whole; (b) the ability of Borrower or any Guarantor to perform their respective obligations under the Exit Financing Documentation; and (c) the validity or enforceability of

- 1 -

any of the Exit Financing Documentation or the rights and remedies of Agent, the Lenders and the other secured parties under the Exit Financing Documentation.

6. <u>Receipt of Historical Financial Statements</u>. Agent shall have received and be satisfied with, to the extent available, interim unaudited monthly financial statements of Holdings and its subsidiaries, including Borrower, for each month ending after April 30, 2008.

7. <u>Receipt of Pro Forma Financial Statements and Business Plan</u>. Agent shall have received and be satisfied with (a) a pro forma estimated balance sheet of Holdings and its subsidiaries, including Borrower, at the Closing Date and after giving effect to the Emergence Transactions; (b) Borrower's business plan which shall include a financial forecast and borrowing base utilization and availability forecast on a monthly basis through December 31, 2009 and on an annual basis thereafter through December 31, 2012 prepared by Borrower's management; and (c) to the extent available, Borrower's post-Effective Date plan for executive and management incentive and bonus compensation.

8. <u>Outstanding Debts and Liens</u>. Agent shall be satisfied that: (a) all outstanding non-contingent obligations under the Borrower's existing Debtor-In-Possession Credit Facility shall have been repaid in full in cash and the Debtor-In-Possession Credit Facility shall have been terminated; (b) Holdings', Borrower's, and their respective subsidiaries' existing debts and liens do not exceed an amount to be mutually agreed; and (c) there shall not occur as a result of, and after giving effect to, the consummation of the Emergence Transactions and the funding of the Exit Financing, a default (or any event which with the giving or notice or the lapse of time or both will be a default) under any of Holdings', Borrower's, and their respective subsidiaries' debt instruments or other material agreements.

9. <u>Other Customary Conditions</u>. Other customary closing conditions, including, without limitation, relating to delivery of satisfactory legal opinions of counsel to the Group Members, no conflict with applicable law or other material agreements, evidence of corporate authority, copy of organizational documents, satisfactory corporate structure, insurance reasonably satisfactory to Agent (and receipt of additional insured and loss payee insurance certificates) and payment of all fees and expenses then due and owing.

10. <u>Evidence of Solvency</u>. Agent shall be satisfied, based on financial statements (actual and pro forma), projections and other evidence provided by Borrower, or requested by Agent including, without limitation, a certificate of the Chief Financial Officer of Borrower, that Borrower and Borrower and each of the Guarantors, taken as a whole, after incurring the indebtedness contemplated by the Exit Financing, will be solvent, able to will satisfy its obligations as they mature and adequately capitalized.

11. <u>Cash Management</u>. Borrower and each Guarantor shall maintain a cash management system acceptable to Agent.

12. <u>Revolving Credit Facility</u>. On the Closing Date, no more than $175 million (including issued Letters of Credit and including the borrowing of the full amount of the $25 million FILO Tranche) will be drawn under the Revolving Credit Facility and Borrower shall have at least $45 million of unused availability under the LIFO Tranche of the Revolving Credit Facility.

13. <u>Additional Bankruptcy Conditions</u>. The Borrower shall have (a) no later than July 11, 2008, obtained the Noteholder Acceptances (as hereinafter defined), and (b) no later than July 16, 2008, commenced the Prepackaged Chapter 11 Cases in a Bankruptcy Court (as defined in the Prepackaged DIP Commitment Letter) jurisdiction acceptable to Agent (it being understood that the District of Delaware is acceptable to Agent) as "prepackaged" chapter 11 cases. In addition, Borrower and Guarantors shall have on the petition date of the Prepackaged Chapter 11 Cases (or thereafter to the extent that the Agent so consents

- 2 -

in writing) filed (X) their Joint Prepackaged Plans of Reorganization (the "Plan") in substantially the form solicited pursuant to the Disclosure Statement relating to the Joint Prepackaged Plan of Reorganization of Vertis Holdings, Inc. et al. under Chapter 11 of the Bankruptcy Code and the Joint Prepackaged Plan of Reorganization of ACG Holdings, Inc. (the "Disclosure Statement"); (Y) the Disclosure Statement; and (Z) a certification, in form and substance reasonably acceptable to Agent, to the Bankruptcy Court that Borrower and Guarantors conducted a solicitation (the "Noteholder Solicitation") from the holders of the Vertis Second Lien Notes, the Vertis Senior Notes, the Vertis Senior Subordinated Notes and the Vertis Holdings Mezzanine Notes of such holders' acceptance of the Plan in accordance with applicable law and applicable rules and that the Borrower and the Guarantors received the acceptances (the "Noteholder Acceptances") by the holders of the Vertis Second Lien Notes, the Vertis Senior Notes, the Vertis Senior Subordinated Notes and the Vertis Holdings Mezzanine Notes, on or before July 11, 2008, of the Plan by sufficient numbers and amount to constitute the acceptance of the Plan by each class of creditors composed, whether in whole or in part, of any such holders under the Plan, all in accordance with the provisions of section 1126(c) of the Bankruptcy Code. No later than July 18, 2008, the Borrower shall have obtained from the Bankruptcy Court an order, in form and substance acceptable to Agent, scheduling the hearing to consider confirmation of the Plan to take place no later than the deadline for the confirmation of the Plan set forth in Section 8.04(d) of the Restructuring Agreement (as such deadline may be and actually is extended pursuant to the terms and conditions thereof) (the "Confirmation Deadline").

14. <u>Exit Financing</u>. No later than August 19, 2008, Borrower and Guarantors shall have obtained an order (the "Exit Facility Order"), in form and substance reasonably acceptable to Agent, (I) authorizing Borrower's and Guarantors' performance of their pre-closing obligations and undertakings under this Exit Commitment Letter and the Exit Fee Letter, and (II) providing that the rights of the Commitment Parties to payment of all costs, fees and expenses and to indemnification (including indemnification rights of Lenders) under the Exit Financing Documentation shall be entitled to priority as administrative expense claims under section 503(b)(1) of the Bankruptcy Code whether or not the Exit Financing closes.

15. <u>Effective Date of Plan</u>. No later than the Confirmation Deadline, Borrower and Guarantors shall have obtained from the Bankruptcy Court an order (the "Confirmation Order"), in form and substance acceptable to Agent, confirming the Plan (as defined in the Prepackaged DIP Commitment Letter) and approving the consummation of the Restructuring Transactions on the effective date of the Plan (the "Effective Date"). As of the Effective Date, the Confirmation Order shall not be subject to a stay or injunction (or similar prohibition) in effect with respect thereto. The Effective Date shall occur no later than the deadline for the effective date of the Plan set forth in Section 8.04(e) of the Restructuring Agreement (as such deadline may be and actually is extended pursuant to the terms and conditions thereof) and shall be conditioned, in any event, upon, <u>inter alia</u>, payment in full in cash of all obligations under the DIP Credit Facility (as defined in the Prepackaged DIP Commitment Letter.

16. <u>Bankruptcy Court Orders</u>. The entry of all orders described or referred to herein or in the body of the Exit Term Sheet or in the Prepackaged DIP Commitment Letter shall have been upon proper notice as may be required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and any applicable bankruptcy rules.

17. <u>Restructuring Term Sheet</u>. Each term and condition set forth in the Vertis Holdings, Inc., et al., ACG Holdings, Inc., et al. Restructuring Term Sheet, dated May 22, 2008 (the "Restructuring Term Sheet"), shall have been complied with and/or satisfied in all material respects in each case to the reasonable satisfaction of Agent and with such exceptions as may be acceptable to Agent.

18. <u>Merger Agreement</u>. The Merger Agreement shall have been consummated on terms and conditions reasonably acceptable to Agent.

- 3 -

- 4 -