# EXHIBIT B

**Exit Financing Commitment Letter - Term Loan**

MORGAN STANLEY SENIOR FUNDING, INC.
1585 Broadway
New York, New York 10036

CONFIDENTIAL

July 8, 2008

Vertis, Inc.
250 West Pratt Street
Baltimore, MD 21201
Attention: Michael DuBose and Barry Kohn

VERTIS, INC. AND AMERICAN COLOR GRAPHICS, INC. MERGER
$400 million Exit Term Facility
Commitment Letter

Ladies and Gentlemen:

You have advised Morgan Stanley Senior Funding, Inc. ("*MSSF*"; and its affiliates, "*we*" or "*us*") that Vertis Holdings, Inc. ("*Vertis Holdings*"), Vertis, Inc. ("*Vertis*", certain subsidiaries of Vertis, and together with Vertis Holdings, the "*Vertis Debtors*") and ACG Holdings, Inc. ("*ACG Holdings*", together with American Color Graphics, Inc., the "*ACG Debtors*") will file cases under Chapter 11 of the United States Bankruptcy Code (the "*Bankruptcy Code*"); respectively in the Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"; the "*Vertis Bankruptcy Cases*" and "*ACG Bankruptcy Cases*" and together, the "*Bankruptcy Cases*") and certain subsidiaries of ACG each as a debtor company under the Companies' Creditors Arrangement Act (Canada) (the "*CCAA*"; such case, the "*CCAA Case*") will file in the Superior Court of Ontario (the "*Canadian Bankruptcy Court*") and the Vertis Plan (as defined in the Term Sheet) and the ACG Plan (as defined in the Term Sheet) to effectuate, among other things, a merger of the Vertis Debtors and the ACG Debtors, with Vertis Holdings to emerge as the "*Reorganized Parent*", Vertis to emerge as the "*Reorganized Company*" and such other Vertis Debtors and ACG Debtors to emerge as the "*Reorganized Subsidiaries*", together with the Reorganized Parent and the Reorganized Company, the "*New Business*".

You have further advised us that you desire to establish a $400 million exit term loan facility for the New Business, with the loans under such facility being allocated as follows: (a) a First Out Term Loan B tranche in an aggregate principal amount of $250 million (the "*Term Loan B*"); and (b) a Last Out Term Loan C tranche in an aggregate principal amount of $150 million (the "*Term Loan C*", and together with the Term Loan B, the "*Exit Term Facility*"). The proceeds of the Exit Term Facility will be used (a) to repay a portion of the outstanding first lien credit facility and debtor-in-possession credit facility of the Vertis Debtors, (b) to repay a portion of the outstanding first lien credit facility and debtor-in-possession credit facility of the ACG Debtors, (c) to make such other payments as are required to be paid on the Effective Date of the Vertis Plan and the ACG Plan, (d) for working capital and other general corporate purposes of the Borrowers and, subject to limitations to be agreed, other Loan Parties and

(e) for the payment of fees and expenses incurred in connection with the foregoing Transactions (such term and each other capitalized term used but not defined herein having the meaning assigned to such terms in the Summary of Principal Terms and Conditions attached hereto as Exhibit A (the "*Term Sheet*")).

1. Commitments.

In connection with the foregoing, MSSF is pleased to advise you and the New Business of its commitment to provide 100% of the Term Loan B upon the terms and subject to the conditions set forth or referred to in this commitment letter, including the Term Sheet and other attachments hereto and thereto (collectively, this "*Commitment Letter*").

Avenue Capital Management LP is pleased to advise you and the New Business of its commitment to provide 100% of the Term Loan C upon the terms and subject to the conditions set forth in this Commitment Letter.

2. Agency Roles.

You and the New Business hereby appoint (a) MSSF to act, and MSSF hereby agrees to act, as sole bookrunner and lead arranger for the Exit Term Facility, and (b) MSSF to act, and MSSF hereby agrees to act, as Term Loan B Agent, and if no other entity serves as the administrative agent for the Term Loan C, the Term Loan C Agent, in each case on the terms and subject to the conditions set forth or referred to in this Commitment Letter. MSSF, in such capacities, will perform the duties and exercise the authority customarily performed and exercised by it in such roles. You and the New Business agree that MSSF shall have "left" and "right" placement in any and all marketing materials or other documentation used in connection with the Exit Term Facility. You and the New Business further agree that no other titles will be awarded and no compensation (other than that expressly contemplated by this Commitment Letter, the Fee Letter and any other letter agreements referred to below) will be paid in connection with the Exit Term Facility unless we shall so agree.

3. Syndication.

We reserve the right, prior to and/or after the execution of definitive documentation for the Exit Term Facility, to syndicate all or a portion of our commitment with respect to the Term Loan B to a group of banks, financial institutions and other institutional lenders (together with us, the "*Lenders*") identified by us in consultation with you and the New Business. We intend to commence syndication efforts promptly upon the execution of this Commitment Letter, and you and the New Business agree actively to assist us in completing a satisfactory syndication (it being understood that such assistance shall continue after the execution of definitive documentation for the Exit Term Facility). Such assistance shall include (a) your using commercially reasonable efforts to enable any syndication efforts to benefit materially from the Vertis Debtors' and the ACG Debtors' existing lending and investment banking relationships, (b) direct contact between senior management, representatives and advisors of each of you and the ACG Debtors and the proposed Lenders, (c) assistance by you and the New Business in the preparation of a Confidential Information Memorandum for the Exit Term Facility and other marketing materials to be used in connection with the syndication as requested by us, (d) you and the New Business providing or causing to be provided a business plan or projections of Vertis Holdings and ACG Holdings and their subsidiaries for the second, third and fourth fiscal quarters for 2008 and each fiscal quarter during 2009 in a form substantially similar to the financial forecasts previously provided and for each fiscal year during the years 2008 through 2013, (e) the use of commercially reasonable efforts to obtain ratings for the Exit Term Facility from each of Standard & Poor's Ratings Service and Moody's Investors Service, Inc. within (90) ninety days from execution of this Commitment Letter, and (f) the hosting, with MSSF,

of one or more meetings of prospective Lenders. You and the New Business agree, at the request of MSSF, to assist in the preparation of a version of the Confidential Information Memorandum and other marketing materials and presentations to be used in connection with the syndication of the Exit Term Facility, consisting exclusively of information and documentation that is either (i) publicly available or (ii) not material with respect to Vertis Holdings or ACG Holdings or their respective subsidiaries or any of their respective securities for purposes of foreign, United States Federal and state securities laws (all such information and documentation being "*Public Lender Information*"). Any information and documentation that is not Public Lender Information is referred to herein as "*Private Lender Information*". You and the New Business further agree that each document to be disseminated by MSSF to any Lender in connection with the Exit Term Facility will, at the request of MSSF, be identified by you or the New Business as either (i) containing Private Lender Information or (ii) containing solely Public Lender Information. You and the New Business acknowledge that the following documents will contain solely Public Lender Information (unless you or the New Business notify us that any such document contains Private Lender Information (1) in the case of documents delivered or approved by you, or on your behalf or the New Business, at or prior to the time of such delivery or approval, or (2) in the case of other documents, promptly after you or the New Business have had an opportunity to review the same): (x) drafts and final definitive documentation with respect to the Exit Term Facility; (y) administrative materials prepared by MSSF for prospective Lenders (such as lender meeting invitations, commitment allocations, and funding and closing memoranda); and (z) notifications of changes in the terms of the Exit Term Facility.

MSSF will manage all aspects of any syndication in consultation with you and the New Business, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders, any naming rights and the amount and distribution of fees among the Lenders. To assist MSSF in their syndication efforts, you and the New Business agree promptly to prepare and provide to MSSF all information with respect to the Vertis Debtors and the ACG Debtors and their respective subsidiaries, and the Transactions and the other transactions contemplated hereby, including all financial information and projections (the "*Projections*"), as MSSF may reasonably request.

4.    Information.

You and the New Business hereby represent and covenant (and it shall be a condition to MSSF's commitment hereunder and MSSF's agreements to perform the services described herein) that (a) all information, other than the Projections (the "*Information*"), that has been or will be made available to MSSF by or on behalf of you, the New Business and any of your respective representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (b) the Projections that have been or will be made available to MSSF by or on behalf of you, the New Business or any of your respective representatives have been or will be prepared in good faith based upon accounting principles consistent with the historical audited financial statements of the Vertis Debtors and the ACG Debtors and upon assumptions that are reasonable at the time made and at the time the related Projections are made available to MSSF. You and the New Business agree that if at any time prior to the closing of the Exit Term Facility, any of the representations in the preceding sentence would be incorrect if the Information and Projections were being furnished, and such representations were being made, at such time, then you and the New Business will promptly supplement the Information and the Projections so that such representations will be correct under those circumstances. In arranging and syndicating the Exit Term Facility, we will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

5. Fees and Expenses.

As consideration for MSSF's commitment hereunder and MSSF's agreements to perform the services described herein, you and the New Business agree to pay to MSSF the fees and expenses, and fulfill the obligations, set forth in this Commitment Letter, the fee letter dated the date hereof and delivered herewith with respect to the Exit Term Facility (the "*Fee Letter*") and any other letter agreements dated the date hereof and delivered herewith with respect to the Exit Term Facility.

6. Conditions Precedent.

MSSF's commitment hereunder, and MSSF's agreement to perform the services described herein, are subject to (a) our not having discovered or otherwise become aware of any information not previously disclosed to us that we reasonably believe to be inconsistent in a material and adverse manner with our understanding, based on the information provided to us prior to the date hereof, of (i) the business, assets, liabilities, operations, condition (financial or otherwise), operating results, Projections or prospects of the Vertis Debtors and the ACG Debtors and their respective subsidiaries, taken as a whole, or (ii) the Transactions; (b) there not having occurred any event, change or condition since December 31, 2007 with respect to the Vertis Debtors and since March 31, 2008 with respect to the ACG Debtors (such date being the most recent audited financial statements of the Vertis Debtors and the ACG Debtors delivered to MSSF as of the date hereof; it being understood that the commencement, continuation and prosecution of the Bankruptcy Cases by the Vertis Debtors and the ACG Debtors do not constitute such an event, change or condition) that, individually or in the aggregate, has had, or could reasonably be expected to have, a material adverse effect on the business, assets, liabilities, operations, condition (financial or otherwise), operating results, or Projections of the Vertis Debtors and the ACG Debtors and their respective subsidiaries, taken as a whole; (c) the absence of a material disruption or adverse change after the date of execution of this Commitment Letter in the financial, banking or capital markets generally, or in the market for new issuances of leveraged loans or exit facility loans in particular, in each case that, in MSSF's reasonable judgment, could reasonably be expected to materially and adversely affect the syndication of the Exit Term Facility; (d) our satisfaction that, prior to and during the syndication of the Exit Term Facility, there shall be no other issues of debt securities or commercial bank or other credit facilities of the Vertis Debtors and the ACG Debtors or their respective subsidiaries being announced, offered, placed or arranged other than as disclosed in the Vertis Plan and the ACG Plan, including their debtor-in-possession financings; (e) the negotiation, execution and delivery of definitive documentation with respect to the Exit Term Facility reasonably satisfactory to MSSF and its counsel; (f) your compliance and the New Business' compliance with the terms of this Commitment Letter, the Fee Letter and any other letter agreement; (g) the successful arrangement and commitment of the Term Loan C with investors reasonably acceptable to the Arranger and on terms and conditions no less favorable to the New Business than as set forth in the Term Sheet and reasonably acceptable to the Arranger; and (h) the other conditions set forth or referred to in the Term Sheet.

7. Indemnification; Expenses.

The New Business agrees (a) to indemnify and hold harmless MSSF and its officers, directors, employees, agents, advisors, controlling persons, members and successors and assigns (each, an "*Indemnified Person*") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, any other letter agreement, the Transactions, the Exit Term Facility or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by the Vertis Debtors or the ACG Debtors or any of their respective affiliates), and to reimburse each such Indemnified Person upon demand for any reasonable legal or other

expenses incurred in connection with investigating or defending any of the foregoing; *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Person, and (b) to reimburse MSSF from time to time, upon presentation of a summary statement, whether or not the Exit Term Facility is funded, for all reasonable out-of-pocket expenses (including but not limited to expenses of MSSF's due diligence investigation, consultants' fees, syndication expenses, travel expenses and fees, disbursements and other reasonable charges of counsel, including, without limitation, Paul Hastings Janofsky & Walker, LLP and other counsel), in each case incurred in connection with the Exit Term Facility and the preparation, negotiation and enforcement of this Commitment Letter, the Fee Letter, any other letter agreement, the definitive documentation for the Exit Term Facility and any ancillary documents or security arrangements in connection therewith. Notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall be liable for any indirect, special, punitive or consequential damages in connection with its activities related to the Exit Term Facility.

8.    Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.

You and the New Business acknowledge that MSSF may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you and the New Business may have conflicting interests regarding the transactions described herein or otherwise. We will not furnish confidential information obtained from you and the New Business by virtue of the transactions contemplated by this Commitment Letter or our other relationships with you or the New Business to other companies. You and the New Business also acknowledge that we do not have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you and the New Business, confidential information obtained by us from other companies.

You and the New Business further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between the New Business, the Vertis Debtors or the ACG Debtors and MSSF is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether MSSF has advised or is advising you, the Vertis Debtors, the ACG Debtors or the New Business on other matters, (b) MSSF, on the one hand, and the New Business, the Vertis Debtors and the ACG Debtors, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you or the New Business rely on, any fiduciary duty on the part of MSSF, (c) you and the New Business are capable of evaluating and understanding, and you and the New Business understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you and the New Business have been advised that MSSF is engaged in a broad range of transactions that may involve interests that differ from your interests and the New Business' interests and that MSSF has no obligation to disclose such interests and transactions to you or the New Business by virtue of any fiduciary, advisory or agency relationship, and (e) you and the New Business waive, to the fullest extent permitted by law, any claims you or the New Business may have against MSSF for breach of fiduciary duty or alleged breach of fiduciary duty and agree that MSSF shall have no liability (whether direct or indirect) to you or the New Business in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, or the New Business including your respective stockholders, employees or creditors. Additionally, you and the New Business acknowledge and agree that MSSF is not advising you or the New Business as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You and the New Business shall consult with your own respective advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby, and MSSF shall have no responsibility or liability to you or the New Business with respect thereto. Any review by MSSF of the Vertis Debtors, the ACG Debtors, the Transactions, the other transactions contemplated hereby or other

matters relating to such transactions will be performed solely for the benefit of MSSF and its affiliates and shall not be on behalf of you, the New Business or any of your respective affiliates.

You and the New Business further acknowledge that MSSF is a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, MSSF may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of the Vertis Debtors, the ACG Debtors and other companies with which either the Vertis Debtors or the ACG Debtors may have commercial or other relationships. With respect to any securities and/or financial instruments so held by MSSF or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

9.     Assignments; Amendments; Governing Law; Etc.

This Commitment Letter shall not be assignable by you or the New Business without the prior written consent of MSSF (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto (and Indemnified Persons) and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Indemnified Persons). MSSF may assign its commitment hereunder to one or more prospective Lenders, whereupon MSSF shall be released from the portion of its commitment hereunder so assigned. Any and all obligations of, and services to be provided by, MSSF hereunder (including, without limitation, MSSF's commitment) may be performed and any and all rights of MSSF hereunder may be exercised by or through any of its affiliates or branches. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by MSSF and you and the New Business. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter. You and the New Business acknowledge that information and documents relating to the Exit Term Facility may be transmitted through Syndtrak, Intralinks, the internet, e-mail, or similar electronic transmission systems, and that in the absence of willful misconduct and gross negligence, MSSF shall not be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner. Notwithstanding anything in Section 12 to the contrary, MSSF may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the internet or worldwide web as it may choose, and circulate similar promotional materials, after the closing of the Transactions in the form of a "tombstone" or otherwise describing the names of the Vertis Debtors, the ACG Debtors, the Reorganized Company, the Reorganized Parent and their respective affiliates (or any of them), and the amount, type and closing date of such Transactions, all at MSSF's expense. This Commitment Letter, the Fee Letter and any other letter agreement supersede all prior understandings, whether written or oral, between us with respect to the Exit Term Facility. **THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

10.     Jurisdiction.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States

of America sitting in New York City, the United States Bankruptcy Court for the District of Delaware and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter, and any other letter agreement or the transactions contemplated hereby or thereby, and agrees that all claims in respect of any such action or proceeding may be heard and determined by any such court or, to the extent permitted by law, in such Federal court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letter, and any other letter agreement or the transactions contemplated hereby or thereby in any such court or in any such Federal court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Vertis Debtors hereby irrevocably designate and appoint Vertis (the "*Process Agent*") as the authorized agent upon which process may be served in any action, suit or proceeding arising out of or relating to this Commitment Letter, the Fee Letter or any other letter agreement that may be instituted by MSSF or any other Indemnified Person in any Federal or state court in the State of New York. Each of the Vertis Debtors hereby agrees that service of any process, summons, notice or document by U.S. registered mail addressed to the Process Agent, with written notice of said service to you at the address above, shall be effective service of process for any action, suit or proceeding brought in any such court. Each of you and the New Business further agrees to take any and all action, including execution and filing of any and all such documents and instruments, as may be necessary to continue the designation and appointment of the Process Agent for a period of six years from the date of this Commitment Letter.

11.    Waiver of Jury Trial.

   **EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER, THE FEE LETTER, AND ANY OTHER LETTER AGREEMENT OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.**

12.    Confidentiality.

   This Commitment Letter is delivered to you and the New Business on the understanding that neither this Commitment Letter nor the Fee Letter nor any other letter agreement nor any of their terms or substance, nor the activities of MSSF pursuant hereto, shall be disclosed, directly or indirectly, to any other person except (a) to your respective officers, directors, employees, attorneys, accountants and advisors on a confidential and need-to-know basis, (b) as required by applicable law, including the Bankruptcy Code, the CCAA or compulsory legal process (in which case you and the New Business agree to inform us promptly thereof), (c) on a confidential and redacted basis, to the counsel and advisors to (i) American Color Graphics, Inc., (ii) holders of American Color Graphics, Inc. $280,000,000 10% Senior Secured Notes due 2010, (iii) holders of your 9 3/4% Senior Secured Second Lien Notes due 2009, (iv) holders of your 10 7/8% Senior Notes due 2009, (v) holders of your 13 ½% Senior Subordinated Notes due 2009 and (vi) holders of Vertis Holdings' Mezzanine Notes arising from the Mezzanine Note and Warrant Purchase Agreement, dated as of December 7, 1999, as amended or (d) as otherwise agreed by the parties hereto.

   Subject to the terms herein, the Vertis Debtors and the ACG Debtors may file this Commitment Letter, the Term Sheet (except for provisions therein pertaining to pricing, fees and prepayments, if any, unless redacted in a manner reasonably satisfactory to you, the New Business and us; any such omitted or redacted information (collectively, the "*Excluded Information*")), and, if consented to by MSSF, a

statement summarizing the aggregate amount of fees payable under the Fee Letter with the Bankruptcy Court or the Canadian Bankruptcy Court, as applicable, in connection with the Vertis Plan or the ACG Plan to evidence the commitments under the Exit Term Facility. The Excluded Information and the Fee Letter may only be disclosed, after notice to and consent by MSSF (a) in the Bankruptcy Cases, to the Office of the United States Trustee, any judge presiding over the Bankruptcy Cases, and other third parties as directed by the Bankruptcy Court, and (b) in the CCAA Cases, to the monitor appointed in the CCAA Cases, any judge presiding over the CCAA Cases and other third parties as directed by the Canadian Bankruptcy Court; *provided* that the Vertis Debtors and the ACG Debtors will use commercially reasonable efforts to ensure that the terms and substance of Section 1 of the Fee Letter are disclosed only to any judge presiding over the Bankruptcy Cases and the CCAA Cases, to the Office of the United States Trustee and to the monitor appointed in the CCAA Cases. The terms and substance of any letter agreement may be disclosed only to any judge presiding over the Bankruptcy Cases and the CCAA Cases, to the Office of the United States Trustee and to the monitor appointed in the CCAA Cases. Further and without limiting the operation of the preceding sentence, you agree to use your commercially reasonable efforts to cause the Vertis Debtors and the ACG Debtors to prevent the Excluded Information, the contents of the Fee Letter and the contents of any letter agreement from becoming publicly available by or through their actions, including, without limitation, by the filing of a motion or an *ex parte* request in accordance with the CCAA or pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, as applicable, in each case seeking an order of the US Bankruptcy Court or the Canadian Bankruptcy Court, as applicable, authorizing the Vertis Debtors or the ACG Debtors, as applicable, to file the Excluded Information, the Fee Letter and any letter agreement under seal.

Notwithstanding anything herein to the contrary, any party to this Commitment Letter (and any employee, representative or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Commitment Letter and the Fee Letter and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure, except that (a) tax treatment and tax structure shall not include the identity of any existing or future party (or any affiliate of such party) to this Commitment Letter or the Fee Letter, and (b) no party shall disclose any information relating to such tax treatment and tax structure to the extent nondisclosure is reasonably necessary in order to comply with applicable securities laws. For this purpose, the tax treatment of the transactions contemplated by this Commitment Letter and the Fee Letter is the purported or claimed U.S. Federal income tax treatment of such transactions and the tax structure of such transactions is any fact that may be relevant to understanding the purported or claimed U.S. Federal income tax treatment of such transactions.

13.  Surviving Provisions.

The compensation (including, without limitation, as to Alternate Transaction Financing), expense reimbursement, market flex, indemnification, confidentiality, syndication, jurisdiction, governing law and waiver of jury trial provisions contained herein, in the Fee Letter and in any letter agreement shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or MSSF's commitment hereunder and MSSF's agreement to perform the services described herein.

14.  PATRIOT Act Notification.

MSSF hereby notifies you and the New Business that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "*PATRIOT Act*"), MSSF and each Lender is required to obtain, verify and record information that identifies each borrower under the Exit Term Facility, which information includes the name, address, tax identification number

and other information regarding each borrower that will allow MSSF or such Lender to identify each such borrower in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to MSSF and each Lender.

15. <u>Acceptance and Termination</u>.

MSSF's commitment hereunder and MSSF's agreement shall expire automatically and without further action or notice (a) at 11:59 p.m. New York City time on July 8, 2008 unless prior to such time you and the New Business shall have returned to us executed counterparts of this Commitment Letter, the Fee Letter and any required letter agreements, (b) at 5:00 p.m. New York City time on July 31, 2008, unless prior to such time you shall have delivered evidence to MSSF that the Vertis Debtors and the ACG Debtors have (i) received the required creditor approvals to effectuate the Vertis Plan and ACG Plan and (ii) commenced their respective Bankruptcy Cases, and (c) at 5:00 p.m. New York City time on October 15, 2008, unless prior to such time you and the New Business shall have delivered to MSSF and its counsel a copy of the Confirmation Order entered in the Bankruptcy Cases by the Bankruptcy Court and, to the extent applicable, the Canadian Bankruptcy Court (collectively, the "*Approval Orders*"), in each case in form and substance reasonably satisfactory to MSSF and its counsel, confirming the Vertis Plan and the ACG Plan and all transactions contained therein, including the Transaction and payment to MSSF all remaining fees and expenses set forth in this Commitment Letter, the Fee Letter and any other letter agreements. In the event of any termination pursuant to this paragraph, this Commitment Letter and MSSF's commitment hereunder, and MSSF's agreement to perform the services described here, shall automatically terminate without further action or notice and without further obligation to you and the New Business unless MSSF shall, in its discretion, agree to an extension. If any Approval Order shall at any time cease to be in full force and effect or shall be reversed or stayed, or modified in a manner that is material and adverse to MSSF (in the sole discretion of MSSF), MSSF may, in its sole discretion, terminate its commitment hereunder, and MSSF may, in its sole discretion, terminate its agreement to perform the services described herein without further obligation hereunder.

*[signatures on following page]*

MSSF and Avenue Capital are pleased to have been given the opportunity to assist you and the New Business in connection with the financing.

Very truly yours,

**MORGAN STANLEY SENIOR FUNDING, INC.**

By_____
    Name:
    Title:

AVENUE CAPITAL MANAGEMENT LP


By_____
    Name:
    Title:

Accepted and agreed to as of
the date first above written:


**VERTIS HOLDINGS, INC.**


By_____
     Name:
     Title:


**VERTIS, INC.,** on behalf of itself and its subsidiaries


By_____
     Name:
     Title:

**July 8, 2008**

<u>VERTIS, INC. AND AMERICAN COLOR GRAPHICS, INC. MERGER</u>
<u>$400 million Exit Term Facility</u>
<u>Summary of Principal Terms and Conditions</u>

<u>Borrowers:</u>

The Reorganized Company and its Reorganized Subsidiaries (each as defined below).

<u>Reorganized Companies:</u>

Vertis Holdings, Inc. ("*Vertis Holdings*"), Vertis, Inc. ("*Vertis*", certain subsidiaries of Vertis, and together with Vertis Holdings, the "*Vertis Debtors*") and ACG Holdings, Inc. ("*ACG Holdings*", together with American Color Graphics, Inc., the "*ACG Debtors*") have filed cases under Chapter 11 of the United States Bankruptcy Code (the "*Bankruptcy Code*"); filed respectively in the Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"; the "*Vertis Bankruptcy Cases*" and "*ACG Bankruptcy Cases*" respectively and together, the "*Bankruptcy Cases*") and certain subsidiaries of ACG each as a debtor company under the Companies' Creditors Arrangement Act (Canada) (the "*CCAA*"; such case, the "*CCAA Case*") filed in the Superior Court of Ontario (the "*Canadian Bankruptcy Court*") and filed the Vertis Plan (as defined below) and ACG Plan (as defined below) to effectuate, among other things, a merger of the Vertis Debtors and the ACG Debtors, with Vertis Holdings to emerge as the "*Reorganized Parent*", Vertis to emerge as the "*Reorganized Company*" and such other Vertis Debtors and ACG Debtors to emerge as the "*Reorganized Subsidiaries*".

<u>Reorganized Parent:</u>

Vertis Holdings, Inc., a Delaware corporation, as the Reorganized Parent.

<u>Guarantees:</u>

The Reorganized Parent and all of the Reorganized Parent's direct and indirect

LEGAL_US_E # 79868410.10

subsidiaries (subject to customary exceptions to be agreed, including for foreign and immaterial subsidiaries) the *"Guarantors"*). The Reorganized Parent, the Reorganized Companies and the other Guarantors are referred to herein as *"Loan Parties"* and each, a *"Loan Party"*. All obligations of the Borrowers under the Exit Term Facility and under any interest rate protection or other hedging arrangements entered into with the Administrative Agent, the Arranger, an entity that is a Lender at the time of such transaction, or any affiliate of any of the foregoing (*"Hedging Arrangements"*) will be guaranteed by the Guarantors.

Transactions:

On the Closing Date (as defined below), the Borrowers will obtain the Exit Term Facility described below under the caption "Exit Term Facility" and the Borrowers will use the proceeds (a) to repay a portion of the outstanding first lien credit facility and debtor-in-possession credit facility of the Vertis Debtors, (b) to repay a portion of the outstanding first lien credit facility and debtor-in-possession credit facility of the ACG Debtors, (c) to make such other payments as are required to be paid on the Effective Date (as defined below) of the Vertis Plan and the ACG Plan (each as defined below), (d) for working capital and other general corporate purposes of the Borrowers and, subject to limitations to be agreed, other Loan Parties and (e) for the payment of fees and expenses incurred in connection with the foregoing (the *"Transaction Costs"*). The transactions described in this paragraph are collectively referred to herein as the *"Transactions"*.

Administrative Agent:

Morgan Stanley Senior Funding, Inc., acting through one or more of its branches or affiliates (*"MSSF"*), will act as administrative agent for the Term Loan B (as defined below) (the *"Term Loan B Agent"*), MSSF or such other entity acceptable to Arranger and the Term Loan C Lenders will act as administrative agent for the Term Loan C (as defined below) (the *"Term Loan C Agent"*) and MSSF will act as collateral agent for the Term Loan B Lenders and MSSF

will act as collateral agent for the Term Loan C Lenders or such other entity acceptable to the Arranger and the Term Loan C Lenders (the "*Collateral Agent*", together with the Term Loan B Agent and Term Loan C Agent, the "*Administrative Agent*") for a syndicate of banks, financial institutions and other institutional lenders (together with MSSF, the "*Lenders*"), and will perform the duties customarily associated with such role.

Sole Bookrunner and Lead Arranger:

Morgan Stanley Senior Funding, Inc. will act as sole bookrunner and lead arranger for the Exit Term Facility described below (collectively, in such capacities, the "*Arranger*"), and will perform the duties customarily associated with such roles.

Syndication Agent:

At the option of the Arranger, one or more financial institutions identified by the Arranger and acceptable to the Reorganized Company will act as the syndication agent (in such capacity, the "*Syndication Agent*").

Documentation Agent:

At the option of the Arranger, one or more financial institutions identified by the Arranger and acceptable to the Reorganized Company (in such capacity, the "*Documentation Agent*").

Exit Term Facility:

A senior secured term loan facility in an aggregate principal amount of $400 million (the "*Exit Term Facility*"). The Exit Term Facility shall become due and payable on the Exit Facility Termination Date (as defined below).

Availability:

Availability under the Exit Term Facility will be equal to (i) $250 million under the First Out Term Loan B tranche (the "*Term Loan B*") and (ii) $150 million under the Last Out Term Loan C tranche (the "*Term Loan C*", together with the Term Loan B, the "*Loans*").

Amounts borrowed under the Exit Term Facility that are repaid or prepaid may not be reborrowed.

Exit Revolving Credit Facility

On the Closing Date, the Reorganized Company and Reorganized Parent shall enter into an asset based working capital facility in an amount not to exceed $250 million in form and substance and

on terms reasonably acceptable to the Arranger and substantially on the same terms described in the Plan and Disclosure Statement (as such terms are defined below).

Second Lien Notes

On the Closing Date, the Reorganized Company and Reorganized Parent shall issue new senior secured notes in an aggregate amount at issuance not to exceed $350 million which notes shall have a junior priority in the Collateral (as defined below) to the Exit Term Facility and the Exit Revolving Credit Facility (the "*Second Lien Notes*") in form and substance and on terms reasonably acceptable to the Arranger and substantially on the same terms as described Plan and Disclosure Statement.

Senior PIK Notes

On the Closing Date, the Reorganized Company and Reorganized Parent shall issue new senior payment-in-kind notes in an aggregate amount at issuance not to exceed $200 million which notes shall be unsecured and shall be in form and substance and on terms reasonably acceptable to the Arranger and substantially on the same terms as described in the Plan and Disclosure Statement.

Loan Documents:

The Exit Term Facility will be documented by a Term Loan Agreement (the "*Term Loan Agreement*") and other guarantee, security, intercreditor and other relevant documentation (together with the Term Loan Agreement, collectively, the "*Loan Documents*") reflecting the terms and provisions set forth in this term sheet and otherwise in form and substance reasonably satisfactory to the Arranger.

Closing Date:

The date on which the conditions precedent shall have been satisfied (the "*Closing Date*").

Interest Rates and Fees:

As set forth on Annex I hereto.

Default Rate:

The applicable interest rate plus 2.0% per annum.

Final Maturity:

The Exit Term Facility will mature on the Exit Facility Termination Date.

The "*Exit Facility Termination Date*" shall be

the earliest of: (a) sixty (60) months from the Closing Date, (b) three (3) months prior to the scheduled maturity of other material indebtedness of the Loan Parties (other than the Exit Revolving Credit Facility) and (c) the acceleration of the Loans and the termination of the commitment with respect to the Exit Term Facility in accordance with the Loan Documents.

Security and Priority:

The Exit Term Facility, the Guarantees and any Hedging Arrangements will be secured by fully perfected liens securing substantially all the existing and after acquired tangible and intangible property of the Loan Parties (the "*Collateral*").

The liens securing the Exit Term Facility will be first in priority (as between the Exit Term Facility and the Exit Revolving Credit Facility) with respect to the Term Collateral. The "*Term Collateral*" shall consist of all tangible and intangible assets owned by the Reorganized Parent, the Reorganized Company, and each Guarantor (excluding the Revolver Collateral as defined below), including capital stock and other investment property (including intercompany debt which shall be subordinated), machinery, equipment, material owned and leased real estate, intellectual property, general intangibles (other than general intangibles specifically included in the Revolver Collateral) all other Collateral which is not Revolver Collateral and all proceeds and products of the foregoing, including without limitation accounts relating to equipment, accounts receivable, instruments and other rights to payment to the extent related to the sale or other disposition of the Term Collateral. The liens securing the Exit Revolving Credit Facility with respect to the Term Collateral will be second in priority (as between the Exit Revolving Credit Facility and the Exit Term Facility) only to the liens securing the Exit Term Facility with respect to the Term Collateral.

The Exit Revolving Credit Facility will be first in priority (as between the Exit Revolving Credit

Facility and the Exit Term Facility) with respect to the Revolver Collateral. The *"Revolver Collateral"* shall consist of all existing and after acquired accounts receivable, inventory, maintenance parts, cash, deposit accounts, chattel paper relating to the foregoing, instruments relating to the foregoing, documents relating to the foregoing, supporting obligations relating to the foregoing, books and records relating to the foregoing, letters of credit and letter of credit rights relating to the foregoing, rights, claims and causes of action relating to the foregoing, insurance relating to the foregoing and all proceeds of the foregoing. The liens securing the Exit Term Facility with respect to the Revolver Collateral will be second in priority (as between the Exit Revolving Credit Facility and the Exit Term Facility) only to the liens securing the Exit Revolving Credit Facility with respect to the Revolver Collateral.

All of the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, reasonably satisfactory to the Arranger (including, in the case of real property, customary items such as satisfactory title insurance and surveys), and none of the Collateral shall be subject to any other liens, subject to customary and limited exceptions to be agreed upon.

The priority of the security interests and related creditor rights between the Exit Revolving Credit Facility and the Exit Term Facility shall be set forth in an intercreditor agreement (the *"Intercreditor Agreement"*) on terms reasonably satisfactory to the Arranger.

The Second Lien Notes holding a lien on the Term Loan Collateral shall be subject to intercreditor provisions to be set forth in an intercreditor agreement (the *"Second Lien Intercreditor Agreement"*) on terms reasonably satisfactory to the Arranger.

<u>Mandatory Prepayments:</u>    Subject to customary and other exceptions

(including, but not limited to those as set forth in the Exit Revolver Credit Facility prepayment provisions), the Loans shall be prepaid with (a) 100% of the net cash proceeds of all asset sales or other dispositions of Term Loan Collateral by the Reorganized Parent and its subsidiaries, (b) 100% of the net cash proceeds of issuances, offerings or placements of debt obligations of the Reorganized Parent and its subsidiaries, (c) 50% of net proceeds from the sale of stock of any subsidiary of the Reorganized Company, (d) 100% of Extraordinary Receipts (to be defined) and (e) 75% of excess cash flow (reduced to 50% of excess cash flow if leverage ratio is less than TBD) each fiscal year (commencing in Borrowers' fiscal year 2009) in the first quarter of the succeeding fiscal year, with the first payment being made in 2010, payable on the first date that such payment would not result in a breach of the minimum liquidity test under the Exit Revolving Credit Facility.

No premium or penalty shall be due or payable in connection with any mandatory prepayment, other than customary breakage costs in the case of a prepayment of a LIBOR borrowing other than on the last day of the relevant interest period.

**Voluntary Prepayments; Call Premium:**

Voluntary prepayments of the borrowings under the Exit Term Facility (both partial prepayments and payments in full) will be permitted at any time in the case of Term Loan C and after the one year anniversary of the Closing Date in the case of Term Loan B, together with the applicable call premium, subject to the payment of customary breakage costs in the case of a prepayment of an adjusted LIBOR borrowing other than on the last day of the relevant interest period.

With respect to the Term Loan B, the Borrowers shall pay a call premium in an amount equal to the amount of the Term Loan B being prepaid multiplied by (a) ▇▇▇ if the prepayment or termination is after the first anniversary of the Closing Date, but on or before the second anniversary of the Closing Date, (b) ▇▇▇ if the prepayment or termination is after the second anniversary of the Closing Date, but on or before the third anniversary of the Closing Date, (c) ▇▇▇ if the prepayment or termination is after the third anniversary but before the fourth anniversary of the Closing Date and (d) no additional fee if prepayment or termination is after the fourth anniversary.

With respect to the Term Loan C, the Borrowers shall pay a call premium in an amount equal to (a) a make-whole premium computed using a discount rate of ▇▇▇▇ if the prepayment or termination is before or on the first anniversary of the Closing Date, (b) ▇▇▇ of the amount of the Term Loan C being prepaid if the prepayment or termination is after the first anniversary of the Closing Date, but on or before the second anniversary of the Closing Date, (c) ▇▇▇ of the amount of the Term Loan C being prepaid if the prepayment or termination is after the second anniversary of the Closing Date, but on or before the third anniversary of the Closing Date, (d) ▇▇▇ of the amount of the Term Loan C being prepaid if the prepayment or termination is after the third anniversary but before the fourth anniversary of the Closing Date and (e) no additional fee if prepayment or termination is after the fourth anniversary.

| | |
|---|---|
| <u>Application of Payments and Proceeds:</u> | Payments and proceeds will be applied in the following order: (a) first, to fees and expenses of the Administrative Agent under the Term Loan Agreement, (b) second, to Term Loan B in an order to be determined and (c) third, to Term Loan C in an order to be determined. |
| <u>Representations and Warranties:</u> | Usual for exit facilities of this type and including, without limitation, the following to be applicable to the Reorganized Parent, the Reorganized Company and their respective subsidiaries: corporate status; legal, valid and binding documentation; no consents; accuracy of financial statements, confidential information memorandum and other information; other than the filing of the Bankruptcy Cases, no material adverse changes; absence of undisclosed liabilities, litigation and investigations; no violation of material contracts or agreements other than those caused by the commencement of the Bankruptcy Cases; compliance with laws (including PATRIOT Act, ERISA, margin regulations, environmental laws and laws applicable to sanctioned persons); payment of taxes; ownership of properties; inapplicability of the Investment Company Act; effectiveness of governmental approvals; labor matters; environmental and other regulatory matters; validity, priority and perfection of security interests in the Collateral; and delivery of complete schedules of existing indebtedness of the Reorganized Parent, the Reorganized Company and their respective subsidiaries. |
| <u>Closing Conditions Precedent:</u> | Usual for exit facilities of this type and including, without limitation, the following: the terms and conditions of the Term Loan C shall be in form and substance reasonably acceptable to the Arranger; loan, security, intercreditor and guarantee documentation to be prepared by counsel to the Administrative Agent and to be reasonably satisfactory to the Arranger; delivery of satisfactory legal opinions (as to Delaware, New York and Canadian law, and as to such other jurisdictions as may be reasonably practicable by the Closing Date), corporate documents and officers' and public officials' |

certifications; execution of the Guarantees, which shall be in full force and effect; evidence of authority; payment of fees and expenses; obtaining of satisfactory insurance (together with a customary insurance broker's letter); accuracy of representations and warranties; absence of defaults under the debtor-in-possession credit facilities of Vertis Debtors and ACG Debtors; absence of defaults under any material contracts (other than as a result of the Bankruptcy Cases); capital structure amounts and terms reasonably satisfactory to Arranger and substantially consistent with the merger documents filed with the U.S. Securities and Exchange Commission in May 2008 (the *"Merger Documents"*); absence of business and market material adverse change in the reasonable judgment of the Arranger; minimum LTM EBITDA of the Reorganized Company of $143 million, calculated in accordance with <u>Annex II</u> hereto; minimum liquidity of $50 million; completion of legal and compliance due diligence by the Arranger and Administrative Agent; receipt at least five (5) business days prior to Closing Date of "know your customer" and similar information; first priority perfected security interests in the Term Loan Collateral and second priority interests in the Revolver Collateral (free and clear of all liens, subject to customary and limited exceptions to be agreed upon) execution and delivery of security documentation and perfection filings from the Loan Parties by the Closing Date (with other security documentation and filings, as agreed by the Arranger promptly thereafter); receipt of satisfactory lien and judgment searches; receipt of any required third party and governmental approvals and consents and satisfaction of the bankruptcy conditions contained in the "Bankruptcy Conditions" section below.

<u>Bankruptcy Conditions:</u>

The Vertis Debtors and the ACG Debtors shall have filed their Joint Prepackaged Plans of Reorganization (the "<u>Plan</u>") in substantially the form solicited pursuant to the Disclosure Statement (the "<u>Disclosure Statement</u>") relating

to the Joint Prepackaged Plan of Reorganization of Vertis Holdings, Inc. et al. under Chapter 11 of the Bankruptcy Code (the "Vertis Plan") and the Joint Prepackaged Plan of Reorganization of ACG Holdings, Inc. et al. under Chapter 11 of the Bankruptcy Code (the "ACG Plan").

The Vertis Debtors and the ACG Debtors shall have obtained from the Bankruptcy Court an order (the "Confirmation Order"), in form and substance reasonably acceptable to the Arranger, confirming the Plan and approving the consummation of the Transactions on the effective date of the Plan (the "Effective Date"). As of the Effective Date, the Confirmation Order shall not be subject to a stay or injunction (or similar prohibition) in effect with respect thereto and no appeal is pending that has a reasonable likelihood of success to reverse the Confirmation Order in the judgment of the Arranger.

The Canadian Bankruptcy Court shall have entered orders, reasonably acceptable to the Arranger, approving the transactions contemplated by the Canadian ACG Debtors and their assets in the ACG Bankruptcy Cases.

The Effective Date of the Vertis Plan and the ACG Plan and the closing of the Exit Term Facility and Exit Revolving Credit Facility shall have occurred no later than October 15, 2008.

Affirmative Covenants:

Usual for exit facilities of this type and including, without limitation, the following to be applicable to the Reorganized Parent, the Reorganized Company and their respective subsidiaries: maintenance of corporate existence and rights; performance of obligations; delivery of consolidated and consolidating financial statements and other information, including information required under the PATRIOT Act; delivery of notices of litigation, tax or environmental events, ERISA or Canadian Pension Plan events and material adverse change; maintenance of properties in good working order; maintenance of satisfactory insurance; obtain a

rating of the Exit Term Facility by each of Standard & Poor's Ratings Service ("*S&P*") and Moody's Investors Service, Inc. ("*Moody's*") within ninety (90) days from the execution of the Commitment Letter; maintenance with the Administrative Agent or other banks (provided that such other banks shall have entered into an account control agreement with the Administrative Agent with respect to such accounts providing for springing control rights after the Exit Revolving Credit Facility) of main cash concentration accounts and with the Administrative Agent or other banks reasonably acceptable to the Administrative Agent (provided that such other banks shall have entered into an account control agreement with the Administrative Agent with respect to such accounts providing for springing control rights after the Exit Revolving Credit Facility) of blocked accounts into which all proceeds of collateral are paid and which are swept into the main cash concentration accounts; compliance with laws; inspection of books and properties; further assurances; payment of taxes; notice of monthly financial covenant compliance and other reporting requirements; and all reports required to be delivered under the Exit Revolving Credit Facility.

Negative Covenants:

Usual for exit facilities of this type and including, without limitation, the following to be applicable to the Reorganized Parent, the Reorganized Company and their respective subsidiaries: limitations on dividends on, and redemptions and repurchases of, equity interests and other restricted payments; limitations on prepayments, redemptions and repurchases of debt (other than Loans under the Exit Term Facility); limitations on liens and sale-leaseback transactions; limitations on loans and investments; limitations on debt, guarantees and hedging arrangements; limitations on mergers, acquisitions and asset sales (other than the merger, asset sales and related transactions provided for in the Vertis Plan and the ACG Plan); limitations on transactions with affiliates; limitations on

changes in business conducted by the Reorganized Parent, the Reorganized Company and their respective subsidiaries; limitations on restrictions on ability of subsidiaries to pay dividends or make distributions; and limitations on amendments of debt and other material agreements; and limitations on capital expenditures.

**Selected Financial Covenants:** The Exit Credit Agreement will contain (a) maximum first lien leverage, (b) maximum total leverage and (c) minimum fixed charge coverage.

**Financial Reporting Requirements:** Usual for exit facilities of this type, including, but not limited to Borrowers' delivery of: (a) monthly financial reporting, (b) notice of monthly compliance with financial covenants, (c) audited financial statements and (d) annual operating plans.

**Events of Default:** Usual for exit facilities of this type, others to be reasonably specified by the Arranger, and including, without limitation, the following to be applicable to the Reorganized Parent, the Reorganized Company and their respective subsidiaries (subject, where appropriate, to thresholds and grace periods to be agreed upon): (a) in the reasonable judgment of the Arranger, the entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner materially adverse to the Lenders and without the prior consent of the Arranger, the Exit Term Facility, or the confirmation order in the Bankruptcy Cases, or order in the CCAA Cases; (b) failure of the Borrowers to pay (i) the principal of any Loan when due or (ii) any interest on any Loan or any other amount after such interest or other amount becomes due; (c) representations and warranties incorrect in any material respect on or as of the date made or deemed made; (d) failure of any Loan Party to comply with covenants (with grace periods and notice requirements as applicable); (e) cross-default and cross-acceleration; (f) failure to satisfy or stay execution of judgments; (g) existence of certain material ERISA events; (h) actual or asserted invalidity or impairment of

any Loan Document (including the failure of any lien to remain perfected); (i) a Change of Control occurs, which results in the acquisition by a third party (other than permitted holders to be described in final documentation), directly or indirectly, of more than 50% of the voting stock of the New Business, subject to Arrangers review of the final capital and equity structure of the New Business (j) after the Closing Date bankruptcy or insolvency events and (k) events of default under the Exit Revolving Credit Facility.

Voting:

Amendments and waivers of the definitive credit documentation will require the approval of Lenders holding more than 50% of the aggregate amount of the Loans under the Exit Term Facility (the "*Required Lenders*"), except that the holders of more than 50% of the aggregate Term Loan B (the "*Required Term Loan B Lenders*") and the holders of more than 50% of the aggregate Term Loan C (the "*Required Term Loan C Lenders*") shall separately vote with respect to certain provisions determined by the Term Loan B Lenders as provided for in the definitive documents; provided further, that the consent of each Lender shall be required with respect to, among other things, (a) increases in the commitment of such Lender, (b) reductions of principal, interest or fees payable to such Lender, (c) extensions of final maturity of the Loans or commitments of such Lender and (d) releases of all or substantially all of the value of the guarantees, or all or a material portion of the Collateral.

Cost and Yield Protection:

Usual for facilities and transactions of this type, including customary tax gross-up provisions.

Assignments and Participations:

The Lenders will be permitted to assign loans under the Exit Term Facility, and so long as no event of default has occurred and is continuing, with the consent of the Borrowers; <u>provided however</u>, that the approval of the Borrowers shall not be required in connection with assignments to other Lenders (or to the affiliates or approved funds of Lenders). All assignments will require the consent of the Administrative Agent, not to

be unreasonably withheld or delayed. Each assignment will be in an amount of an integral multiple of $1,000,000. Assignments will be by novation.

The Lenders will be permitted to sell participations in loans and commitments without restriction. Voting rights of participants shall be limited to matters in respect of (a) increases in commitments of such participant, (b) reductions of principal, interest or fees payable to such participant, (c) extensions of final maturity of the loans or commitments in which such participant participates and (d) releases of all or substantially all of the value of the guarantees, or all or substantially all of the Collateral.

<u>Expenses and Indemnification:</u>   The Borrowers will indemnify the Arranger, the Administrative Agent, the Syndication Agent, the Documentation Agent, the Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "*Indemnified Person*") and hold them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Reorganized Parent, the Reorganized Company or any of their respective affiliates) that relates to the Transactions, including the financing contemplated hereby, *provided* that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from its gross negligence or willful misconduct. In addition, (a) all out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of counsel) of the Administrative Agent and the Arranger in connection with the Transactions shall be paid by

the Borrowers on the Closing Date and from time to time thereafter, whether or not the Transactions close, and (b) all reasonable out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of counsel) of the Arranger, the Administrative Agent, the Syndication Agent, the Documentation Agent and the Lenders, for enforcement costs and documentary taxes associated with the Exit Term Facility will be paid by the Borrowers.

<u>Governing Law:</u>    New York.

<u>Miscellaneous:</u>    Customary waiver of jury trial, consent to exclusive jurisdiction, and other customary miscellaneous provisions.

<u>Counsel to Administrative Agent and Arranger:</u>    Paul Hastings Janofsky & Walker, LLP

Interest Rates[1]:

**Term Loan B:**  At the option of the Borrowers, LIBOR plus ██████ or ABR plus █████.

**Term Loan C:**  At the option of the Borrowers, LIBOR plus ██████ or ABR plus ██████.  In addition, the Term Loan C Lenders shall be entitled to ████ in payment-in-kind interest.

LIBOR Floor of █████.

The Borrowers may elect interest periods of 1, 2, 3 or 6 months for adjusted LIBOR borrowings.

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans based on the Prime Rate) and interest shall be payable at the end of each interest period and, in any event, at least every three months.

ABR is the Alternate Base Rate, which is the higher of Prime Rate and the Federal Funds Effective Rate plus ███████.

Amortization:

Term Loan B, 1% annually payable in quarterly installments beginning the first fiscal quarter following the Closing Date

---

[1] Interest rates have been redacted as syndication process is on-going.

# Minimum LTM EBITDA Calculation

| | LTM<br>6/30/08 (1) (2) |
|---|---|
| **Vertis** | |
| Reported EBITDA | ($168.3) |
| Adjustments | |
| Restructuring | $18.0 |
| A/R Fees | 5.4 |
| Gain/Loss on Asset Disposals | (4.3) |
| Management Fees | 1.3 |
| Discontinued Operations | 0.3 |
| Asset Impairments | 246.5 |
| Professional Fees | 21.0 |
| Misc. Charge | (0.1) |
| Total Adjustments | 288.1 |
| Adjusted EBITDA | $119.8 |
| **ACG** | |
| Reported EBITDA | $14.0 |
| Adjustments | |
| Restructuring Expense / (Benefit) | ($0.3) |
| Professional Fees | 13.5 |
| Legal Fees | 0.7 |
| Other Non-Operating Expense | 1.2 |
| Total Adjustments | 15.2 |
| Adjusted EBITDA | $29.1 |
| **Combined** | |
| Reported EBITDA | ($154.3) |
| Adjustments | 303.2 |
| Adjusted EBITDA | $148.9 |

(1) Reversal of incentive accrual in Corporate Overhead of $5mm in September 2007
(2) 11 months of actuals; Estimated monthly for June 2008