## EXHIBIT D


## New Vertis Senior Notes Indenture

VERTIS, INC.,

the Company,

the Guarantors

and

HSBC Bank USA,

National Association,

as Trustee

---

INDENTURE

Dated as of [   ], 2008

---

13.5% Senior PIK Notes due 2014

# CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| Section 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.8; 7.10; 11.2 |
| (c) | N.A. |
| Section 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| Section 312(a) | 2.5 |
| (b) | 11.3 |
| (c) | 11.3 |
| Section 313(a) | 7.6 |
| (b)(1) | 7.6 |
| (b)(2) | 7.6 |
| (c) | 7.6; 11.2(b) |
| (d) | 7.6 |
| Section 314(a) | 4.6; 4.7; 13.2 |
| (b) | N.A. |
| (c)(1) | 11.4 |
| (c)(2) | 11.4 |
| (c)(3) | 11.4 |
| (d) | N.A. |
| (e) | 11.5 |
| (f) | N.A. |
| Section 315(a) | 7.1(b) |
| (b) | 7.5; 11.2 |
| (c) | 7.1(a) |
| (d) | 7.1(c) |
| (e) | 6.11 |
| Section 316(a)(last sentence) | 2.9 |
| (a)(1)(A) | 6.5 |
| (a)(1)(B) | 6.4 |
| (a)(2) | N.A. |
| (b) | 6.7 |
| (c) | 9.4 |
| Section 317(a)(1) | 6.8 |
| (a)(2) | 6.9 |
| (b) | 2.4 |
| Section 318(a) | 2.9; 11.1 |
| (c) | 2.9; 11.1 |

N.A. means Not Applicable.

NOTE: This Cross-Reference Table shall not, for any purpose, be deemed to be a part of the Indenture.

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INCORPORATION BY REFERENCE.................................1

Section 1.1    Definitions..................................................................................................1
Section 1.2    Incorporation by Reference of Trust Indenture Act .................................27
Section 1.3    Rules of Construction ..............................................................................28

ARTICLE II THE SECURITIES.................................................................................................28

Section 2.1    Form and Dating ......................................................................................28
Section 2.2    Execution and Authentication..................................................................29
Section 2.3    Registrar and Paying Agent .....................................................................30
Section 2.4    Paying Agent to Hold Money in Trust .....................................................30
Section 2.5    Securityholder Lists .................................................................................31
Section 2.6    Transfer and Exchange.............................................................................31
Section 2.7    Replacement Notes ..................................................................................31
Section 2.8    Outstanding Notes....................................................................................32
Section 2.9    Disregarded Notes....................................................................................32
Section 2.10   Temporary Notes......................................................................................32
Section 2.11   Cancellation .............................................................................................33
Section 2.12   Defaulted Interest.....................................................................................33
Section 2.13   CUSIP Number ........................................................................................33
Section 2.14   Book-Entry Provisions for Global Securities ..........................................33
Section 2.15   Special Transfer Provisions......................................................................34

ARTICLE III REDEMPTION .....................................................................................................36

Section 3.1    Notices to Trustee ....................................................................................36
Section 3.2    Selection of Notes to be Redeemed ..........................................................36
Section 3.3    Notice of Redemption ..............................................................................37
Section 3.4    Effect of Notice of Redemption................................................................37
Section 3.5    Deposit of Redemption Price ...................................................................38
Section 3.6    Notes Redeemed in Part ...........................................................................38

ARTICLE IV COVENANTS .......................................................................................................38

Section 4.1    Payment of Notes......................................................................................38
Section 4.2    Maintenance of Office or Agency.............................................................39
Section 4.3    Corporate Existence .................................................................................39
Section 4.4    Payment of Taxes and Other Claims.........................................................40
Section 4.5    Maintenance of Properties; Books and Records; Compliance with Law ............40
Section 4.6    Compliance Certificates; Notice of Default...............................................40
Section 4.7    Reports .....................................................................................................41
Section 4.8    Limitation on Restricted Payments...........................................................43
Section 4.9    Limitation on Incurrence of Additional Indebtedness ...............................45

Section 4.10  Limitation on Dividend and Other Payment Restrictions Affecting
              Subsidiaries.............................................................................................46
Section 4.11  Limitation on Liens.......................................................................................47
Section 4.12  Limitation on Asset Sales.............................................................................48
Section 4.13  Limitations on Transactions with Affiliates.................................................51
Section 4.14  Change of Control.........................................................................................53
Section 4.15  Waiver of Stay; Extension of Usury Laws...................................................55
Section 4.16  Limitation on Guarantees by Restricted Subsidiaries..................................55
Section 4.17  Limitation on Preferred Stock of Subsidiaries.............................................56
Section 4.18  Conduct of Business .....................................................................................56

ARTICLE V SUCCESSOR CORPORATION .............................................................................56

Section 5.1   Limitation on Mergers, Consolidations or Sales of Assets ...........................56
Section 5.2   Successor Entity Substituted.........................................................................58

ARTICLE VI DEFAULT AND REMEDIES.................................................................................59

Section 6.1   Events of Default ..........................................................................................59
Section 6.2   Acceleration ..................................................................................................60
Section 6.3   Other Remedies.............................................................................................61
Section 6.4   Waiver of Past Default ..................................................................................61
Section 6.5   Control by Majority .......................................................................................62
Section 6.6   Limitation on Suits........................................................................................62
Section 6.7   Rights of Holders to Receive Payment .........................................................62
Section 6.8   Collection Suit by Trustee.............................................................................63
Section 6.9   Trustee May File Proofs of Claim.................................................................63
Section 6.10  Priorities........................................................................................................63
Section 6.11  Undertaking for Costs ...................................................................................64
Section 6.12  Rights and Remedies Cumulative .................................................................64
Section 6.13  Delay or Omission Not Waiver .....................................................................64

ARTICLE VII TRUSTEE............................................................................................................64

Section 7.1   Duties of Trustee ...........................................................................................64
Section 7.2   Rights of Trustee ...........................................................................................65
Section 7.3   Individual Rights of Trustee ..........................................................................66
Section 7.4   Trustee's Disclaimer ......................................................................................66
Section 7.5   Notice of Defaults .........................................................................................66
Section 7.6   Reports by Trustee to Holders.......................................................................67
Section 7.7   Compensation and Indemnity ........................................................................67
Section 7.8   Replacement of Trustee..................................................................................68
Section 7.9   Successor Trustee by Merger, Etc .................................................................69
Section 7.10  Eligibility; Disqualification ..........................................................................69
Section 7.11  Preferential Collection of Claims Against Company ....................................69

ARTICLE VIII DISCHARGE OF INDENTURE; DEFEASANCE ...............................................69

| Section 8.1 | Termination of the Company's Obligations | 69 |
| Section 8.2 | Legal Defeasance and Covenant Defeasance | 70 |
| Section 8.3 | Conditions to Legal Defeasance or Covenant Defeasance | 71 |
| Section 8.4 | Application of Trust Money | 73 |
| Section 8.5 | Repayment to the Company | 73 |
| Section 8.6 | Reinstatement | 73 |

ARTICLE IX AMENDMENTS, SUPPLEMENTS AND WAIVERS ......................................74

| Section 9.1 | Without Consent of Holders | 74 |
| Section 9.2 | With Consent of Holders | 74 |
| Section 9.3 | Compliance with Trust Indenture Act | 76 |
| Section 9.4 | Revocation and Effect of Consents | 76 |
| Section 9.5 | Notation on or Exchange of Notes | 76 |
| Section 9.6 | Trustee to Sign Amendments, Etc | 77 |

ARTICLE X GUARANTEE ......................................77

| Section 10.1 | Unconditional Guarantee | 77 |
| Section 10.2 | Severability | 78 |
| Section 10.3 | Release of a Guarantor | 78 |
| Section 10.4 | Limitation of Guarantor's Liability | 78 |
| Section 10.5 | Consolidation, Merger and Sale of Assets | 79 |
| Section 10.6 | Contribution | 79 |
| Section 10.7 | Waiver of Subrogation | 79 |
| Section 10.8 | Evidence of Guarantee | 80 |
| Section 10.9 | Waiver of Stay, Extension or Usury Laws | 80 |

ARTICLE XI MISCELLANEOUS ......................................80

| Section 11.1 | Trust Indenture Act Controls | 80 |
| Section 11.2 | Notices | 81 |
| Section 11.3 | Communications by Holders with Other Holders | 81 |
| Section 11.4 | Certificate and Opinion of Counsel as to Conditions Precedent | 81 |
| Section 11.5 | Statements Required in Certificate and Opinion of Counsel | 82 |
| Section 11.6 | Rules by Trustee, Paying Agent, Registrar | 82 |
| Section 11.7 | Legal Holidays | 82 |
| Section 11.8 | Governing Law | 82 |
| Section 11.9 | No Recourse Against Others | 83 |
| Section 11.10 | Successors | 83 |
| Section 11.11 | Counterparts | 83 |
| Section 11.12 | Severability | 83 |
| Section 11.13 | Table of Contents, Headings, Etc | 83 |
| Section 11.14 | No Adverse Interpretation of Other Agreements | 83 |
| Section 11.15 | Benefits of Indenture | 84 |
| Section 11.16 | Independence of Covenants | 84 |

Exhibit A-1 &mdash; Form of Series A Note
Exhibit A-2 &mdash; Form of Series B Note
Exhibit B &mdash; Form of Legend for Global Securities
Exhibit C &mdash; Transferee Certificate for Non-QIB Accredited Investors
Exhibit D &mdash; Transferee Certificate for Transfers Pursuant to Regulation S
Exhibit E &mdash; Form of Guarantee
Exhibit F &mdash; Form of Restricted Control Security Legend

Note:  This Table of Contents shall not, for any purpose, be deemed to be part of the Indenture.

INDENTURE dated as of [____], 2008 (the "***Issue Date***"), among VERTIS, INC., a corporation duly organized and existing under the laws of the State of Delaware, as issuer (the "***Company***"), the Guarantors (as defined herein) and HSBC Bank USA, National Association, a national banking association, as trustee (the "***Trustee***").

The parties hereto agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders:

ARTICLE I

DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1        Definitions.

"***Acceleration Notice***" has the meaning provided in Section 6.2.

"***Accrued Bankruptcy Interest***" means all interest accruing subsequent to the occurrence of any events specified in Section 6.1(f) or (g) or which would have accrued but for any such event.

"***Acquired Indebtedness***" means Indebtedness (1) of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary of the Company or (2) assumed in connection with the acquisition of assets from such Person, in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such acquisition. Acquired Indebtedness shall be deemed to have been incurred, with respect to clause (1) of the preceding sentence, on the date such Person becomes a Restricted Subsidiary of the Company and, with respect to clause (2) of the preceding sentence, on the date of consummation of such acquisition of assets.

"***Additional Notes***" means the 13.5% Senior PIK Notes due 2014 of the Company (other than the Initial Notes) issued under this Indenture in accordance with Sections 2.2, 4.1 and 4.9.

"***Adjusted Net Assets***" has the meaning provided in Section 10.6.

"***Affiliate***" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative of the foregoing. Notwithstanding the foregoing, no Person (other than the Company or any Subsidiary of the Company) in whom a Receivables Entity makes an Investment in connection with a Qualified Receivables Transaction shall be deemed to be an Affiliate of the Company or any of its Subsidiaries solely by reason of such Investment.

"***Affiliate Transaction***" has the meaning provided in Section 4.13.

"***Agent***" means any Registrar, Paying Agent or co-registrar.

"*Agent Members*" has the meaning provided in Section 2.14.

"*A/R Facility*" means any agreement or agreements governing a Qualified Receivables Transaction.

"*Asset Acquisition*" means (1) an Investment by the Company or any Restricted Subsidiary of the Company in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Company or of any Restricted Subsidiary of the Company, or shall be merged with or into the Company or any Restricted Subsidiary of the Company, or (2) the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"*Asset Sale*" means any direct or indirect sale, issuance, conveyance, transfer, lease (other than operating leases entered into in the ordinary course of business), assignment or other disposition for value by the Company or any of its Restricted Subsidiaries (including any Sale and Leaseback Transaction) to any Person other than the Company or a Restricted Subsidiary of the Company of: (1) any Capital Stock of any Restricted Subsidiary of the Company; or (2) any other property or assets of the Company or any Restricted Subsidiary of the Company other than in the ordinary course of business; provided, however, that Asset Sales shall not include:

(a)     any transaction or series of related transactions for which the Company or its Restricted Subsidiaries receive aggregate consideration of less than $5.0 million;

(b)     the sale, lease, conveyance, disposition or other transfer of all or substantially all of the assets of the Company as permitted under Article V;

(c)     the sale or discount, in each case without recourse, of accounts receivable arising in the ordinary course of business;

(d)     the factoring of accounts receivable arising in the ordinary course of business pursuant to arrangements customary in the industry;

(e)     the licensing of intellectual property;

(f)     disposals or replacements of obsolete equipment in the ordinary course of business;

(g)     the sale, lease, conveyance, disposition or other transfer by the Company or any Restricted Subsidiary of assets or property in transactions constituting Permitted Investments or Restricted Payments that are not prohibited under Section 4.8;

(h)     sales of accounts receivable and related assets of the type specified in the definition of "Qualified Receivables Transaction" to a Receivables Entity (for the purposes of this clause (h), Purchase Money Notes shall be deemed to be cash);

(i)     transfers of accounts receivable and related assets of the type specified in the definition of "Qualified Receivables Transaction" (or a fractional undivided interest therein) by a Receivables Entity in a Qualified Receivables Transaction;

(j)     leases or subleases to third persons not interfering in any material respect with the business of the Company or any of its Restricted Subsidiaries; and

(k)     the surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims of any kind.

"***Attributed Receivables Facility Indebtedness***" at any time means the principal amount of Indebtedness which would be outstanding at such time under an A/R Facility if same were structured as a secured lending agreement rather than a purchase agreement; provided that such principal amount shall be net of amounts of cash and Cash Equivalents on deposit in any principal funding or equalization account established pursuant to an A/R Facility which, if the A/R Facility were structured as a secured lending arrangement rather than as a facility for the sale of Receivables, would collateralize the Indebtedness issued thereunder.

"***Avenue***" means Avenue Investments, L.P.

"***Bankruptcy Law***" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute or any other United States federal, state or local law or the law of any other jurisdiction relating to bankruptcy, insolvency, winding up, liquidation, reorganization or relief of debtors, whether in effect on the date hereof or hereafter.

"***Bankruptcy Order***" means any court order made in a proceeding pursuant to or within the meaning of any Bankruptcy Law, containing an adjudication of bankruptcy or insolvency, or providing for liquidation, winding up, dissolution or reorganization, or appointing a custodian of a debtor or of all or any substantial part of a debtor's property, or providing for the staying, arrangement, adjustment or composition of indebtedness or other relief of a debtor.

"***Board of Directors***" means, as to any Person, the board of directors of such Person or any duly authorized committee thereof.

"***Board Resolution***" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"***Budget***" has the meaning provided in Section 4.7(c).

"***Business Day***" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of New York, New York or is a day on which banking institutions therein located are authorized or required by law or other governmental action to close.

"***CA***" has the meaning provided in Section 4.7(a).

*"Capital Stock"* means:

(1)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person; and

(2)     with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person.

*"Capitalized Lease Obligation"* means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

*"Cash Equivalents"* means:

(1)     marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or any member state of the European Union or issued by any agency thereof and backed by the full faith and credit of the United States or any member state of the European Union, in each case maturing within one year from the date of acquisition thereof;

(2)     marketable direct obligations issued by any state of the United States of America or any member state of the European Union or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successors to its rating agency business (*"S&P"*) or Moody's Investors Service, Inc. and any successors to its rating agency business (*"Moody's"*);

(3)     commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's;

(4)     time deposits, certificates of deposit or bankers' acceptances (or with respect to foreign banks, similar instruments) maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States of America or any state thereof or the District of Columbia or any member state of the European Union or any U.S. branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $200.0 million;

(5)     certificates of deposit or bankers' acceptances or similar instruments maturing within one year from the date of acquisition thereof issued by any foreign bank that is a lender under the Senior Credit Facilities having at the date of acquisition thereof combined capital and surplus of not less than $500.0 million;

(6)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) or (2) above entered into with any bank meeting the qualifications specified in clause (4) above;

(7) demand deposit accounts maintained in the ordinary course of business; and

(8) investments in money market funds which invest substantially all their assets in securities of the types described in clauses (1) through (7) above.

"*Change of Control*" means the occurrence of one or more of the following events:

(1) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all of the assets of the Company to any Person or group of related Persons for purposes of Section 13(d) of the Exchange Act (a "*Group*"), together with any Affiliates thereof (other than one or more Permitted Holders);

(2) the approval by the holders of Capital Stock of the Company of any plan or proposal for the liquidation or dissolution of the Company;

(3) any Person or Group (other than one or more Permitted Holders) shall become the beneficial owner (as defined in Rules 13d-3 and 13d-5 or any successor rule or regulation promulgated under the Exchange Act), directly or indirectly, of shares representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock of Holdings or the Company; or

(4) the first day on which a majority of the Board of Directors of the Company are not Continuing Directors.

"*Change of Control Date*" has the meaning provided in Section 4.14(a).

"*Change of Control Offer*" has the meaning provided in Section 4.14(a).

"*Change of Control Payment Date*" has the meaning provided in Section 4.14(b).

"*Common Stock*" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common stock.

"*Company*" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and, thereafter, means the successor.

"*Consolidated EBITDA*" means, with respect to any Person, for any period, the sum (without duplication) of:

(1) Consolidated Net Income; and

(2) to the extent Consolidated Net Income has been reduced thereby:

(a) all income taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period (other than income taxes attributable to

extraordinary, unusual or nonrecurring gains or losses or taxes attributable to sales or dispositions outside the ordinary course of business);

(b)    Consolidated Interest Expense;

(c)    Consolidated Non-cash Charges;

(d)    the amount of any restructuring reserve or charge recorded during such period in accordance with GAAP;

(e)    any fees permitted pursuant to clause (b)(9) of Section 4.13;

(f)    amounts paid as a spread payment in connection with a cashless exercise of options by a director or employee of Holdings or any of its Restricted Subsidiaries (i.e., a payment equal to the spread of the then fair market value of Holdings' Common Stock which may be purchased with such options over the aggregate exercise price of such options); and

(g)    less, without duplication, non-cash items increasing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period in each case determined in accordance with GAAP.

"*Consolidated Fixed Charge Coverage Ratio*" means, with respect to any Person, the ratio of Consolidated EBITDA of such Person during the four full fiscal quarters (the "*Four Quarter Period*") ending on or prior to the date of the transaction giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are available (the "*Transaction Date*") to Consolidated Fixed Charges of such Person for the Four Quarter Period. In addition to and without limitation of the foregoing, for purposes of this definition, "Consolidated EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a *pro forma* basis for the period of such calculation to:

(1)    the incurrence or repayment of any Indebtedness of such Person or any of its Restricted Subsidiaries (and the application of the proceeds thereof) giving rise to the need to make such calculation and any incurrence or repayment of other Indebtedness (and the application of the proceeds thereof), other than the incurrence or repayment of Indebtedness in the ordinary course of business for working capital purposes pursuant to working capital facilities, occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period;

(2)    any asset sales or other dispositions or Asset Acquisitions (including, without limitation, any Asset Acquisition giving rise to the need to make such calculation as a result of such Person or one of its Restricted Subsidiaries (including any Person who becomes a Restricted Subsidiary as a result of the Asset Acquisition) incurring, assuming or otherwise being liable for Acquired Indebtedness and also including any Consolidated EBITDA (including *pro forma* expense and cost reductions calculated on a basis consistent with Regulation S-X under the Exchange Act) attributable to the assets which are the subject of the Asset Acquisition or

asset sale during the Four Quarter Period) occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such asset sale or Asset Acquisition (including the incurrence, assumption or liability for any such Indebtedness or Acquired Indebtedness) occurred on the first day of the Four Quarter Period; and

(3)     any asset sales or asset acquisitions (including any Consolidated EBITDA (including *pro forma* expense and cost reductions calculated on a basis consistent with Regulation S-X under the Exchange Act) attributable to the assets which are the subject of the Asset Acquisition or asset sale during the Four Quarter Period) that have been made by any Person that has become a Restricted Subsidiary of the Company or has been merged with or into the Company or any Restricted Subsidiary of the Company during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date that would have constituted asset sales or Asset Acquisitions had such transactions occurred when such Person was a Restricted Subsidiary of the Company or subsequent to such Person's merger into the Company, as if such asset sale or Asset Acquisition (including the incurrence, assumption or liability for any Indebtedness or Acquired Indebtedness in connection therewith) occurred on the first day of the Four Quarter Period;

*Provided* that to the extent that clause (2) or (3) of this sentence requires that pro forma effect be given to an asset sale or Asset Acquisition, such *pro forma* calculation shall be based upon the four full fiscal quarters immediately preceding the Transaction Date of the Person, or division or line of business of the Person, that is acquired or disposed of for which financial information is available. If such Person or any of its Restricted Subsidiaries directly or indirectly guarantees Indebtedness of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Indebtedness as if such Person or any Restricted Subsidiary of such Person had directly incurred or otherwise assumed such guaranteed Indebtedness.

Furthermore, in calculating "***Consolidated Fixed Charges***" for purposes of this "***Consolidated Fixed Charge Coverage Ratio***" interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

"***Consolidated Fixed Charges***" means, with respect to any Person for any period, the sum, without duplication, of:

(1)     Consolidated Interest Expense, minus any non-cash interest expense included therein; plus

(2)     the product of (x) the amount of all dividend payments on any series of Preferred Stock of such Person and its Restricted Subsidiaries (other than dividends paid in Qualified Capital Stock and dividends paid on Preferred Stock of Unrestricted Subsidiaries) paid, accrued or scheduled to be paid or accrued during such period times (y) a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of such Person, expressed as a decimal; provided

that to the extent that such dividend payments are tax deductible, then this clause (2) shall equal the amount set forth in clause (x) hereof without giving effect to clause (y) hereof.

"*Consolidated Interest Expense*" means, with respect to any Person for any period, the sum of, without duplication:

(1) the aggregate of all cash and non-cash interest expense with respect to all outstanding Indebtedness of such Person and its Restricted Subsidiaries, including the net costs associated with Interest Swap Obligations for such period determined on a consolidated basis in conformity with GAAP, but excluding amortization of original issue discount and amortization of any deferred financing costs; and

(2) the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such Person and its Restricted Subsidiaries during such period as determined on a consolidated basis in accordance with GAAP.

"*Consolidated Net Income*" of the Company means, for any period, the aggregate net income (or loss) of the Company and its Restricted Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; provided that there shall be excluded therefrom:

(1) gains and losses from Asset Sales (without regard to the $5.0 million limitation set forth in the definition thereof) or abandonments or reserves relating thereto and the related tax effects according to GAAP;

(2) gains and losses due solely to fluctuations in currency values and the related tax effects according to GAAP;

(3) extraordinary, unusual or nonrecurring gains, losses, income or expense, and the related tax effects;

(4) the net income (or loss) of any Person acquired in a "pooling of interests" transaction accrued prior to the date it becomes a Restricted Subsidiary of the Company or is merged or consolidated with the Company or any Restricted Subsidiary of the Company;

(5) the net income of any Restricted Subsidiary of the Company to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted by a contract, operation of law or otherwise;

(6) the net loss of any Person other than a Restricted Subsidiary of the Company;

(7) the net income of any Person, other than a Restricted Subsidiary of the Company, except to the extent of cash dividends or distributions paid to the Company or to a Restricted Subsidiary of the Company by such Person unless, in the case of a Restricted Subsidiary of the Company who receives such dividends or distributions, such Restricted Subsidiary is subject to clause (5) above;

(8)    (A) all non-cash charges (provided that any cash payments actually made with respect to the liabilities for which such cash charges were created shall be deducted from Consolidated Net Income in the period when made) and (B) all deferred financing costs written off in connection with the early extinguishment of any Indebtedness, in each case incurred by the Company or any of its Restricted Subsidiaries in connection with the recapitalization of Holdings in 2008 and the related financing transactions;

(9)    non-cash compensation charges, including any arising from existing stock options resulting from any merger or recapitalization transition; and

(10)    the cumulative effect of a change in accounting principles.

"*Consolidated Non-cash Charges*" means, with respect to any Person, for any period, the aggregate depreciation, amortization and other non-cash expenses of such Person and its Restricted Subsidiaries reducing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charges constituting an extraordinary item or loss or any such charge which requires an accrual of or a reserve for cash charges for any future period).

"*Continuing Directors*" means, as of any date of determination, any member of the Board of Directors of the Company who:

(1)    was a member of such Board of Directors on the Issue Date;

(2)    was nominated for election or elected to such Board of Directors with, or whose election to such Board of Directors was approved by, the affirmative vote of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election; or

(3)    is any designee of a Permitted Holder or was nominated by a Permitted Holder or any designees of a Permitted Holder on the Board of Directors.

"*Covenant Defeasance*" has the meaning provided in Section 8.2.

"*Corporate Trust Office*" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 10 East 40th Street, 14th Floor, New York, NY 10016 Attention: Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"*Currency Agreement*" means any foreign exchange contract, currency swap agreement or other similar agreement or arrangement designed to protect the Company or any Restricted Subsidiary of the Company against fluctuations in currency values.

"*Custodian*" means any receiver, interim receiver, receiver and manager, trustee, assignee, liquidator, sequestrator or similar official charged with maintaining possession or

control over property for one or more creditors, whether under any Bankruptcy Law or otherwise.

"**_Default_**" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

"**_Depository_**" means The Depository Trust Company, its nominees and successors.

"**_Disqualified Capital Stock_**" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event which would constitute a Change of Control), matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof (except, in each case, upon the occurrence of a Change of Control) on or prior to the final maturity date of the Notes.

"**_Dollars_**" or the sign "**_$_**" means the lawful money of the United States of America.

"**_Domestic Restricted Subsidiary_**" means a Restricted Subsidiary incorporated or otherwise organized or existing under the laws of the United States, any state thereof or any territory or possession of the United States.

"**_Event of Default_**" means each of the events set forth in Section 6.1.

"**_Exchange Act_**" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto, and the rules and regulations of the SEC promulgated thereunder.

"**_fair market value_**" means, with respect to any asset or property, the price which could be negotiated in an arm's-length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. Fair market value shall be determined by the Board of Directors of the Company acting reasonably and in good faith and shall be evidenced by a Board Resolution of the Board of Directors of the Company delivered to the Trustee.

"**_First Lien Revolving Credit Agreement_**" means that certain _____.

"**_First Lien Term Loan Agreement_**" means that certain _____.

"**_Funding Guarantor_**" has the meaning ascribed to it in Section 10.6.

"**_GAAP_**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect as of the Issue Date.

"*Global Security*" has the meaning provided in Section 2.2.

"*Guarantees*" means, collectively, the guarantees of the Notes by the Guarantors pursuant to Article X which are evidenced by notations of guarantee substantially in the form of Exhibit E.

"*Guarantor*" means (1) each of the Company's existing and future Subsidiaries that is a guarantor of any Senior Credit Facility, the Second Lien Notes or any other Indebtedness for borrowed money of the Company or any Domestic Restricted Subsidiary, (2) each of the Company's existing and future holding companies that guarantees the Second Lien Notes (or any other Indebtedness for borrowed money of the Company or any Domestic Restricted Subsidiary that is junior in right of payment or in rights to collateral to any Senior Credit Facility), and (3) any other Subsidiary that executes a supplemental indenture in which it agrees to be bound by the terms of this Indenture as a Guarantor; provided that any Person constituting a Guarantor as described above shall cease to constitute a Guarantor when its respective Guarantee is released in accordance with the terms of this Indenture.

"*Holder*" or "**Securityholder**" means a Person in whose name a Note is registered. The Holder of a Note will be treated as the owner of such Note for all purposes.

"*Holdings*" means Vertis Holdings, Inc., a Delaware corporation and the parent of the Company.

"*Indebtedness*" means, with respect to any Person, without duplication:

      (1)     all Obligations of such Person for borrowed money;

      (2)     all Obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

      (3)     all Capitalized Lease Obligations of such Person;

      (4)     all Obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all Obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business);

      (5)     all Obligations for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction;

      (6)     guarantees and other contingent obligations in respect of Indebtedness referred to in clauses (1) through (5) above and clause (8) below;

      (7)     all Obligations of any other Person of the type referred to in clauses (1) through (6) which are secured by any lien on any property or asset of such Person, but which Obligations are not assumed by such Person, the amount of such Obligation being deemed to be the lesser of the fair market value of such property or asset or the amount of the Obligation so secured;

(8)     all Obligations under Currency Agreements and all Interest Swap Obligations of such Person; and

(9)     all Disqualified Capital Stock issued by such Person with the amount of Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.

For purposes hereof, (x) the "maximum fixed repurchase price" of any Disqualified Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the fair market value of such Disqualified Capital Stock, such fair market value shall be determined reasonably and in good faith by the Board of Directors of the issuer of such Disqualified Capital Stock and (y) any transfer of accounts receivable or other assets which constitutes a sale for purposes of GAAP shall not constitute Indebtedness hereunder. Accrual of interest, accretion or amortization of original issue discount and the payment of any interest on any Indebtedness in the form of additional Indebtedness with the same terms will not be deemed to be an incurrence of Indebtedness for the purposes of Section 4.9. Notwithstanding anything in this Indenture to the contrary, transactions contemplated pursuant to any A/R Facility shall not be deemed to be the incurrence of Indebtedness by the Company or by any Restricted Subsidiary.

"*Indenture*" means this Indenture as amended or supplemented from time to time pursuant to the terms hereof.

"*Initial Notes*" means $200.0 million in aggregate principal amount of 13.5% Senior PIK Notes due 2014 of the Company issued on the Issue Date.

"*Institutional Accredited Investor*" means an institution that is an "*accredited investor*" as that term is defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"*Intercompany Indebtedness*" means any Indebtedness of the Company or any Guarantor or Wholly Owned Restricted Subsidiary of the Company that is not a Guarantor which, in the case of the Company, is owing to any Guarantor or Wholly Owned Restricted Subsidiary of the Company that is not a Guarantor and which, in the case of any such Subsidiary, is owing to the Company or any Guarantor or Wholly Owned Restricted Subsidiary of the Company that is not a Guarantor; *provided* that if as of any date any Person other than the Company or a Guarantor or Wholly Owned Restricted Subsidiary of the Company that is not a Guarantor, a lender under the Senior Credit Facilities or a creditor under any interest rate protection, currency or other hedging agreement (or any collateral agent acting on behalf of such lenders and/or creditors) owns or holds such Indebtedness, or holds any Lien in respect thereof (other than a Lien in favor of the Holders, the lenders under the Senior Credit Facilities, the creditors under any interest rate protection, currency or other hedging agreement or any collateral agent for such lenders and/or creditors), such Indebtedness shall no longer be Intercompany Indebtedness.

"*interest*," when used with respect to any Note, means the amount of all interest accruing on such Note, including all interest accruing subsequent to the occurrence of any events specified in Sections 6.1(f) and 6.1(g) or which would have accrued but for any such event.

"*Interest Payment Date*," when used with respect to any Note, means the stated maturity of an installment of interest specified in such Note.

"*Interest Swap Obligations*" means the obligations of any Person, pursuant to any arrangement with any other Person, whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments made by such other Person calculated by applying a fixed or a floating rate of interest on the same notional amount.

"*Investment*" by any Person in any other Person means, with respect to any Person, any direct or indirect loan or other extension of credit (including, without limitation, a guarantee) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition by such Person of any Capital Stock, bonds, notes, debentures or other securities or evidences of Indebtedness issued by, such other Person. "Investment" shall exclude extensions of trade credit by the Company and its Restricted Subsidiaries on commercially reasonable terms in accordance with normal trade practices of the Company or such Restricted Subsidiary, as the case may be. For the purposes of Section 4.8:

(1)    the Company shall be deemed to have made an "*Investment*" equal to the fair market value of the net assets of any Restricted Subsidiary at the time that such Restricted Subsidiary is designated an Unrestricted Subsidiary and the aggregate amount of Investments made subsequent to the Issue Date shall exclude (to the extent the designation as an Unrestricted Subsidiary was included as a Restricted Payment) the fair market value of the net assets of any Unrestricted Subsidiary at the time that such Unrestricted Subsidiary is designated a Restricted Subsidiary, not to exceed the amount of the Investment deemed made at the date of designation thereof as an Unrestricted Subsidiary; and

(2)    the amount of any Investment shall be the original cost of such Investment plus the cost of all additional Investments by the Company or any of its Restricted Subsidiaries, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment, reduced by the payment of dividends or distributions (including tax sharing payments) in connection with such Investment or any other amounts received in respect of such Investment; *provided* that no such payment of dividends or distributions or receipt of any such other amounts shall reduce the amount of any Investment if such payment of dividends or distributions or receipt of any such amounts would be included in Consolidated Net Income.

If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Common Stock of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, the Company no longer owns, directly or indirectly, more than 50% of the outstanding Common Stock of such Restricted Subsidiary, the

Company shall be deemed to have made an Investment on the date of any such sale or disposition equal to the fair market value of the Common Stock of such Restricted Subsidiary not sold or disposed of.

"***Laws***" means all applicable statutes, laws, ordinances, regulations, rules, orders, judgments, writs, injunctions or decrees of any state, commonwealth, nation, territory, possession or province, or Tribunal, and "Law" means each of the foregoing.

"***Legal Defeasance***" has the meaning provided in Section 8.2.

"***Legal Holiday***" means any day other than a Business Day.

"***Lien***" means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest).

"***Maturity Date***" means, when used with respect to any Note, the date specified in such Note as the fixed date on which the final installment of principal of such Note is due and payable (in the absence of any acceleration thereof pursuant to Section 6.2 or any Net Proceeds Offer or Change of Control Offer) or, if such Note is accelerated pursuant to Section 6.2, the date of such acceleration.

"***Net Cash Proceeds***" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents (other than the portion of any such deferred payment constituting interest) received by the Company or any of its Restricted Subsidiaries from such Asset Sale net of:

(1) out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(2) taxes paid or payable after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements;

(3) any relocation expenses and severance, pension and shutdown costs incurred as a result thereof;

(4) the repayment of Indebtedness that is secured by a Lien on the property or assets that are the subject of such Asset Sale and such Lien is permitted by this Indenture; and

(5) any portion of cash proceeds which the Company determines in good faith should be reserved for post-closing adjustments, it being understood and agreed that on the day that all such post-closing adjustments have been determined, the amount (if any) by which the reserved amount in respect of such Asset Sale exceeds the actual post-closing adjustments payable by the Company or any of its Subsidiaries shall constitute Net Cash Proceeds on such date; *provided* that, in the case of the sale by the Company of an asset constituting an Investment made after the Issue Date (other than a Permitted Investment), the "Net Cash Proceeds" in

respect of such Asset Sale shall not include the lesser of (x) the cash received with respect to such Asset Sale and (y) the initial amount of such Investment, less, in the case of clause (y), all amounts (up to an amount not to exceed the initial amount of such Investment) received by the Company with respect to such Investment, whether by dividend, sale, liquidation or repayment, in each case prior to the date of such Asset Sale.

"***Net Equity Proceeds***" means the cash proceeds and the fair market value of any non-cash proceeds (limited, in the case of non-cash proceeds, to the Capital Stock of Persons engaged in the same line of business as the Company or any of its Subsidiaries or any line of business similar, related or ancillary thereto or complementary therewith, assets used in any such line of business and Productive Assets) of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees actually incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

"***Net Proceeds Offer***" has the meaning provided in Section 4.12(a).

"***Net Proceeds Offer Amount***" has the meaning provided in Section 4.12(a).

"***Net Proceeds Offer Payment Date***" has the meaning provided in Section 4.12(a).

"***Net Proceeds Offer Trigger Date***" has the meaning provided in Section 4.12(a).

"***Non-U.S. Person***" means a Person who is not a U.S. Person, as defined in Regulation S.

"***Notes***" means, collectively, the Initial Notes and the Additional Notes, treated as a single class of securities, as amended or supplemented from time to time in accordance with the terms hereof, that are issued pursuant to this Indenture. For purposes of this Indenture, all references to Notes to be issued or authenticated upon transfer, replacement or exchange shall be deemed to refer to the Notes. For purposes of this Indenture, all references to "principal amount" of the Notes shall include any PIK Notes issued in respect thereof (and any increase in the principal amount of the Notes) as a result of the payment of PIK Interest.

"***Obligations***" means all obligations for (a) principal, premium, interest (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable law), penalties, fees and (b) to the extent liquidated and quantifiable at the time of determination, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"***Officer***" means the Chairman of the Board, the President, any Vice President, the Chief Financial Officer, the Controller, the Treasurer, the Secretary or Assistant Secretary.

"***Officer's Certificate***" means, as applied to any corporation, a certificate executed on behalf of such corporation by an Officer.

"***Offshore Physical Securities***" has the meaning provided in Section 2.2.

"**_Opinion of Counsel_**" means a written opinion from legal counsel who is reasonably acceptable to the Trustee, which may include outside or in-house counsel to the Company.

"**_Paying Agent_**" has the meaning provided in Section 2.3.

"**_Permitted Holders_**" means Avenue and its Affiliates; provided that, for purposes of the definition of "Change of Control", the term "Permitted Holder" shall exclude any Person the principal activity or business of which is (x) operating a business in the same or a similar line of business to the Company or (y) serving as a direct or indirect holding company for a Person (other than the Company) of the type described in clause (x).

"**_Permitted Indebtedness_**" means, without duplication, each of the following:

(1)     Indebtedness under the Notes and this Indenture (including any Guarantees by the Guarantors) relating to Notes in an aggregate principal amount not to exceed $200.0 million plus the aggregate principal amount of PIK Notes issued hereunder;

(2)     (A) Indebtedness incurred pursuant to the Senior Credit Facilities (including but not limited to Indebtedness in respect of letters of credit or bankers' acceptances issued or created thereunder) (including the guarantees made thereunder) and (B) Attributed Receivables Facility Indebtedness pursuant to any A/R Facility (which Attributed Receivables Facility Indebtedness under this clause (2)(B) may not exceed $175.0 million in the aggregate), in a maximum principal amount not to exceed in the aggregate for clauses (A) and (B) the amount equal to $650.0 million less the amount of all mandatory repayments of term loans actually made under, and permanent commitment reductions actually made in the revolving credit portion of, the Senior Credit Facilities with Net Cash Proceeds of Asset Sales applied thereto as required by Section 4.12;

(3)     other Indebtedness of the Company and its Restricted Subsidiaries outstanding on the Issue Date reduced by the amount of any scheduled amortization payments or mandatory prepayments when actually paid or permanent reductions thereon;

(4)     Interest Swap Obligations of the Company or any Restricted Subsidiary of the Company covering Indebtedness of the Company or any of its Restricted Subsidiaries; provided that any Indebtedness to which any such Interest Swap Obligations correspond is otherwise permitted to be incurred under this Indenture;

(5)     Indebtedness of the Company or any of its Restricted Subsidiaries under (i) Currency Agreements entered into, in the judgment of the Company, to protect the Company or such Restricted Subsidiary from foreign currency exchange rates and (ii) Raw Material Hedge Agreements;

(6)     Intercompany Indebtedness of the Company or any of its Restricted Subsidiaries;

(7)     Acquired Indebtedness of any Restricted Subsidiary of the Company that is not a Guarantor to the extent the Company could have incurred such Indebtedness in accordance with the Consolidated Fixed Charge Coverage Ratio of Section 4.9 on the date such

Indebtedness became Acquired Indebtedness; provided that such Acquired Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company; provided, further, that the aggregate amount of Indebtedness (including refinancings thereof pursuant to clause (9) below) pursuant to this clause (7) shall not exceed $60.0 million in the aggregate;

(8)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business;

(9)     any refinancing, modification, replacement, renewal, restatement, refunding, deferral, extension, substitution, supplement, reissuance or resale of existing or future Indebtedness (other than pursuant to clauses (2), (4), (5), (6), (8), (11), (12), (13), (14) and (15) of this definition), including any additional Indebtedness incurred to pay interest or premiums required by the instruments governing such existing or future Indebtedness as in effect at the time of issuance thereof or other premiums to the extent the Company reasonably determines that such premiums are necessary to effect the refinancing ("*Premiums*") and fees in connection therewith; provided that any such event shall not (1) result in an increase in the aggregate principal amount of Permitted Indebtedness (except to the extent such increase is a result of a simultaneous incurrence of additional Indebtedness (A) to pay Premiums and related fees or (B) otherwise permitted to be incurred under this Indenture) of the Company and its Restricted Subsidiaries and (2) create Indebtedness with a Weighted Average Life to Maturity at the time such Indebtedness is incurred that is less than the Weighted Average Life to Maturity at such time of the Indebtedness being refinanced, modified, replaced, renewed, restated, refunded, deferred, extended, substituted, supplemented, reissued or resold; provided that no Restricted Subsidiary of the Company may refinance any Indebtedness pursuant to this clause (9) other than its own Indebtedness;

(10)     (x) Indebtedness incurred by the Company and its Restricted Subsidiaries to finance the purchase, lease or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets) and (y) Capitalized Lease Obligations in an aggregate principal amount outstanding for both clauses (x) and (y) (including refinancings thereof pursuant to clause (9) above) not to exceed $60.0 million at the time of any incurrence thereof;

(11)     Indebtedness incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including, without limitation, letters of credit in respect of workers' compensation claims or self-insurance, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(12)     Indebtedness arising from agreements of the Company or a Restricted Subsidiary of the Company providing for indemnification, adjustment of purchase price, earn out or other similar obligations, in each case, incurred or assumed in connection with the disposition or acquisition of any business, assets or a Restricted Subsidiary of the Company;

(13) obligations in respect of performance and surety bonds and completion guarantees provided by the Company or any Restricted Subsidiary of the Company in the ordinary course of business;

(14) Indebtedness consisting of guarantees (i) by the Company of Indebtedness and any other obligation or liability permitted to be incurred under this Indenture by Restricted Subsidiaries of the Company, and (ii) subject to the provisions of Section 4.16, by Restricted Subsidiaries of the Company of Indebtedness and any other obligation or liability permitted to be incurred by the Company or other Restricted Subsidiaries of the Company;

(15) additional Indebtedness of the Company or any Restricted Subsidiary in an aggregate principal amount not to exceed $50.0 million at any one time outstanding (which amount may, but need not, be incurred in whole or in part under the Senior Credit Facilities); and

(16) Indebtedness under the Second Lien Notes and the related indenture (including any guarantees thereof) relating to Second Lien Notes in an aggregate principal amount not to exceed $350.0 million plus the aggregate principal amount of Second Lien Notes issued as payment in kind of interest due thereunder.

"*Permitted Investments*" means:

(1) Investments by the Company or any Restricted Subsidiary of the Company in any Restricted Subsidiary of the Company that is a Guarantor or any Wholly Owned Subsidiary of the Company that is not a Guarantor (whether existing on the Issue Date or created thereafter) and Investments in the Company by any Restricted Subsidiary of the Company;

(2) cash and Cash Equivalents;

(3) Investments existing on the Issue Date;

(4) loans and advances to employees, officers and directors of the Company and its Restricted Subsidiaries not in excess of $15.0 million at any one time outstanding;

(5) accounts receivable owing to the Company or any Restricted Subsidiary created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided, however*, that such trade terms may include concessionary trade terms as the customary trade terms;

(6) Currency Agreements, Interest Swap Obligations and Raw Material Hedge Agreements entered into by the Company or any of its Restricted Subsidiaries for *bona fide* business reasons and not for speculative purposes, and otherwise in compliance with this Indenture;

(7) Investments in securities of trade creditors or customers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(8)     guarantees by the Company or any of its Restricted Subsidiaries of Indebtedness otherwise permitted to be incurred by the Company or any of its Restricted Subsidiaries under this Indenture and the creation of Liens on the assets of the Company or any of its Restricted Subsidiaries in compliance with Section 4.11;

(9)     Investments by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the Company and a Guarantor or a Wholly Owned Subsidiary of the Company that is not a Guarantor or (b) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company that is a Guarantor or any Wholly Owned Subsidiary of the Company that is not a Guarantor;

(10)    additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (10) that are at the time outstanding, not exceeding $30.0 million at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(11)    any Investment by the Company or a Restricted Subsidiary of the Company in a Receivables Entity or any Investment by a Receivables Entity in any other Person in connection with a Qualified Receivables Transaction; *provided* that any Investment in a Receivables Entity is in the form of a Purchase Money Note or an equity interest;

(12)    Investments received by the Company or its Restricted Subsidiaries as consideration for asset sales, including Asset Sales; *provided* that such Asset Sale is effected in compliance with Section 4.12; and

(13)    that portion of any Investment where the consideration provided by the Company is Capital Stock of the Company (other than Disqualified Capital Stock).

"*Permitted Liens*" means the following types of Liens:

(1)     Liens securing the Second Lien Notes and the guarantees in respect thereof in an aggregate principal amount not to exceed $350.0 million plus the amount of interest paid in-kind in respect of such Second Lien Notes;

(2)     Liens securing Acquired Indebtedness incurred in reliance on clause (7) of the definition of "Permitted Indebtedness" and permitted refinancings thereof; *provided* that such Liens do not extend to or cover any property or assets of the Company or of any of its Restricted Subsidiaries other than the property or assets that secured the Acquired Indebtedness prior to the time such Indebtedness became Acquired Indebtedness of the Company or a Restricted Subsidiary of the Company;

(3)     Liens existing on the Issue Date, together with any Liens securing Indebtedness incurred in reliance on clause (9) of the definition of "Permitted Indebtedness" in order to refinance the Indebtedness secured by Liens existing on the Issue Date; *provided* that the

Liens securing the refinancing Indebtedness shall not extend to property other than that pledged under the Liens securing the Indebtedness being refinanced;

        (4)     Liens in favor of the Company on the property or assets, or any proceeds, income or profit therefrom, of any Restricted Subsidiary;

        (5)     Liens securing Indebtedness under the Senior Credit Facilities (including, without limitation, Indebtedness in respect of letters of credit issued thereunder and guarantees thereunder) whether incurred pursuant to clause (2) of the definition of "Permitted Indebtedness" or any other clause thereof or pursuant to the Consolidated Fixed Charge Coverage Ratio;

        (6)     Liens securing any A/R Facility;

        (7)     Liens securing Interest Swap Obligations permitted to be incurred pursuant to clause (4) of the definition of "Permitted Indebtedness";

        (8)     Liens securing Currency Agreements and Raw Material Hedge Agreements permitted to be incurred pursuant to clause (5) of the definition of "Permitted Indebtedness";

        (9)     Liens securing Capitalized Lease Obligations and other Indebtedness permitted to be incurred pursuant to clause (10) of the definition of "*Permitted Indebtedness*" and permitted refinancings thereof;

        (10)     Liens securing Indebtedness permitted to be incurred pursuant to clause (11) of the definition of "*Permitted Indebtedness*";

        (11)     Liens securing Indebtedness permitted to be incurred pursuant to clause (15) of the definition of "*Permitted Indebtedness*";

        (12)     purchase money Liens to finance property or assets (whether through the direct purchase of assets or the Capital Stock of any person owning such assets) of the Company or any Restricted Subsidiary of the Company acquired or constructed in the ordinary course of business; *provided, however*, that (a) the related purchase money Indebtedness shall not exceed the cost of such property (including related expenses and taxes) or assets and shall not be secured by any property or assets of the Company or any Restricted Subsidiary of the Company other than the property and assets so acquired or constructed and (b) the Lien securing such Indebtedness shall be created within 180 days of such acquisition or construction;

        (13)     inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

        (14)     Liens arising out of the existence of judgments or awards not constituting an Event of Default;

(15)     Liens (other than any Lien imposed by ERISA) (x) incurred or deposits made in the ordinary course of business of the Company and its Restricted Subsidiaries in connection with workers' compensation, unemployment insurance and other types of social security, (y) to secure the performance by the Company and its Restricted Subsidiaries of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (z) to secure the performance by the Company and its Restricted Subsidiaries of leases of real property, to the extent incurred or made in the ordinary course of business consistent with past practices;

(16)     Liens in favor of customs and revenue authorities arising as a matter of law or regulation to secure the payment of customs duties in connection with the importation of goods and deposits made to secure statutory obligations in the form of excise taxes;

(17)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Company or any Restricted Subsidiary in the ordinary course of business (excluding any general inventory financing);

(18)     Liens imposed by law such as carriers', warehousemen's and mechanics' liens and other similar Liens on the property of the Company or any of its Restricted Subsidiaries arising in the ordinary course of business and securing payment of obligations that are being contested in good faith by appropriate proceedings;

(19)     Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(20)     Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements of the Company or any Restricted Subsidiaries, including rights of offset and set-off; and

(21)     Liens securing Indebtedness and other obligations in an aggregate amount not to exceed $50.0 million at any one time outstanding.

"***Person***" means an individual, partnership, corporation, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof or any other entity.

"***Physical Security***" means, collectively, the Offshore Physical Securities and the U.S. Physical Securities.

"***PIK Interest***" has the meaning set forth in Section 4.1(b).

"***PIK Notes***" has the meaning set forth in Section 4.1(b).

"***Preferred Stock***" of any Person means any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions or upon liquidation.

"***principal***" of a debt security means the principal amount of the security plus, when appropriate, the premium, if any, on the security.

"***Private Placement Legend***" means the legend initially set forth on the Series A Notes in the form set forth on Exhibit A-1.

"***pro forma***" means, with respect to any calculation made or required to be made pursuant to the terms of this Indenture, a calculation in accordance with Article 11 of Regulation S-X under the Securities Act as interpreted by the Company's chief financial officer or Board of Directors in consultation with its independent certified public accountants.

"***Productive Assets***" means assets (including Capital Stock) of a kind used or usable in the businesses of the Company and its Restricted Subsidiaries as, or related to such business, conducted on the Issue Date or in businesses reasonably related thereto.

"***Purchase Money Note***" means a promissory note of a Receivables Entity evidencing a line of credit, which may be irrevocable, from the Company or any Subsidiary of the Company in connection with a Qualified Receivables Transaction to a Receivables Entity, which note shall be repaid from cash available to the Receivables Entity, other than amounts required to be established as reserves pursuant to agreements, amounts paid to investors in respect of interest, principal and other amounts owing to such investors and amounts paid in connection with the purchase of newly generated receivables.

"***Qualified Capital Stock***" means any Capital Stock that is not Disqualified Capital Stock.

"***Qualified Institutional Buyer***" or "***QIB***" shall have the meaning specified in Rule 144A under the Securities Act.

"***Qualified Receivables Transaction***" means any transaction or series of transactions that may be entered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Receivables Entity (in the case of a transfer by the Company or any of its Subsidiaries) and (b) any other Person (in the case of a transfer by a Receivables Entity), or may grant a security interest in, any accounts receivable (whether now existing or arising in the future) of the Company or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable.

"***Raw Material Hedge Agreements***" means agreements designed to hedge against fluctuations in the cost of raw materials entered into in the ordinary course of business in connection with the operation of the Company's and its Restricted Subsidiaries' business.

"***Receivable***" means a right to receive payment arising from a sale or lease of goods or services by a Person pursuant to an arrangement with another Person pursuant to which such other Person is obligated to pay for goods or services under terms that permit the purchase of such goods and services on credit, as determined in accordance with GAAP.

"***Receivables Entity***" means a Wholly Owned Subsidiary of the Company (or another Person in which the Company or any Subsidiary of the Company makes an Investment and to which the Company or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Company (as provided below) as a Receivables Entity:

(1)     no portion of the Indebtedness or any other Obligations (contingent or otherwise) of which:

(i)     is guaranteed by the Company or any Subsidiary of the Company (excluding guarantees of Obligations (other than the principal of, and interest on, Indebtedness) pursuant to Standard Securitization Undertakings);

(ii)     is recourse to or obligates the Company or any Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings; or

(iii)     subjects any property or asset of the Company or any Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(2)     with which neither the Company nor any Subsidiary of the Company has any material contract, agreement, arrangement or understanding other than on terms no less favorable to the Company or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company, other than (i) pursuant to documents which evidence a Qualified Receivables Transaction and (ii) fees payable in the ordinary course of business in connection with servicing accounts receivable; and

(3)     to which neither the Company nor any Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results other than through the contribution of additional Receivables, related security and collections thereto and proceeds of the foregoing.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"***Redemption Date***" means, with respect to any Note, the Maturity Date of such Note or the date on which such Note is to be redeemed by the Company pursuant to the terms of the Notes.

"*Reference Date*" has the meaning provided in Section 4.8(a).

"*Registered Exchange Offer*" means an offer to exchange Series B Notes for Additional Notes originally issued in the form of Series A Notes in accordance with a Registration Rights Agreement.

"*Registrar*" has the meaning provided in Section 2.3.

"*Registration Rights Agreement*" means any registration rights agreement entered into in connection with an issuance of Additional Notes (other than PIK Notes) in the form of Series A Notes after the Issue Date.

"*Regulation S*" means Regulation S under the Securities Act.

"*Responsible Officer*" shall mean, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"*Restricted Payment*" has the meaning provided in Section 4.8.

"*Restricted Security*" has the meaning set forth in Rule 144(a)(3) under the Securities Act; *provided* that the Trustee shall be entitled to request and conclusively rely upon an Opinion of Counsel with respect to whether any Note is a Restricted Security.

"*Restricted Control Security*" means, with respect to any Series B Note, any U.S. Physical Security issued to a Holder who is deemed to be an underwriter as defined in Section 1145 of the Bankruptcy Code.

"*Restricted Control Security Legend*" has the meaning provided in Section 2.15.

"*Restricted Subsidiary*" of any Person means any Subsidiary of such Person which at the time of determination is not an Unrestricted Subsidiary.

"*Rule 144A*" means Rule 144A under the Securities Act.

"*Sale and Leaseback Transaction*" means any direct or indirect arrangement with any Person or to which any such Person is a party, providing for the leasing to the Company or a Restricted Subsidiary of any property, whether owned by the Company or any Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person or to any other Person from whom funds have been or are to be advanced by such Person on the security of such property.

"*SEC*" means the Securities and Exchange Commission.

"*Second Lien Notes*" means the 16% Senior Secured Second Lien Notes due 2012 issued by the Company pursuant to the indenture, dated as of the Issue Date, among the Company, the guarantors parties thereto and [Wilmington Trust Company], as trustee, whether issued on the Issue Date or thereafter, and any amendments, supplements or other modifications to such indenture from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring all or a portion of the Indebtedness under such indenture.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securityholder*" means Holder.

"*Senior Credit Facilities*" means (i) the First Lien Revolving Credit Agreement and (ii) the First Lien Term Loan Agreement, in each case together with the related documents thereto (including, without limitation, any guarantee agreements and security documents), in each case as such agreements may be amended (including any amendment and restatement thereof), supplemented or otherwise modified from time to time, including any agreement extending the maturity of, refinancing, replacing or otherwise restructuring (including increasing the amount of available borrowings thereunder or adding Restricted Subsidiaries of the Company as additional borrowers or guarantors thereunder) all or any portion of the Indebtedness under such agreement or any successor or replacement agreement and whether by the same or any other agent, lender or group of lenders.

"*Series A Notes*" means any Additional Notes (other than Series B Notes) issued, authenticated and delivered under this Indenture after the Issue Date substantially in the form set forth in Exhibit A-1.

"*Series B Notes*" means the $200.0 million of 13.5% Senior PIK Notes due 2014 issued on the Issue Date, the PIK Notes issued from time to time in respect thereof or in respect of such PIK Notes, and any Additional Notes issued in exchange for Series A Notes pursuant to a Registered Exchange Offer and this Indenture substantially in the form set forth in Exhibit A-2. The Series B Notes are identical to the Series A Notes except that the Series B Notes shall not contain the restrictive legend on the face of the form of the Series A Notes.

"*Significant Subsidiary*" with respect to any Person, means any Restricted Subsidiary of such Person that satisfies the criteria for a "significant subsidiary" set forth in Rule 1.02(w) of Regulation S-X under the Exchange Act.

"*Standard Securitization Undertakings*" means representations, warranties, covenants and indemnities entered into by the Company or any Subsidiary of the Company which, taken as a whole, are reasonably customary in an accounts receivable transaction (including, without limitation, all such representations, warranties, covenants and indemnities included in the documents evidencing any A/R Facility as in effect on the Issue Date).

"*Subordinated Obligation*" means (x) with respect to the Company, any Indebtedness of the Company (whether outstanding on the Issue Date or thereafter incurred) which is expressly subordinate in right of payment to the Notes, pursuant to a written agreement and (y) with respect to a Guarantor, any Indebtedness of such Guarantor (whether outstanding on the Issue

Date or thereafter incurred) which is expressly subordinate in right of payment to the Guarantee of such Guarantor, pursuant to a written agreement.

"*Subsidiary*" with respect to any Person, means:

(1)     any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors under ordinary circumstances shall at the time be owned, directly or indirectly, by such Person; or

(2)     any other Person of which at least a majority of the voting interest under ordinary circumstances is at the time, directly or indirectly, owned by such Person.

"*TIA*" means the Trust Indenture Act of 1939 (15 U.S. Code Sections 77aaa-77bbbb) as in effect on the date of this Indenture.

"*Transaction Date*" has the meaning provided in the definition of "Consolidated Fixed Charge Coverage Ratio."

"*Tribunal*" means any government, any arbitration panel, any court or any governmental department, commission, board, bureau, agency, authority or instrumentality of the United States or any state, province, commonwealth, nation, territory or possession, whether now or hereafter constituted and/or existing.

"*Trustee*" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions of this Indenture and thereafter means such successor.

"*Unrestricted Subsidiary*" of any Person means:

(1)     any Subsidiary of such Person that at the time of determination shall be or continue to be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2)     any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided* that:

(1)     the Company certifies to the Trustee that such designation complies with Section 4.8; and

(2)     each Subsidiary to be so designated and each of its Subsidiaries has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries.

The Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary only if:

(1)     immediately after giving effect to such designation, the Company is able to incur at least $1.00 of additional Indebtedness (other than Permitted Indebtedness) in compliance with Section 4.9; and

(2)     immediately before and immediately after giving effect to such designation, no Default or Event of Default shall have occurred and be continuing. Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the Board Resolution giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*U.S. Government Obligations*" means direct non-callable obligations of, or non-callable obligations guaranteed by, the United States of America for the payment of which guarantee or obligations the full faith and credit of the United States is pledged.

"*U.S. Legal Tender*" means such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

"*U.S. Physical Securities*" means Notes, together with their related Guarantees, issued in the form of certificated Notes, together with their related Guarantees, in registered form in substantially the form set forth in Exhibit A-1 or Exhibit A-2.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the then outstanding aggregate principal amount of such Indebtedness into (b) the sum of the total of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

"*Wholly Owned Subsidiary*" means any Restricted Subsidiary of the Company all the outstanding voting interests or voting Capital Stock of which (other than directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) are owned, directly or indirectly, by the Company.

Section 1.2          Incorporation by Reference of Trust Indenture Act.

Whenever this Indenture refers to a provision of the TIA, the provision shall be deemed incorporated by reference in and made a part of this Indenture. The following TIA terms used in this Indenture have the following meanings:

(a)     "*Commission*" means the SEC;

(b)     "*indenture securities*" means the Notes, together with their related Guarantees;

(c)     "**_indenture security holder_**" means a Securityholder;

(d)     "**_indenture to be qualified_**" means this Indenture;

(e)     "**_indenture trustee_**" or "institutional trustee" means the Trustee; and

(f)     "**_obligor_**" on the indenture securities means the Company or any other obligor on the Notes and the Guarantees.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule and not otherwise defined herein have the meanings so assigned to them therein.

Section 1.3          Rules of Construction.

Unless the context otherwise requires:

(a)     a term has the meaning assigned to it;

(b)     "**_or_**" is exclusive;

(c)     words in the singular include the plural, and words in the plural include the singular;

(d)     provisions apply to successive events and transactions;

(e)     "**_herein_**," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other Subdivision; and

(f)     unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP as in effect from time to time, applied on a basis consistent with the most recent audited consolidated financial statements of the Company.

ARTICLE II

THE SECURITIES

Section 2.1          Form and Dating.

The Series A Notes and the Series B Notes and the Trustee's certificate of authentication with respect thereto shall be substantially in the form set forth in Exhibits A-1 and A-2 annexed hereto, which is hereby incorporated in and expressly made a part of this Indenture. The Notes may have notations, legends or endorsements required by law, rule, usage or agreement to which the Company is subject. Each Note shall be dated the date of its issuance and shall show the date of its authentication. The terms and provisions contained in the Notes and the Guarantees shall constitute, and are expressly made, a part of this Indenture.

Section 2.2          Execution and Authentication.

Two Officers shall execute the Notes on behalf of the Company by either manual or facsimile signature. The Guarantors shall execute the Guarantees in the manner set forth in Article X.

If a Person whose signature is on a Note as an Officer no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until the Trustee manually signs the certificate of authentication on the Note. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture. Each Note shall be dated the date of its authentication.

The Trustee shall authenticate Initial Notes for original issue on the Issue Date in an aggregate principal amount not to exceed $200.0 million, upon receipt of an Officer's Certificate. The Trustee shall authenticate PIK Notes from time to time as required pursuant to Section 4.1(b). The Trustee shall authenticate Additional Notes other than PIK Notes (so long as the incurrence of additional Indebtedness is permitted by the terms of this Indenture) for original issue, upon a written order of the Company in the form of an Officer's Certificate in an aggregate principal amount as specified in such order (other than as provided in Section 2.7). The Initial Notes and the PIK Notes issued from time to time in respect thereof or in respect of such PIK Notes shall be Series B Notes. Subject to the following sentence, any other Additional Notes issued hereunder shall, upon original issue, be Series A Notes, and any PIK Notes issued in respect thereof or in respect of such PIK Notes shall, upon original issue, be Series A Notes. In addition, on or prior to the date of consummation of a Registered Exchange Offer with respect to any Series A Notes issued hereunder, the Trustee or an authenticating agent shall authenticate Series B Notes to be issued at the time of consummation of such Registered Exchange Offer upon receipt of an Officer's Certificate. The aggregate principal amount of Notes outstanding at any time is unlimited.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. Such authenticating agent shall have the same authenticating rights and duties as the Trustee in any dealings hereunder with the Company or with any Affiliate of the Company.

The Notes shall be issuable only in registered form without coupons and only in denominations of $1,000 and any integral multiple thereof, subject to the payment of PIK Interest, in which case the aggregate principal amount of the Notes may be increased by, or PIK Notes may be issued in, an aggregate principal amount equal to the amount of PIK Interest paid by the Company for the applicable period, rounded up the nearest whole dollar.

Notes offered and sold in reliance on Rule 144A shall be issued initially in the form of one or more permanent global notes in registered form, substantially in the form set forth in Exhibit A-1 ("**Global Security**"), deposited with the Trustee, as custodian for the Depository, and shall bear the legend set forth on Exhibit B. The aggregate principal amount of any Global

Security may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for the Depository, as hereinafter provided.

Notes offered and sold in offshore transactions in reliance on Regulation S shall be issued in the form of certificated notes in registered form set forth in Exhibit A-1 ("*Offshore Physical Securities*").

Each Additional Note is an additional obligation of the Company and the Guarantors and shall be governed by, and entitled to the benefits of, this Indenture and shall be subject to the terms of this Indenture (including the Guarantees), shall rank pari passu with and be subject to the same terms (including the rate of interest from time to time payable thereon) as all other Notes (except, as the case may be, with respect to the issuance date and aggregate principal amount), and shall have the benefit of any Liens securing Notes.

Section 2.3        Registrar and Paying Agent.

The Company shall maintain an office or agency (which shall be located in the Borough of Manhattan in the City of New York, State of New York) where Notes may be presented for registration of transfer or for exchange (the "*Registrar*"), an office or agency (which shall be located in the Borough of Manhattan, City of New York, State of New York) where Notes may be presented for payment (the "*Paying Agent*") and an office or agency where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The Registrar shall keep a register of the Notes and of their transfer and exchange.  The Company may have one or more co-registrars and one or more additional paying agents.  The term "Paying Agent" includes any additional paying agent.  The Company may act as its own Paying Agent, except that for the purposes of payments on account of principal on the Notes pursuant to Sections 4.12 and 4.14, neither the Company nor any Affiliate of the Company may act as Paying Agent.

The Company shall enter into an appropriate agency agreement with any Agent not a party to this Indenture, which shall incorporate the provisions of the TIA.  The agreement shall implement the provisions of this Indenture that relate to such Agent.  The Company shall notify the Trustee of the name and address of any such Agent.  If the Company fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such and shall be entitled to appropriate compensation in accordance with Section 7.7.

The Company initially appoints the Trustee as Registrar and Paying Agent and agent for service of notices and demands in connection with the Notes.

Section 2.4        Paying Agent to Hold Money in Trust.

Each Paying Agent shall hold in trust for the benefit of the Securityholders or the Trustee all money held by the Paying Agent for the payment of principal of or interest on the Notes, and shall notify the Trustee of any default by the Company in making any such payment.  Money held in trust by the Paying Agent need not be segregated except as required by law and in no event shall the Paying Agent be liable for any interest on any money received by it hereunder.  The Company at any time may require the Paying Agent to pay all money held by it to the Trustee and account for any funds disbursed and the Trustee may at any time during the

continuance of any Event of Default specified in Section 6.1(a) or (b) upon written request to the Paying Agent, require such Paying Agent to pay forthwith all money so held by it to the Trustee and to account for any funds disbursed. Upon making such payment, the Paying Agent shall have no further liability for the money delivered to the Trustee.

Section 2.5        Securityholder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of the Securityholders and otherwise comply with TIA Section 312(a). If the Trustee is not the Registrar, the Company shall furnish or cause the Registrar to furnish to the Trustee before each Interest Payment Date, and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Securityholders.

Section 2.6        Transfer and Exchange.

Subject to the provisions of Sections 2.14 and 2.15, when Notes are presented to the Registrar or a co-Registrar with a request from the Holder of such Notes to register the transfer or to exchange them for an equal principal amount of Notes of other authorized denominations, the Registrar shall register the transfer or make the exchange as requested; *provided* that every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed or be accompanied by a written instrument of transfer in form satisfactory to the Company and the Registrar, duly executed by the Holder thereof or his attorneys duly authorized in writing. To permit registrations of transfers and exchanges, the Company shall issue and execute and the Trustee shall authenticate new Notes (together with related Guarantees executed by the Guarantors) evidencing such transfer or exchange. No service charge shall be made to the Securityholder for any registration of transfer or exchange. The Company may require from the Securityholder payment of a sum sufficient to cover any transfer taxes or other governmental charge that may be imposed in relation to a transfer or exchange, but this provision shall not apply to any exchange pursuant to Section 2.10, 4.12, 4.14 or 9.5 (in which events the Company will be responsible for the payment of such taxes). The Registrar or co-Registrar shall not be required to register the transfer of or exchange of any Note (i) during a period beginning at the opening of business 15 days before the mailing of a notice of redemption of Notes and ending at the close of business on the day of such mailing and (ii) selected for redemption in whole or in part pursuant to Article III, except the unredeemed portion of any Note being redeemed in part.

Section 2.7        Replacement Notes.

If a mutilated Note is surrendered to the Registrar or the Trustee or if the Holder of a Note of any series claims that the Note has been lost, destroyed or wrongfully taken, the Company shall issue and the Trustee shall authenticate a replacement Note (together with related Guarantees executed by the Guarantors) if the Holder of such Note furnishes to the Company and to the Trustee evidence reasonably acceptable to them of the ownership and the destruction, loss or theft of such Note. If required by the Trustee or the Company, an indemnity bond shall be posted, sufficient in the judgment of the Company or the Trustee, as the case may be, to protect the Company, the Trustee or any Agent from any loss that any of them may suffer if such Note is replaced. The Company may charge such Holder for the Company's expenses in replacing such

Note and the Trustee may charge the Company for the Trustee's expenses in replacing such Note. Every replacement Note shall constitute an additional obligation of the Company and shall be entitled to the benefits of this Indenture.

Section 2.8    Outstanding Notes.

The Notes outstanding at any time are all Notes that have been authenticated by the Trustee except for (a) those canceled by it, (b) those delivered to it for cancellation or (c) those described in this Section 2.8 as not outstanding. A Note does not cease to be outstanding because the Company or one of its Affiliates holds the Note.

If a Note is replaced pursuant to Section 2.7, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser in whose hands such Note is a legal, valid and binding obligation of the Company.

If the Paying Agent holds, in its capacity as such, on any Maturity Date or on any optional redemption date money sufficient to pay all accrued interest and principal with respect to such Notes payable on that date and is not prohibited from paying such money to the Holders thereof pursuant to the terms of this Indenture, then on and after that date such Notes cease to be outstanding and interest on them ceases to accrue.

Section 2.9    Disregarded Notes.

Notwithstanding Section 316(a) of the TIA, in determining whether the Holders of the required principal amount of Notes have concurred in any declaration of acceleration, notice of default, direction, waiver, consent, amendment, modification, supplemental indenture or other change or other matter with respect to this Indenture or the Notes, Notes owned by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any Guarantor (each, a "*Control Person*"), shall not be disregarded. The Trustee, each Holder and each direct and indirect beneficial owner of an interest in the Notes hereby (i) waives the application of the final sentence of Section 316(a) of the TIA with respect to any Control Person, (ii) specifically agrees that such sentence and the terms thereof shall be excluded from this Indenture and the Notes and shall not be deemed included herein or therein, and (iii) to the extent necessary, waives the application of Section 318 of the TIA and agrees that the provisions of this Section 2.9 shall govern and control. As of the Issue Date, the beneficial owners of the Notes include one or more Control Persons, and such Control Persons would not have accepted the Notes issued hereunder in the absence of the waivers and agreements set forth in this Section 2.9. The provisions of this Section 2.9 may be specifically enforced by the Trustee or any Holder or direct or indirect beneficial owner of the Notes.

Section 2.10    Temporary Notes.

Until definitive Notes are prepared and ready for delivery, the Company may prepare and the Trustee shall authenticate temporary Notes (together with related Guarantees executed by the Guarantors). Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Company reasonably considers appropriate for temporary Notes. Without unreasonable delay, the Company shall prepare and the Trustee shall authenticate definitive Notes (together with related Guarantees executed by the Guarantors) in exchange for

temporary Notes. Until such exchange, such temporary Notes shall be entitled to the same rights, benefits and privileges as the definitive Notes.

Section 2.11       Cancellation.

The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar and the Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall (subject to the record-retention requirements of the Exchange Act) dispose of canceled Notes unless the Company directs the Trustee to return such Notes to the Company. The Company may not reissue or resell, or issue new Notes to replace, Notes that the Company has redeemed or paid, or that have been delivered to the Trustee for cancellation.

Section 2.12       Defaulted Interest.

If the Company defaults in a payment of interest on the Notes, it shall pay the defaulted interest, plus, to the extent permitted by law, any interest payable on the defaulted interest, to the Persons who are Securityholders on a subsequent special record date. Such record date shall be the fifteenth day next preceding the date fixed by the Company for the payment of defaulted interest, whether or not such day is a Business Day. At least 15 days before the subsequent special record date, the Company shall mail (or cause to be mailed) to each Securityholder a notice that states the record date, the payment date and the amount of defaulted interest to be paid. Notwithstanding the foregoing, any interest which is paid prior to the expiration of the 30-day period set forth in Section 6.1(a) or (b) shall be paid to Holders of Notes as of the regular record date for the interest payment date for which interest has not been paid. Notwithstanding the foregoing, the Company may make payment of any defaulted interest in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Notes may be listed, and upon such notice as may be required by such exchange.

Section 2.13       CUSIP Number.

The Company in issuing the Notes may use a "CUSIP" number, and if so, such CUSIP number shall be included in notices of redemption or exchange as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes, and that reliance may be placed only on the other identification numbers printed on the Notes. The Company will promptly notify the Trustee of any change in the CUSIP number.

Section 2.14       Book-Entry Provisions for Global Securities.

(a)       The Global Securities initially shall (i) be registered in the name of the Depository or the nominee of such Depository, (ii) be delivered to the Trustee as custodian for such Depository and (iii) bear legends as set forth in Exhibit B.

Members of, or participants in, the Depository ("**Agent Members**") shall have no rights under this Indenture with respect to any Global Security held on their behalf by the Depository, or the Trustee as its custodian, or under the Global Security, and the Depository may be treated

by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner of the Global Security for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b)     Transfers of Global Securities shall be limited to transfers in whole, but not in part, to the Depository, its successors or their respective nominees. U.S. Physical Securities shall be transferred to all beneficial owners in exchange for their beneficial interests in Global Securities, in accordance with the rules and procedures of the Depository, only if (i) the Depository notifies the Company that it is unwilling or unable to continue as Depository for any Global Security and a successor depositary is not appointed by the Company within 90 days of such notice or (ii) an Event of Default has occurred and is continuing and the Registrar has received a request from the Depository to issue U.S. Physical Securities.

(c)     In connection with the transfer of Global Securities as an entirety to beneficial owners pursuant to paragraph (b), the Global Securities shall be deemed to be surrendered to the Trustee for cancellation, and the Company shall execute, and the Trustee shall authenticate and deliver to each beneficial owner identified by the Depository in exchange for its beneficial interest in the Global Securities, an equal aggregate principal amount of U.S. Physical Securities (together with related Guarantees executed by the Guarantors) of authorized denominations.

(d)     Any U.S. Physical Security constituting a Restricted Security delivered in exchange for an interest in a Global Security pursuant to paragraph (b) shall, except as otherwise provided by paragraphs (a)(i)(x) and (c) of Section 2.15, bear the legend regarding transfer restrictions applicable to the U.S. Physical Securities set forth in Exhibit A-1.

(e)     The Holder of any Global Security may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

Section 2.15     Special Transfer Provisions.

(a)     Transfers to Non-QIB Institutional Accredited Investors and Non-U.S. Persons. The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Security to any Institutional Accredited Investor which is not a QIB or to any Non-U.S. Person:

(i)     the Registrar shall register the transfer of any Note constituting a Restricted Security, whether or not such Note bears the Private Placement Legend, if (x) the requested transfer is after the first anniversary of the date on which such Series A Note was issued or (y) (1) in the case of a transfer to an Institutional Accredited Investor which is not a QIB (excluding Non-U.S. Persons), the proposed transferee has delivered to the Registrar a certificate substantially in the form of Exhibit C hereto or (2) in the case of a transfer to a Non-

U.S. Person, the proposed transferee has delivered to the Registrar a certificate substantially in the form of Exhibit D hereto, together, in the case of clause (i)(x) with such other certifications, legal opinions addressed to the Trustee, the Registrar and the Company or other information as the Company may reasonably require to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act; and

(ii)    if the proposed transferor is an Agent Member holding a beneficial interest in a Global Security, upon receipt by the Registrar of (x) the certificate, if any, required by paragraph (i) above and (y) instructions given in accordance with the Depository's and the Registrar's procedures, whereupon (a) the Registrar shall reflect on its books and records the date and (if the transfer does not involve a transfer of outstanding Physical Securities) a decrease in the principal amount of a Global Security in an amount equal to the principal amount of the beneficial interest in a Global Security to be transferred, and (b) the Company shall execute and the Trustee shall authenticate and deliver one or more Physical Securities (together with related Guarantees executed by the Guarantors) of like tenor and amount.

(b)    Transfers to QIBs. The following provisions shall apply with respect to the registration of any proposed transfer of a Note constituting a Restricted Security to a QIB (excluding transfers to Non-U.S. Persons):

(i)    the Registrar shall register the transfer if such transfer is being made by a proposed transferor who has checked the box provided for on the form of Note stating, or has otherwise advised the Company and the Registrar in writing, that the sale has been made in compliance with the provisions of Rule 144A to a transferee who has signed the certification provided for on the form of Note stating, or has otherwise advised the Company and the Registrar in writing, that it is purchasing the Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a QIB within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as it has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon its foregoing representations in order to claim the exemption from registration provided by Rule 144A; and

(ii)    if the proposed transferee is an Agent Member, and the Notes to be transferred consist of Physical Securities which after transfer are to be evidenced by an interest in the Global Security, upon receipt by the Registrar of instructions given in accordance with the Depository's and the Registrar's procedures, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Global Security in an amount equal to the principal amount of the Physical Securities to be transferred, and the Trustee shall cancel the Physical Securities so transferred.

(c)    Private Placement Legend. Upon the transfer, exchange or replacement of Notes not bearing the Private Placement Legend, the Registrar shall deliver Notes that do not bear the Private Placement Legend. Upon the transfer, exchange or replacement of Notes bearing the Private Placement Legend, the Registrar shall deliver only Notes that bear the Private Placement Legend unless (i) the circumstances contemplated by paragraph (a)(i)(x) of this

Section 2.15 exist, (ii) there is delivered to the Registrar an Opinion of Counsel addressed to the Trustee, the Registrar and the Company reasonably satisfactory to the Company and the Trustee to the effect that neither such legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act or (iii) such Note has been sold pursuant to an effective registration statement under the Securities Act.

      (d)    Restricted Control Securities. Each Restricted Control Security shall bear the restrictive legend set forth in Exhibit F (the "***Restricted Control Security Legend***"). Notes represented by Restricted Control Securities may only be transferred in compliance with the restrictions set forth in the Restricted Control Security Legend. Upon the transfer of such Notes, the Registrar shall deliver U.S. Physical Securities that do not bear any restrictive legend.

      (e)    General. By its acceptance of any Note bearing the Private Placement Legend or the Restricted Control Security Legend, each Holder of such a Note acknowledges the restrictions on transfer of such Note set forth in this Indenture and in such legend and agrees that it will transfer such Note only as provided in this Indenture.

The Registrar shall retain copies of all letters, notices and other written communications received pursuant to Section 2.14 or this Section 2.15. The Company shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

## ARTICLE III

## REDEMPTION

Section 3.1        Notices to Trustee.

If the Company elects to redeem Notes pursuant to Section 5 of the Notes, it shall notify the Trustee and the Paying Agent in writing of the Redemption Date and the principal amount of Notes to be redeemed.

The Company shall give each notice provided for in this Section 3.1 at least 30 but not more than 60 days before the Redemption Date (unless a shorter notice shall be satisfactory to the Trustee), together with an Officer's Certificate stating that such redemption will comply with the conditions contained herein and in the Notes.

Section 3.2        Selection of Notes to be Redeemed.

If less than all of the Notes are to be redeemed, the Trustee shall select Notes to be so redeemed in compliance with applicable legal requirements and the requirements of the principal national securities exchange, if any, on which the Notes are listed or, if the Notes are not listed on a national securities exchange, by lot, pro rata or in such other fair and appropriate manner chosen at the discretion of the Trustee.

The Trustee shall make the selection from the Notes outstanding and not previously called for redemption. Notes in denominations of $1,000 or less may only be redeemed in whole. The Trustee may select for redemption portions of the principal of Notes that have

denominations larger than $1,000. Provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption. The Trustee shall promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount of each certificate selected for redemption.

Section 3.3        Notice of Redemption.

At least 30 days but not more than 60 days before a Redemption Date, the Company shall mail or cause the mailing of a notice of redemption by first-class mail, postage prepaid, to each Holder of Notes to be redeemed at such Holder's address as it appears on the Notes register maintained by the Registrar with a copy to the Trustee and any Paying Agent.

The notice shall identify the Notes to be redeemed and shall state:

        (a)        the Redemption Date;

        (b)        the redemption price to be paid;

        (c)        the name and address of the Paying Agent;

        (d)        that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price and accrued interest, if any;

        (e)        that, unless the Company defaults in making the redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date and the only remaining right of the Holders of such Notes is to receive payment of the redemption price upon surrender to the Paying Agent of the Notes to be redeemed;

        (f)        if any Note is to be redeemed in part, the portion of the principal amount of such Note to be redeemed and that, on or after the Redemption Date, upon surrender of such Note, a new Note or Notes in aggregate principal amount equal to the unredeemed portion thereof will be issued without charge to the Securityholder;

        (g)        if less than all of the Notes are to be redeemed, the identification of the particular Notes (or portion thereof) to be redeemed, as well as the aggregate principal amount of Notes to be redeemed; and

        (h)        the CUSIP number, if any.

At the Company's request, made to the Trustee at least 40 days prior to the Redemption Date (unless a shorter notice shall be satisfactory to the Trustee), the Trustee shall give the notice of redemption, in the Company's name and at the Company's expense, in accordance with this Section 3.3.

Section 3.4        Effect of Notice of Redemption.

Once notice of redemption is mailed, Notes called for redemption become due and payable on the Redemption Date and at the redemption price. Upon surrender to the Paying

Agent, such Notes shall be paid at the redemption price plus accrued interest to the Redemption Date, but interest installments whose Interest Payment Date is on or prior to such Redemption Date will be payable on the relevant Interest Payment Dates to the Holders of record at the close of business on the relevant record dates referred to in the Notes.

Section 3.5        Deposit of Redemption Price.

Prior to 10:00 a.m. New York City time on the Redemption Date, the Company shall deposit with the Paying Agent in immediately available funds U.S. Legal Tender sufficient to pay the redemption price of and accrued interest on all Notes or portions thereof to be redeemed on that date.

If any Note surrendered for redemption in the manner provided in the Notes shall not be so paid on the Redemption Date due to the failure of the Company to deposit sufficient funds with the Paying Agent, interest will continue to accrue from and including the Redemption Date until such payment is made on the unpaid principal and, to the extent lawful, on any interest not paid on such unpaid principal, in each case at the date and in the manner provided in the Notes.

Section 3.6        Notes Redeemed in Part.

Upon surrender to the Paying Agent of a Note that is redeemed in part, the Company shall execute and the Trustee shall authenticate for the Holder a new Note (together with related Guarantees executed by the Guarantors) equal in principal amount to the unredeemed portion of the Note surrendered.

ARTICLE IV

COVENANTS

Section 4.1        Payment of Notes.

(a)     The Company shall pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and this Indenture. An installment of principal or cash interest shall be considered paid on the date due if the Trustee or Paying Agent (other than the Company or any Subsidiary of the Company or any Affiliate of any thereof) holds on such date by 10:00 a.m. New York City time immediately available funds designated for and sufficient to pay such installment. An installment of PIK Interest shall be considered paid on the due date.

(b)     The Company shall pay interest on the Notes at the rate of 13.5% per annum payable semi-annually in arrears. In addition, upon demand from time to time, the Company shall pay interest (including Accrued Bankruptcy Interest) on overdue principal and on overdue installments of interest, in each case at the rate of 13.5% per annum, to the extent lawful. Prior to the Maturity Date, interest shall be paid in-kind ("*PIK Interest*") through the issuance of Additional Notes (the "*PIK Notes*"), except that interest paid in connection with the consummation of a Net Proceeds Offer or Change of Control Offer shall be paid in cash. On and after the Maturity Date, all interest shall be paid in cash. On the Maturity Date, the Company shall pay in full in cash all principal of the Notes and all accrued and unpaid interest on the Notes.

(c)     Not less than five Business Days prior to each Interest Payment Date, the Company may deliver to the Trustee an Officer's Certificate notifying the Trustee of the aggregate amount of PIK Notes to be issued, and specifying the amount of PIK Notes to be issued through the issuance of additional Physical Securities and the amounts to be issued through increases in Global Securities.  On or after the date of such Officer's Certificate but not less than 2 Business Days prior to the relevant Interest Payment Date, the Company shall deliver to the Trustee any additional Physical Securities to be issued, which additional Physical Securities shall have been duly executed by the Company in the manner provided in Section 2.2.  On the relevant Interest Payment Date the Trustee shall record increases in the Global Securities and, if so requested by the Company, authenticate additional Physical Securities, as appropriate, in the aggregate principal amounts required to pay the interest then due.

Section 4.2          Maintenance of Office or Agency.

The Company shall maintain in the Borough of Manhattan, the City of New York, an office or agency, where Notes may be surrendered for registration of transfer or exchange or for presentation for payment and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the address of the Trustee set forth in Section 11.2.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New York, for such purposes.  The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby initially designates the Corporate Trust Office of the Trustee set forth in Section 11.2 as an agency of the Company in accordance with Section 2.3.

Section 4.3          Corporate Existence.

Subject to Article V hereof, the Company shall do or cause to be done, at its own cost and expense, all things necessary to, and will cause each of its Restricted Subsidiaries to, preserve and keep in full force and effect the corporate existence and rights (charter and statutory), licenses and/or franchises of the Company and each of its Restricted Subsidiaries; *provided* that the Company shall not be required to preserve any such right, license or franchise, or the corporate existence of any of its Restricted Subsidiaries, if in the judgment of the Board of Directors or management of the Company (i) such preservation or existence is not desirable in the conduct of business of the Company or such Restricted Subsidiary and (ii) the loss of such right, license or franchise or the dissolution of such Restricted Subsidiary is not adverse in any material respect to the Holders.

Section 4.4          Payment of Taxes and Other Claims.

The Company shall and shall cause each of its Subsidiaries to pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (a) all material taxes, assessments and governmental charges levied or imposed upon its or its Subsidiaries' income, profits or property and (b) all material lawful claims for labor, materials and supplies which, if unpaid, would be reasonably likely to by law become a Lien upon its property or the property of any of its Subsidiaries; *provided* that the Company shall not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate negotiations or proceedings and for which disputed amounts adequate reserves (in the good faith judgment of the Board of Directors or management of the Company) have been made in accordance with GAAP.

Section 4.5          Maintenance of Properties; Books and Records; Compliance with Law.

The Company shall and shall cause each of its Restricted Subsidiaries to at all times cause all properties used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order (reasonable wear and tear excepted) and supplied with all necessary equipment, and shall cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereto; *provided* that nothing in this Section 4.5 shall prevent the Company or any Restricted Subsidiary from discontinuing the operation or maintenance of any of such properties, or disposing of any of them, if such discontinuance or disposal is either (i) in the ordinary course of business, (ii) in the reasonable and good faith judgment of the Board of Directors or management of the Company or the Restricted Subsidiary concerned, as the case may be, desirable in the conduct of the business of the Company or such Restricted Subsidiary, as the case may be, or (iii) otherwise permitted by this Indenture.

Section 4.6          Compliance Certificates; Notice of Default.

(a)     The Company shall deliver to the Trustee, within 120 days after the end of its fiscal year, an Officer's Certificate signed by the principal executive officer, the principal financial officer or the principal accounting officer complying with TIA Section 314(a)(4) stating (i) that a review of the activities of the Company and the activities of its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officer with a view to determining whether the Company and the Guarantors have kept, observed, performed and fulfilled each of their respective obligations under this Indenture, the Notes and the Guarantees and (ii) that, to the best knowledge of such Officer after due inquiry, each of the Company and the Guarantors has kept, observed, performed and fulfilled, in each case in all material respects, each and every covenant and other obligation contained in this Indenture, the Notes and the Guarantees and is not in default in the performance or observance of any of the terms, provisions and conditions hereof and has not failed to comply with any other obligation hereunder (or, if a Default, Event of Default or failure to comply with any other obligation hereunder shall have occurred, describing with particularity all such Defaults, Events of Default or failures to comply with any other obligation hereunder of which such Officer may have knowledge, including, but not limited to, their status and what action the Company is taking or proposes to take with respect thereto).

(b)     The Company shall, so long as any of the Notes are outstanding, deliver to the Trustee, forthwith upon becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

Section 4.7          Reports.

(a)     The Company shall post on a confidential website (access to which shall require signature on a non-negotiable customary confidentiality agreement established on such website as a condition to access thereof (the "*CA*"), a form of which shall be provided by the Company to each Holder or beneficial owner of the Notes upon request) the following information:

(1)     within 100 days after the end of the fiscal year of the Company, (A) audited year-end consolidated financial statements of the Company and its Subsidiaries (including balance sheets, statements of operations and statements of cash flows which would be required from a SEC registrant in an Annual Report on Form 10-K, including pursuant to Rule 3-10 of Regulation S-K promulgated by the SEC) prepared in accordance with GAAP; and (B) the information described in Item 303 of Regulation S-K under the Securities Act ("Management's Discussion and Analysis of Financial Condition and Results of Operations") with respect to such period, to the extent such information would otherwise be required to be filed in an Annual Report on Form 10-K;

(2)     within 50 days after the end of the first three fiscal quarters of each fiscal year, (A) unaudited quarterly consolidated financial statements of the Company and its Subsidiaries (including balance sheets, statements of operations and statements of cash flows which would be required from a SEC registrant in a Quarterly Report on Form 10-Q, including pursuant to Rule 3-10 of Regulation S-K promulgated by the SEC) prepared in accordance with GAAP, subject to normal year-end adjustments; and (B) the information described in Item 303 of Regulation S-K under the Securities Act with respect to such period to the extent such information would otherwise be required to be filed in a Quarterly Report on Form 10-Q; and

(3)     within 5 Business Days of the occurrence of any of the following events, notice of such event and information pertaining to such event that would be required to be filed on a Current Report on Form 8-K in accordance with the Exchange Act by the Company if the Company were required to file such report with the SEC:

(i)     any change in the executive officers or directors of the Company;

(ii)     any incurrence of any material long-term Indebtedness of the Company;

(iii)     any acceleration of any Indebtedness of the Company or any of its Restricted Subsidiaries;

(iv)     any issuance by the Company of its Capital Stock generating net cash proceeds greater than $10 million; provided that any issuance of Capital

Stock in the ordinary course of business to directors, officers, employees, consultants or advisors of the Company or any of its Subsidiaries in connection with their service as directors, their employment or their retention as consultants or advisors pursuant to the Company's or such Subsidiaries' employee benefit, option or other equity incentive plans, as applicable, shall not require notice pursuant to this clause (iv);

(v)     any entry into an agreement by the Company or any of its Subsidiaries relating to a transaction that has, or would reasonably be expected to result in, a Change of Control;

(vi)     any resignation or termination of the Company's independent accountants or any new engagement of the Company's independent accountants;

(vii)     any determination by the Company or the receipt of advice or notice by the Company from its independent accountants relating to non-reliance on previously issued financial statements, a related audit opinion or a completed interim review; and

(viii)     the completion by the Company and any of the Company's Restricted Subsidiaries of the acquisition or disposition of a significant amount of assets,

in each case, solely to the extent such information would be required to be filed on a Current Report on Form 8-K in accordance with the Exchange Act by the Company if the Company were required to file such report with the SEC; provided that there shall be no obligation to provide financial statements or *pro forma* financial statements with respect to a business acquired or disposed of.

(b)     The Company will provide any prospective purchaser of the Notes or beneficial interests in Notes identified by an existing Holder or beneficial owner of Notes with access to the confidential website if such prospective purchaser agrees to be bound by the CA.

(c)     Upon written request of any Holder or beneficial owner of Notes (which request may be by electronic mail pursuant to Section 11.2), the Company shall, subject to execution of a CA, provide a copy of the Budget to such Holder or beneficial owner; *provided, however*, that the Company will not be obligated to comply with any such request if it reasonably determines, in good faith, that such Person is a competitor of the Company; *provided, further*, that the Company shall not have an obligation to update any Budget previously provided to any such Person. For purposes of this Agreement, the "Budget" means a summary budget of the Company and its Subsidiaries prepared before the beginning of each fiscal year of the Company, but in any event no later than the last day of the preceding fiscal year of the Company, consisting of annual sales, statements of Consolidated EBITDA and consolidated statements of cash flows, all prepared on a consistent basis with the historical financial statements of the Company and its Subsidiaries, together with appropriate supporting details and a statement of underlying assumptions. For avoidance of doubt, the Budget shall not be required to be posted on any website maintained by the Company.

(d)     The Company may in its sole discretion elect to file with the SEC Forms 10-Q, 10-K and 8-K, as applicable. In such event, the timely and compliant filing with the SEC

of all information and reports on Forms 10-Q, 10-K and 8-K, as applicable, shall be deemed to satisfy all of the requirements described in paragraph (a) above.

Section 4.8        Limitation on Restricted Payments.

(a)        The Company shall not, and shall not cause or permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)        declare or pay any dividend or make any distribution (other than dividends or distributions payable in Qualified Capital Stock or options, warrants and other rights to purchase the same) on or in respect of shares of Capital Stock of the Company to holders of such Capital Stock;

(2)        purchase, redeem or otherwise acquire or retire for value any Capital Stock of the Company or any warrants, rights or options to purchase or acquire shares of any class of such Capital Stock;

(3)        make any principal payment on, purchase, defease, redeem, prepay or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Obligation; or

(4)        make any Investment (other than Permitted Investments) in any other Person (each of the foregoing actions set forth in clauses (1), (2), (3) and (4) being referred to as a "**_Restricted Payment_**")

if at the time of such Restricted Payment or immediately after giving effect thereto:

(i)        a Default or an Event of Default shall have occurred and be continuing; or

(ii)        the Company is not able to incur at least $1.00 of additional Indebtedness (other than Permitted Indebtedness) in compliance with Section 4.9; or

(iii)        the aggregate amount of Restricted Payments made subsequent to the Issue Date (the amount expended for such purposes, if other than cash, being the fair market value of such property as determined in good faith by the Board of Directors of the Company) shall exceed the sum of (the "**_Restricted Payment Basket_**"):

(w)        50% of the cumulative Consolidated Net Income (or if cumulative Consolidated Net Income shall be a loss, minus 100% of such loss) of the Company earned subsequent to the fiscal quarter during which the Issue Date occurs and on or prior to the date the Restricted Payment occurs (the "**_Reference Date_**") (treating such period as a single accounting period); plus

(x)        100% of the aggregate Net Equity Proceeds received by the Company from any Person (other than a Subsidiary of the Company) from the issuance and sale subsequent to the Issue Date and on or prior to the Reference Date of Qualified Capital Stock of the Company (including Capital Stock issued upon the conversion of

convertible Indebtedness or in exchange for outstanding Indebtedness but excluding aggregate Net Equity Proceeds from the sale of Capital Stock to the extent used to repurchase or acquire shares of Capital Stock of the Company or a Subordinated Obligation of the Company or a Guarantor pursuant to clause (2) of the next succeeding paragraph (b) below); plus

(y)     without duplication of any amounts included in clause (iii)(x) above, 100% of the aggregate Net Equity Proceeds of any equity contribution received by the Company from a holder of the Company's Capital Stock subsequent to the Issue Date; plus

(z)     to the extent that any Investment (other than a Permitted Investment) that was made after the Issue Date is sold for cash or otherwise liquidated or repaid for cash, the net cash proceeds received with respect to such sale, liquidation or repayment of such Investment, but only to the extent not included in the calculation of Consolidated Net Income.

(b)     Notwithstanding the foregoing, the provisions set forth in paragraph (a) do not prohibit:

(1)     the payment of any dividend within 60 days after the date of declaration of such dividend if the dividend would have been permitted on the date of declaration;

(2)     the acquisition of any shares of Capital Stock of the Company or the repurchase, redemption or other repayment of any Subordinated Obligation of the Company or any Guarantor in exchange for or solely out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of shares of Qualified Capital Stock of the Company;

(3)     the repurchase, redemption or other repayment of any Subordinated Obligation of the Company or any Guarantor in exchange for or solely out of the proceeds of the substantially concurrent issuance (other than to a Subsidiary of the Company) of a Subordinated Obligation of the Company or such Guarantor with no payments of principal required until at least six months following the maturity date of the Notes;

(4)     the making of distributions, loans or advances in an amount not to exceed (x) $5.0 million to pay the ordinary operating costs of Holdings (including, without limitation, directors fees, indemnification obligations, professional fees and expenses) related to Holdings' ownership of Capital Stock of the Company in any fiscal year plus (y) any other amounts of corporate overhead expenses payable by Holdings which were deducted in calculating the Consolidated Net Income of the Company in accordance with GAAP;

(5)     the payment by the Company of cash dividends to Holdings in the amounts and at the times of any payment by Holdings in respect of taxes, *provided* that (x) the amount of cash dividends paid pursuant to this clause (5) to enable Holdings to pay federal and state income taxes at any time shall not exceed the lesser of (A) the amount of such federal and state income taxes owing by Holdings at such time for the respective period and (B) the amount of such federal and state income taxes that would be owing by the Company and its Subsidiaries

on a consolidated basis for such period if determined without regard to Holdings' ownership of the Company and (y) any refunds shall promptly be returned by Holdings to the Company;

(6)     payments for the purpose of and in an amount equal to the amount required to permit Holdings to redeem or repurchase Holdings' common equity or options in respect thereof, in each case in connection with the repurchase, put or call provisions under employee stock option, management subscription, retained share or stock purchase agreements or other agreements to compensate management employees; *provided* that such redemptions or repurchases pursuant to this clause (6) shall not exceed $15.0 million per annum; *provided* that amounts not used pursuant to this clause (6) in prior years shall not be carried forward for use in future years;

(7)     so long as no Default or Event of Default shall have occurred and be continuing, payments not to exceed $500,000 in the aggregate to enable Holdings to make payments to holders of its Capital Stock in lieu of issuance of fractional shares of its Capital Stock;

(8)     payments allowed pursuant to Section 4.13(b), clauses (5), (8), (9), (10), (11) and (12);

(9)     repurchases of Capital Stock deemed to occur upon the exercise of stock options if such Capital Stock represents a portion of the exercise price thereof; and

(10)     additional Restricted Payments in an aggregate amount not to exceed $20.0 million.

(c)     In determining the aggregate amount of the Restricted Payment Basket in accordance with clause (iii) of paragraph (a) above, amounts expended pursuant to clauses (1), (6) and (10) of paragraph (b) above shall be included in such calculation.

Section 4.9          Limitation on Incurrence of Additional Indebtedness.

(a)     The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume, guarantee, acquire, become liable, contingently or otherwise, with respect to, or otherwise become responsible for payment of (collectively, "*incur*") any Indebtedness (other than Permitted Indebtedness); *provided, however,* that if no Default or Event of Default shall have occurred and be continuing at the time or as a consequence of the incurrence of any such Indebtedness, the Company or any Guarantor may incur Indebtedness if on the date of the incurrence of such Indebtedness, after giving effect to the incurrence thereof, the Consolidated Fixed Charge Coverage Ratio of the Company would have been greater than 2.00 to 1.0.

No Indebtedness incurred pursuant to the Consolidated Fixed Charge Coverage Ratio test of the preceding paragraph (including, without limitation, Indebtedness under the Senior Credit Facilities) shall reduce the amount of Indebtedness which may be incurred pursuant to any clause of the definition of "Permitted Indebtedness" (including, without limitation, Indebtedness under the Senior Credit Facilities pursuant to clause (2) of the definition of "Permitted Indebtedness").

(b)     The Company will not, and will not permit any Guarantor to, directly or indirectly, incur any Indebtedness which by its terms (or by the terms of any agreement governing such Indebtedness) is subordinated in right of payment to any other Indebtedness of the Company or such Guarantor, as the case may be, unless such Indebtedness is also by its terms (or by the terms of any agreement governing such Indebtedness) made expressly subordinate in right of payment to the Notes or the Guarantee of such Guarantor, as the case may be, to the same extent and in the same manner as such Indebtedness is subordinated to other Indebtedness of the Company or such Guarantor, as the case may be.

(c)     For purposes of determining compliance with this covenant, (1) in the event that an item of Indebtedness meets the criteria of more than one of the types of Indebtedness described in the definition of "Permitted Indebtedness", the Company, in its sole discretion, will classify such item of Indebtedness at the time of incurrence and will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the definition of "Permitted Indebtedness" and (2) the Company will be entitled from time to time to reclassify any Indebtedness incurred pursuant to any clause in the definition of "Permitted Indebtedness".

Section 4.10        Limitation on Dividend and Other Payment Restrictions Affecting Subsidiaries.

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions on or in respect of its Capital Stock;

(2)     make loans or advances or to pay any Indebtedness or other obligation owed to the Company or any other Restricted Subsidiary of the Company; or

(3)     transfer any of its property or assets to the Company or any other Restricted Subsidiary of the Company,

except for such encumbrances or restrictions existing under or by reason of:

(a)     applicable law;

(b)     this Indenture or the indenture governing the Second Lien Notes or encumbrances or restrictions substantially similar to the encumbrances and restrictions contained in this Indenture or the Second Lien Notes indenture, taken as a whole;

(c)     non-assignment provisions of any contract or any lease entered into in the ordinary course of business;

(d)     any instrument governing Acquired Indebtedness, which encumbrance or restriction is not applicable to the Company or any Restricted Subsidiary of the Company, or the properties or assets of any such Person, other than the Person or the properties or assets of the

Person so acquired; *provided, however*, that such Acquired Indebtedness was not incurred in connection with, or in anticipation or contemplation of, an acquisition by the Company or the Restricted Subsidiary;

(e)     agreements existing on the Issue Date;

(f)     the Senior Credit Facilities or any A/R Facility;

(g)     restrictions on the transfer of assets subject to any Lien permitted under this Indenture imposed by the holder of such Lien;

(h)     restrictions imposed by any agreement to sell assets permitted under this Indenture to any Person pending the closing of such sale;

(i)     Indebtedness or other contractual requirements of a Receivables Entity in connection with a Qualified Receivables Transaction; *provided* that such restrictions apply only to such Receivables Entity;

(j)     agreements governing Indebtedness permitted to be Incurred pursuant to Section 4.9, provided that the provisions relating to such encumbrances or restrictions contained in such Indebtedness are not materially less favorable to the Company as determined by the Board of Directors of the Company in their reasonable and good faith judgment than the provisions contained in the Senior Credit Facilities as in effect on the Issue Date; or

(k)     an agreement effecting a refinancing, replacement or substitution of Indebtedness issued, assumed or Incurred pursuant to an agreement referred to in clause (b), (d), (e) or (f) above; *provided, however*, that the provisions relating to such encumbrance or restriction contained in any such refinancing, replacement or substitution agreement are no less favorable to the Company or the Holders in any material respect as determined by the Board of Directors of the Company than the provisions relating to such encumbrance or restriction contained in agreements referred to in such clause (b), (d), (e) or (f).

Section 4.11     Limitation on Liens.

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, create, incur, assume or suffer to exist any Liens (other than Permitted Liens) of any kind against or upon any of their respective property or assets, or any proceeds, income or profit therefrom which secure any Indebtedness of the Company or a Guarantor, unless:

(1)     in the case of Liens securing Subordinated Obligations of the Company, the Notes are secured by a Lien on such property, assets, proceeds, income or profit that is senior in priority to such Liens;

(2)     in the case of Liens securing Subordinated Obligations of a Guarantor, such Guarantor's Guarantee is secured by a Lien on such property, assets, proceeds, income or profit that is senior in priority to such Liens; and

(3)     in all other cases, the Notes are or such Guarantor's Guarantee is, as the case may be, equally and ratably secured by a Lien on such property, assets, proceeds, income or profit.

Section 4.12          Limitation on Asset Sales.

(a)     The Company shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)     the Company or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value of the assets sold or otherwise disposed of (as determined in good faith by the Company's Board of Directors);

(2)     at least 75% of the consideration received by the Company or such Restricted Subsidiary, as the case may be, from such Asset Sale shall be cash or Cash Equivalents and is received at the time of such disposition; *provided* that the amount of (x) any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Company or such Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Notes and other than liabilities consisting of Disqualified Capital Stock) (i) that are assumed by the transferee of any such assets and from which the Company and its Restricted Subsidiaries are unconditionally released or (ii) in respect of which neither the Company nor any Restricted Subsidiary following such sale has any obligation and (y) any notes or other obligations received by the Company or such Restricted Subsidiary from such transferee that are promptly, but in no event more than 60 days after receipt, converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received), shall be deemed to be cash for purposes of this provision; and

(3)     upon the consummation of an Asset Sale, the Company shall apply, or cause such Restricted Subsidiary to apply, the Net Cash Proceeds relating to such Asset Sale within 450 days of receipt thereof either:

(A)     to repay any secured Indebtedness (other than (1) Subordinated Obligations and (2) in the event the Notes become secured by a Lien on any property or assets, Indebtedness secured equally and ratably in such property or assets or secured by Liens junior in priority to the Liens securing the Notes) and, in the case of any such Indebtedness under any revolving credit facility, effect a permanent reduction in the availability under such revolving credit facility;

(B)     to reinvest in Productive Assets (and to the extent such reinvestment constitutes an Investment, such reinvestment complies with Section 4.8); or

(C)     a combination of repayment and investment permitted by the foregoing clauses (3)(A) and (3)(B).

On the 451st day after an Asset Sale or such earlier date, if any, as the Board of Directors of the Company or of such Restricted Subsidiary determines not to apply the Net Cash Proceeds relating to such Asset Sale as set forth in clauses (3)(A), (3)(B) and (3)(C) of the immediately preceding sentence (each, a "*Net Proceeds Offer Trigger Date*"), such aggregate amount of Net Cash Proceeds which have not been applied on or before such Net Proceeds Offer Trigger Date as permitted in clauses (3)(A), (3)(B) and (3)(C) of the immediately preceding sentence (each a "*Net Proceeds Offer Amount*") shall be applied by the Company or such Restricted Subsidiary to make an offer to purchase for cash (the "*Net Proceeds Offer*") on a date (the "*Net Proceeds Offer Payment Date*") not less than 30 nor more than 60 days following the applicable Net Proceeds Offer Trigger Date, from all Holders and holders of *pari passu* Indebtedness that is subject to a similar repurchase offer requirement on a *pro rata* basis, that amount of Notes and such *pari passu* Indebtedness equal to the Net Proceeds Offer Amount at a price in cash equal to 100% of the principal amount of the Notes and such *pari passu* Indebtedness to be purchased, plus accrued and unpaid interest thereon, if any, to the date of purchase; *provided, however*, that if at any time any non-cash consideration received by the Company or any Restricted Subsidiary of the Company, as the case may be, in connection with any Asset Sale is converted into or sold or otherwise disposed of for cash (other than interest, dividends or other earnings received with respect to any such non-cash consideration), then such conversion or disposition shall be deemed to constitute an Asset Sale hereunder as of the date of such conversion or disposition and the Net Cash Proceeds thereof shall be applied in accordance with this covenant.

(b)     Notwithstanding the foregoing, if a Net Proceeds Offer Amount is less than $30.0 million, the application of the Net Cash Proceeds constituting such Net Proceeds Offer Amount to a Net Proceeds Offer may be deferred until such time as such Net Proceeds Offer Amount plus the aggregate amount of all Net Proceeds Offer Amounts arising subsequent to the Net Proceeds Offer Trigger Date relating to such initial Net Proceeds Offer Amount from all Asset Sales by the Company and its Restricted Subsidiaries aggregates at least $30.0 million, at which time the Company or such Restricted Subsidiary shall apply all Net Cash Proceeds constituting all Net Proceeds Offer Amounts that have been so deferred to make a Net Proceeds Offer (the first date the aggregate of all such deferred Net Proceeds Offer Amounts is equal to $30.0 million or more shall be deemed to be a Net Proceeds Offer Trigger Date).

(c)     Notwithstanding paragraphs (a) and (b) of this Section 4.12, the Company and its Restricted Subsidiaries will be permitted to consummate an Asset Sale without complying with such paragraphs to the extent that:

(1)     at least 75% of the consideration for such Asset Sale constitutes Productive Assets (and to the extent any of such Productive Assets constitutes an Investment, such Investment complies with Section 4.8); and

(2)     such Asset Sale is for at least fair market value (as determined in good faith by the Company's Board of Directors); *provided* that any consideration not constituting Productive Assets received by the Company or any of its Restricted Subsidiaries in connection with any Asset Sale permitted to be consummated under this paragraph shall constitute Net Cash Proceeds and shall be subject to the provisions of this covenant with respect to the application of Net Cash Proceeds; *provided* that at the time of entering into such

transaction or immediately after giving effect thereto, no Default or Event of Default shall have occurred or be continuing or would occur as a consequence thereof.

(d)     Within 25 days following the Net Proceeds Offer Trigger Date, the Company shall mail or cause the Trustee to mail (in the Company's name and at its expense) notice of a Net Proceeds Offer to the Holders of the Notes at their last registered addresses with a copy to the Trustee and the Paying Agent.  The Net Proceeds Offer shall remain open from the time of mailing for at least 20 Business Days and until the close of business on the third Business Day prior to the Net Proceeds Offer Payment Date or such longer period as may be required by Law.  The notice shall contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Net Proceeds Offer.  The notice, which shall govern the terms of the Net Proceeds Offer, shall state:

(i)     that the Net Proceeds Offer is being made pursuant to this Section 4.12;

(ii)     the purchase price (including the amount of accrued and unpaid interest, if any) for each Note and the Net Proceeds Offer Payment Date;

(iii)     that any Note not tendered or accepted for payment will continue to accrue interest in accordance with the terms thereof;

(iv)     that any Note accepted for payment pursuant to the Net Proceeds Offer shall cease to accrue interest after the Net Proceeds Offer Payment Date unless the Company shall fail to make payment therefor;

(v)     that Holders electing to have Notes purchased pursuant to a Net Proceeds Offer will be required to surrender their Notes to the Paying Agent at the address specified in the notice prior to 5:00 p.m., New York City time, on the third Business Day immediately preceding the Net Proceeds Offer Payment Date and must complete any form letter of transmittal proposed by the Company and acceptable to the Trustee and the Paying Agent;

(vi)     that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than 5:00 p.m., New York City time, on the third Business Day immediately preceding the Net Proceeds Offer Payment Date, a telex or facsimile transmission (confirmed by overnight delivery of the original thereof) or letter setting forth the name of the Holder, the principal amount of Notes the Holder delivered for purchase, the Note certificate number (if any) and a statement that such Holder is withdrawing his election to have such Notes purchased;

(vii)     that if Notes and, if applicable, other *pari passu* Indebtedness in a principal amount in excess of the Holders' *pro rata* share of the Net Proceeds are tendered pursuant to a Net Proceeds Offer, the Company shall purchase Notes and, if applicable, such other Indebtedness on a *pro rata* basis among the Notes and other Indebtedness tendered (with such adjustments as may be deemed appropriate by the Company so that only Notes in denominations of $1.00 or integral multiples thereof shall be acquired);