## EXHIBIT E

## Stockholders' Agreement

**VERTIS HOLDINGS, INC.**

**STOCKHOLDERS' AGREEMENT**

**DATED AS OF [_____], 2008**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS; RULES OF CONSTRUCTION ........................................................1
    1.1    Definitions ...........................................................................................................1
    1.2    Rules of Construction .........................................................................................9
ARTICLE II ISSUANCES AND TRANSFERS OF SECURITIES .........................................9
    2.1    Issuances and Transfers of Securities ...............................................................10
    2.2    Avenue Right of First Offer ..............................................................................10
    2.3    Additional Right of First Offer .........................................................................11
    2.4    Tag Along Rights ...............................................................................................13
    2.5    Required Sale in Connection with a Sale By The Avenue Stockholders ...............14
    2.6    Certain Affiliate Transactions. ..........................................................................15
ARTICLE III RIGHTS TO SUBSCRIBE FOR SECURITIES ...............................................15
    3.1    General ...............................................................................................................16
    3.2    Excluded Securities ...........................................................................................17
ARTICLE IV BOARD .............................................................................................................17
    4.1    Election of Directors; Voting ............................................................................17
    4.2    Further Assurances ............................................................................................19
    4.3    Certificate Amendment .....................................................................................20
ARTICLE V LIMITATION ON TRANSACTIONS WITH AFFILIATES ...................................20
ARTICLE VI REGISTRATION RIGHTS .................................................................................20
    6.1    Required Registration. ......................................................................................20
    6.2    Piggyback Registration. ....................................................................................22
    6.3    Holdback Agreement. ........................................................................................23
    6.4    Preparation and Filing. ......................................................................................23
    6.5    Expenses. ...........................................................................................................26
    6.6    Indemnification. ................................................................................................26
    6.7    Underwriting Agreement. ..................................................................................28
    6.8    Information by Holder ........................................................................................29
    6.9    Exchange Act Compliance. ...............................................................................29
ARTICLE VII CONFIDENTIALITY; ACCESS TO INFORMATION .......................................29
    7.1    Confidentiality ...................................................................................................30

| | | | |
|---|---|---|---|
| 7.2 | Access to Information. | | 30 |
| ARTICLE VIII LEGEND | | | 30 |
| ARTICLE IX AMENDMENT AND WAIVER | | | 30 |
| 9.1 | Amendment. | | 30 |
| 9.2 | Waiver. | | 31 |
| ARTICLE X TERMINATION | | | 31 |
| ARTICLE XI MISCELLANEOUS | | | 31 |
| 11.1 | Severability. | | 32 |
| 11.2 | Entire Agreement. | | 32 |
| 11.3 | Independence of Agreements and Covenants | | 32 |
| 11.4 | Successors and Assigns. | | 32 |
| 11.5 | Counterparts; Facsimile Signatures; Validity. | | 32 |
| 11.6 | Remedies. | | 33 |
| 11.7 | Notices. | | 33 |
| 11.8 | Governing Law; Jurisdiction. | | 34 |
| 11.9 | Waiver of Jury Trial. | | 34 |
| 11.10 | Further Assurances. | | 34 |
| 11.11 | Third Party Reliance. | | 35 |

**STOCKHOLDERS' AGREEMENT** dated as of [_____], 2008 (as amended, modified, supplemented or restated from time to time, this "Agreement"), among Vertis Holdings, Inc., a Delaware corporation (the "Company"); and the stockholders of the Company signatory hereto from time to time.

**WHEREAS**, in connection with the financial restructuring of the Company and certain of its Subsidiaries (as defined below) pursuant to the Joint Prepackaged Plans of Reorganization of Vertis Holdings, Inc., *et al.* proposed by Vertis Holdings, Inc. *et al.* and ACG Holdings, Inc., *et al.*, dated _____, 2008 under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 *et seq.*, (the "Joint Plans"), the Company has agreed to issue (i) shares of the Company's common stock, par value $0.001 per share (the "Common Stock"), to certain creditors of Vertis, Inc., a Delaware corporation ("Vertis"), and of American Color Graphics, Inc., a New York corporation ("ACG"), each direct or indirect Subsidiaries of the Company, (ii) the Restructuring Warrants (as defined below) to certain creditors of Vertis and (iii) the Equity Incentive Shares (as defined below) to certain employees of the Company, Vertis and ACG.

**WHEREAS**, pursuant to the Joint Plans, the Company is authorized to enter into this Agreement to set forth the terms and conditions of ownership of its equity securities and the rights of certain holders thereof.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as set forth herein.

**ARTICLE I**

**DEFINITIONS; RULES OF CONSTRUCTION**

**1.1**     <u>Definitions</u>

As used in this Agreement, the following terms shall have the meanings set forth below.

"ACG" has the meaning ascribed to it in the recitals.

"ACGN Stockholders" means, collectively, the Goldman Stockholders and the TCW Stockholders, acting in accordance with written instructions signed by the Goldman Stockholders and the TCW Stockholders and delivered to the Company.

"Acceptable Investment Bank" means an investment bank acceptable to the Avenue Stockholders and the Goldman Stockholders acting in good faith.

"Additional Offerees" means each of the Avenue Stockholders, the Goldman Stockholders, [the JPM Stockholders][1] and the TCW Stockholders, in each case, for so long as such Stockholder's Total Percentage Ownership is more than two and one-half percent (2.5%).

---

[1] Subject to confirmation that JP Morgan is signing this Agreement.

"Additional Offer Final Notice" has the meaning ascribed to in Section 2.3(b).

"Additional Offer Period" has the meaning ascribed to it in Section 2.3(b).

"Additional Offered Shares" has the meaning ascribed to it in Section 2.3(a).

"Additional Offer to Purchase" has the meaning ascribed to it in Section 2.3(b).

"Additional Sale Offer" has the meaning ascribed to it in Section 2.3(a).

"Additional Sale Price" has the meaning ascribed to it in Section 2.3(a).

"Additional Third Party Sale" has the meaning ascribed to it in Section 2.3(d).

"Additional Transferring Stockholder" has the meaning ascribed to it in Section 2.3(a).

"Adjusted Percentage Ownership" means, with respect to any Stockholder, the fraction, expressed as a percentage, the numerator of which is the total number of shares of Common Stock held by such Stockholder and the denominator of which is the total number of shares of Common Stock issued and outstanding at the time of determination held by all Stockholders (excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations or similar Securities, and all Equity Incentive Shares).

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person and/or one or more Affiliates thereof.

"Agreement" has the meaning ascribed to it in the preamble.

"Approved Sale" means a Transfer of more than twenty five percent (25.0%) of the Stockholder Shares of the Avenue Stockholders pursuant to which the Avenue Stockholders seek to compel the Other Stockholders to Transfer Stockholder Shares in accordance with Section 2.5; provided that (a) either (i) the Transferee is a Bona Fide Third Party or (ii) the proposed Transfer is approved by a Majority Stockholder Vote and an Acceptable Investment Bank issues a written opinion that the terms of such proposed Transfer are fair from a financial perspective to the Stockholders and (b) if such proposed Transfer would, assuming participation by the Other Stockholders in accordance with Section 2.5, result in any Person, other than the Avenue Stockholders, having a Total Percentage Ownership of more than fifty percent (50.0%), such Transfer is approved by a Majority Stockholder Vote.

"Approved Sale Notice" has the meaning ascribed to it in Section 2.5(b).

"Avenue Related Party" means any Person in which the Avenue Stockholders own more than five percent (5.0%) of the equity Securities of such Person or more than fifteen percent (15.0%) of any tranche of any indebtedness issued by such Person.

"Avenue Stockholders" means, collectively, Avenue Investments, LP and its Affiliates, in each case, only for so long as such Person owns Stockholder Shares.

"Board" means the board of directors of the Company.

"Bona Fide Third Party" means any Person in which the Avenue Stockholders own no more than five percent (5.0%) of the equity Securities of such Person and no more than ten percent (10.0%) of any tranche of any indebtedness issued by such Person.

"Business Day" means any day except a Saturday, a Sunday or any other day on which commercial banks are not required by law to be open in New York, New York.

"By-laws" means the by-laws of the Company, as amended, modified, supplemented or restated and in effect from time to time.

"Certificate" means the certificate of incorporation of the Company, as amended, modified, supplemented or restated and in effect from time to time, including any certificates of designation, correction or amendment filed with the Secretary of State of the State of Delaware pursuant to the terms thereof.

"Commission" means the Securities and Exchange Commission and any other Governmental Authority at the time administering the Securities Act.

"Common Stock" has the meaning ascribed to it in the recitals.

"Company" has the meaning ascribed to it in the preamble.

"Confidentiality Undertaking" means a confidentiality undertaking executed and delivered to the Company by a Transferee, substantially in the form of Exhibit C hereto.

"Control" means, (including, with correlative meaning, the terms "controlling," "controlled by" and "under common control with") with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or investment decisions of such Person, whether through the ownership of voting Securities, by contract or otherwise.

"Co-Sale Notice" has the meaning ascribed to it in Section 2.4(a).

"Demand Registration Request" has the meaning ascribed to such term in Section 6.1(a).

"Eligible Stockholder" means, as determined from time to time, a Stockholder who is an "accredited investor" as such term is defined in Rule 501 of the Securities Act.

"Effective Date" means the date of this Agreement.

"Equity Incentive Plan" means, collectively, (a) the Vertis Holdings, Inc. Equity Incentive Plan, as amended, modified, supplemented or restated from time to time and (b) any

other plan or agreement established, or entered into, by the Company for the purposes of issuing Securities to any employee, officer, consultant or director of the Company or its Subsidiaries as compensation.

"Equity Incentive Shares" means Stockholder Shares issued pursuant to, or acquired in connection with, the terms of any Equity Incentive Plan.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor Federal statute then in force, and the rules and regulations of the Commission promulgated thereunder, all as the same shall be in effect from time to time.

"Excluded Securities" has the meaning ascribed to it in Section 3.2.

"Excusable Closing Delay" means (a) the failure of the Company to provide access to information to any Person in accordance with Section 7.2, within two (2) Business Days after the receipt by the Company of a Confidentiality Undertaking executed by such Person or (b) the failure of the Company to cooperate after receipt by the Company of any Joinder Agreement required of any Transferee that is a Required Stockholder Party with any Stockholder in requesting any Transfer in the stock records of the Company.

"Form S-4" or "Form S-8" means Form S-4 or Form S-8, as appropriate, under the Securities Act or any successor forms thereto.

"Fully Diluted Percentage Ownership" means, with respect to the Avenue Stockholders, the Goldman Stockholders or the TCW Stockholders, as applicable, the fraction, expressed as a percentage, the numerator of which is the total number of shares of Common Stock held by the Avenue Stockholders, the Goldman Stockholders or the TCW Stockholders, as applicable, and the denominator of which is the total number of shares of Common Stock issued and outstanding at the time of determination (including, in each of the numerator and the denominator above, any options, warrants, convertible debt obligations or similar Securities, and all Equity Incentive Shares).

"Goldman Stockholders" means, collectively, [_____] and its Affiliates, in each case, only for so long as such Person owns Stockholder Shares.

"Governmental Authority" means any domestic or foreign government or political subdivision thereof, whether on a Federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"Information" has the meaning ascribed to such term in Section 6.4(i).

"Initial Public Offering" means the first underwritten Public Offering of Common Stock for the account of the Company pursuant to a Registration Statement.

"Initial Subscribing Stockholder" has the meaning ascribed to it in Section 3.1(d).

"Inspectors" has the meaning ascribed to it in Section 6.4(i).

"Joinder Agreement" has the meaning ascribed to it in Section 2.1(b).

"Joint Plans" has the meaning ascribed to it in the recitals.

"JPM Stockholder" means, collectively, [_____] and its Affiliates, in each case, only for so long as such Person owns Stockholder Shares.

"Majority Stockholder Vote" means the affirmative vote of Stockholders of the Company having an aggregate Total Percentage Ownership of more than fifty percent (50.0%).

"Management Stockholders" means each employee of the Company or its Subsidiaries who owns Stockholder Shares and is a signatory hereto from time to time (including any other employee of the Company or its Subsidiaries who hereafter becomes a party to this Agreement pursuant to a Joinder Agreement entered into in accordance with Section 2.1(b)), whether acquired through the Equity Incentive Plan or otherwise, in each case, only for so long as such Person owns Stockholder Shares. Any Person who is a "Management Stockholder" shall continue to be a Management Stockholder following such Person's termination of employment with the Company or its Subsidiaries if such Person continues to own Stockholder Shares following such termination of employment.

"New Investor" has the meaning ascribed to it in Section 3.1(c).

"Observer" has the meaning ascribed to it in Section 4.1(g).

"Offered Securities" has the meaning ascribed to it in Section 3.1(a).

"Offered Shares" has the meaning ascribed to it in Section 2.2(a).

"Offer to Purchase" has the meaning ascribed to it in Section 2.2(b).

"Other Eligible Stockholder" has the meaning ascribed to it in Section 3.1(d).

"Other Shares" means, at any time, those shares of Common Stock which do not constitute Registrable Shares or Primary Shares.

"Other Stockholders" means any Stockholder other than the Avenue Stockholders.

"Permitted Family Transferee" means, with respect to a Stockholder who is a natural Person, (a) the spouse or any lineal descendant (including any descendant by adoption) of such Stockholder, (b) any trust solely for the benefit of such Stockholder or the spouse or any lineal descendant (including any descendant by adoption) of such Stockholder, or (c) a family trust or partnership established solely for the benefit of such Stockholder or such Stockholder's spouse or any lineal descendant (including any descendant by adoption) for estate planning purposes, provided such trust, family trust or partnership remains under the Control of such Stockholder prior to such Stockholder's death or disability, but, in each case, only to the extent that such Transferee agrees to execute a Joinder Agreement and be bound by this Agreement.

"Permitted Transfer" means (a) with respect to the Avenue Stockholders, any Transfer of Stockholder Shares to any Person, (b) with respect to the Other Stockholders, any Transfer of Stockholder Shares (i) approved in writing in advance by the Avenue Stockholders, (ii) pursuant to the exercise of tag along rights set forth in Section 2.4 or as required in connection with the exercise of drag-along rights of the Avenue Stockholders with respect to an Approved Sale as set forth in Section 2.5, (iii) if with respect to an Other Stockholder who is not a natural Person, to an Affiliate of such Other Stockholder or (iv) if with respect to an Other Stockholder who is a natural Person, to a Permitted Family Transferee of such Other Stockholder; (c) with respect to the Other Stockholders on or prior to [ ][2], any Transfer of Stockholder Shares pursuant to a sale to another Stockholder (subject to the right of first offer set forth in Section 2.2); and (d) with respect to the Other Stockholders after [ ][3], any Transfer of Stockholder Shares to any Person (subject to the right of first offer set forth in Section 2.3).

"Person" shall be construed as broadly as possible and shall include an individual person, a partnership (including a limited liability partnership), a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization and a Governmental Authority.

"Preemptive Offer Acceptance Notice" has the meaning ascribed to it in Section 3.1(b).

"Preemptive Offer Notice" has the meaning ascribed to it in Section 3.1(a).

"Preemptive Offer Period" has the meaning ascribed to it in Section 3.1(a).

"Primary Shares" means, at any time, the authorized but unissued shares of Common Stock or shares of Common Stock held in the treasury of the Company.

"Prospectus" means the prospectus included in any Registration Statement, including any amendment or prospectus subject to completion, and any such prospectus as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Registrable Shares and, in each case, by all other amendments and supplements to such prospectus, including post-effective amendments, and in each case including all material incorporated by reference therein.

"Public Offering" means the closing of a public offering of Common Stock pursuant to a Registration Statement declared effective under the Securities Act, except that a Public Offering shall not include an offering of Securities to be issued as consideration in connection with a business acquisition or an offering of Securities issuable pursuant to an employee benefit plan.

"Records" has the meaning ascribed to it in Section 6.4(i).

---

[2] Date that is 18 months after the Effective Date.

[3] Date that is 18 months after the Effective Date.

"Reduction Date" means the first date on which the Total Percentage Ownership of the Avenue Stockholders is less than twenty percent (20.0%).

"Refused Securities" has the meaning ascribed to it in Section 3.1(c).

"Registrable Shares" means at any time, and with respect to any Stockholder, the shares of Common Stock held by, or issuable to, such Stockholder. As to any particular Registrable Shares, once issued, such Registrable Shares shall cease to be Registrable Shares (a) when an offering of such Registrable Shares has been registered under the Securities Act, the Registration Statement in connection therewith has been declared effective and such Registrable Shares have been disposed of pursuant to and in the manner described in such effective Registration Statement or (b) when such Registrable Shares have ceased to be outstanding.

"Registration Date" means the date upon which the Registration Statement filed by the Company to effect its Initial Public Offering shall have been declared effective by the Commission.

"Registration Expenses" has the meaning ascribed to it in Section 6.5.

"Registration Statement" means any registration statement of the Company that covers an offering of any of the Registrable Shares, and all amendments and supplements to any such Registration Statement, including post-effective amendments, in each case including the Prospectus contained therein, all exhibits thereto and all material incorporated by reference therein.

"Representative" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Required Stockholder Party" means (a) any Transferee of Stockholder Shares of any Stockholder, (b) any Person acquiring Stockholder Shares pursuant to the exercise of Restructuring Warrants, (c) any Management Stockholder and (d) any Person who, together with its Affiliates, will have a Total Percentage Ownership of five percent (5.0%) or more.

"Restructuring Warrants" means the warrants to purchase Common Stock issued pursuant to the Warrant Agreement between the Company and [ ], as agent, dated as of the date hereof.

"Rule 144" means Rule 144 promulgated under the Securities Act or any successor rule thereto.

"Sale Offer" has the meaning ascribed to it in Section 2.2(a).

"Sale of the Company" means the consummation of (a) the sale, assignment, transfer, participation, gift, bequest, distribution or other disposition thereof (in one or a series of related transactions) of all or substantially all of the Company's consolidated assets to a Person or a group of Persons acting in concert (other than to a Subsidiary of the Company); (b) the Transfer (in one or a series of related transactions) of a majority of the outstanding equity

Securities of the Company to one Person or a group of Persons acting in concert; or (c) the merger or consolidation of the Company with or into another Person; provided that in the case of clauses (b) and (c) above, under circumstances in which the holders of a majority of the voting power of the outstanding equity Securities of the Company immediately prior to such transaction own less than a majority in voting power of the outstanding equity Securities of the Company or the surviving or resulting corporation or acquirer, as the case may be, immediately following such transaction.

"Sale Price" has the meaning ascribed to it in Section 2.2(a).

"Securities" means "securities" as defined in Section 2(1) of the Securities Act and includes, with respect to any Person, such Person's capital stock or other equity interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock.

"Securities Act" means the Securities Act of 1933, as amended, or any successor Federal statute, and the rules and regulations of the Commission promulgated thereunder, all as the same shall be in effect from time to time.

"Stockholders" means Persons (other than the Company), who are parties hereto, and shall include any other Person who hereafter becomes a party to this Agreement pursuant to a Joinder Agreement, in each case, only for so long as such Person owns Stockholder Shares.

"Stockholders' Counsel" has the meaning ascribed to it in Section 6.4(b).

"Stockholder Shares" means (a) any equity Securities of the Company (including the Common Stock) purchased or otherwise acquired by any Stockholder prior to, on or after the date hereof and (b) any Securities issued or issuable directly or indirectly with respect to the Securities referred to in clause (a) above by way of conversion, exercise or exchange, stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, consolidation or other reorganization. As to any particular shares constituting Stockholder Shares, such shares shall cease to be Stockholder Shares when they have been Transferred, in accordance with the terms of this Agreement, to a Person who is not a Required Stockholder Party.

"Subsidiary" means, at any time, with respect to any Person (the "Subject Person"), any other Person of which either (a) fifty percent (50.0%) or more of the Securities or other interests entitled to vote in the election of directors or comparable governance bodies performing similar functions or (b) fifty percent (50.0%) or more of an interest in the profits or capital of such Person, in each case, are at the time owned or Controlled directly or indirectly by the Subject Person or through one or more Subsidiaries of the Subject Person.

"Tag-Along Notice" has the meaning ascribed to it in Section 2.4(b).

"TCW Stockholders" means, collectively, [_____] and its Affiliates, in each case, only for so long as such Person owns Stockholder Shares.

"Third Party Sale" has the meaning ascribed to it in Section 2.2(d).

"Total Percentage Ownership" means, with respect to any Person, the fraction, expressed as a percentage, the numerator of which is the total number of shares of Common Stock held by such Person and the denominator of which is the total number of shares of Common Stock issued and outstanding at the time of determination (excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations or similar Securities, and all Equity Incentive Shares).

"Transfer" of Securities shall be construed broadly and shall include any direct or indirect issuance, sale, assignment, transfer, participation, gift, bequest, distribution, or other disposition thereof, or any pledge or hypothecation thereof, placement of a lien thereon or grant of a security interest therein or other encumbrance thereon, in each case whether voluntary or involuntary or by operation of law or otherwise. Notwithstanding anything to the contrary contained herein, Transfer shall not include the sale or transfer of Stockholder Shares by any Stockholder to the Company or pursuant to any employment, option, subscription or restricted stock purchase agreement between the Company and such Stockholder or any plan relating to the foregoing.

"Transferee" means a Person acquiring or intending to acquire Stockholder Shares through a Transfer.

"Transferor" means a Stockholder Transferring or intending to Transfer Stockholder Shares.

"Transferring Stockholder" has the meaning ascribed to it in Section 2.2(a).

"Vertis" has the meaning ascribed to it in the recitals.

**1.2    Rules of Construction**

The use in this Agreement of the term "including" means "including, without limitation." The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole, including the schedules and exhibits, as the same may from time to time be amended, modified, supplemented or restated, and not to any particular section, subsection, paragraph, subparagraph or clause contained in this Agreement. All references to sections, schedules and exhibits mean the sections of this Agreement and the schedules and exhibits attached to this Agreement, except where otherwise stated. The title of and the section and paragraph headings in this Agreement are for convenience of reference only and shall not govern or affect the interpretation of any of the terms or provisions of this Agreement. The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require. Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

**ARTICLE II**

**ISSUANCES AND TRANSFERS OF SECURITIES**

**2.1     Issuances and Transfers of Securities**

(a)     The provisions in this Article II shall apply to all Stockholder Shares now owned by any Stockholder or hereafter acquired by a Required Stockholder Party, including Stockholder Shares acquired by reason of original issuance, dividend, distribution, exchange, conversion and acquisition of outstanding Stockholder Shares from another Person, and such provisions shall apply to any Stockholder Shares obtained by a Stockholder upon the exercise, exchange or conversion of any option, warrant or other derivative Security (including Equity Incentive Shares and the Restructuring Warrants).

(b)     The Company shall not issue to any Person, nor register or permit to be registered in the stock books of the Company any Transfer to any Required Stockholder Party of Stockholder Shares unless, as a condition to the issuance or acquisition of such Stockholder Shares, such Person executes and delivers to the Company a joinder agreement in substantially the form attached hereto as Exhibit A (a "Joinder Agreement"), pursuant to which such Person will thereupon become a party to, and be bound by and obligated to comply with the terms and provisions of, this Agreement.

(c)     The Company may from time to time determine other types of Transfers, the Transferees of which may be required, as a condition to the acquisition of any Stockholder Shares, to execute and deliver to the Company a Joinder Agreement. The Company shall promptly notify each Stockholder of such determination in writing; provided that this provision shall in no event result in the imposition of a requirement for a Transferee to execute a Joinder Agreement to the extent that a binding transfer agreement has been entered into prior to the date of such notice that does not impose any such requirement on the Transferee.

(d)     No Stockholder shall Transfer any Stockholder Shares unless such Transfer is a Permitted Transfer.

**2.2     Avenue Right of First Offer**

(a)     On or prior to [     ][4], no Other Stockholder shall Transfer any of its Stockholder Shares, unless such Other Stockholder proposes to Transfer such Stockholder Shares (the "Transferring Stockholder") to another Stockholder in which case such Transferring Stockholder shall first have delivered a written offer (a "Sale Offer") to the Avenue Stockholders offering to Transfer to the Avenue Stockholders the Transferring Stockholder's Stockholder Shares identified in the Sale Offer (the "Offered Shares") on the terms set forth therein. The Sale Offer shall specify (i) that such Transferring Stockholder desires to Transfer all or a portion of its Stockholder Shares (and the amount of such portion) to another Stockholder (and the identity of such other Stockholder), (ii) the proposed sale price of the Offered Shares (the "Sale Price") and (iii) any other material terms and conditions of the proposed Transfer to such Other Stockholder. Upon delivery of a Sale Offer, such Sale Offer shall be irrevocable unless and until the right of first offer provided for herein shall have been waived by the Avenue Stockholders or shall have expired in accordance with the terms hereof.

---

[4] Date that is 18 months after the Effective Date.

(b)     Within five (5) Business Days following their receipt of a Sale Offer, the Avenue Stockholders shall have the right to deliver a written notice (the "Offer to Purchase") to the Transferring Stockholder agreeing to purchase all, or any part, of the Offered Shares upon the terms proposed in such Sale Offer.

(c)     Following receipt of an Offer to Purchase, the Avenue Stockholders and the Transferring Stockholder shall consummate the transaction contemplated by the Sale Offer within forty (40) days after receipt of the Offer to Purchase. At the closing of such Transfer, the Avenue Stockholders and the Transferring Stockholder shall execute such documents as are otherwise necessary or appropriate to effectuate the Transfer.

(d)     If an Offer to Purchase covering all of the Offered Shares has not been timely delivered under Section 2.2(b), the Transferring Stockholder shall be permitted to Transfer the Offered Shares not subject to an Offer to Purchase timely delivered pursuant to Section 2.2(b) to the Other Stockholder identified in the Sale Offer, on the terms and conditions set forth in the Sale Offer (a "Third Party Sale"); provided, that such Third Party Sale is consummated within forty (40) days (as tolled in accordance with the succeeding sentence) after the earlier to occur of (x) the waiver by the Avenue Stockholders of their option to purchase all or any of the Offered Shares and (y) the expiration of the five (5) Business Day period permitted for delivery of the Offer to Purchase. If such Third Party Sale is not consummated within such forty (40) day period for any reason (provided that if such reason is an Excusable Closing Delay, such forty (40) day period shall be tolled for each day during which the consummation of the Third Party Sale is delayed as a result of the Excusable Closing Delay), then the restrictions provided for in this Section 2.2 shall again become effective, and no Transfer of Offered Shares may be made thereafter by the Transferring Stockholder without again offering the same to the Avenue Stockholders in accordance with this Section 2.2.

(e)     The restrictions set forth in this Section 2.2 shall not apply to any Transfer of Stockholder Shares by an Other Stockholder (i) that is a natural person, to a Permitted Family Transferee of such Other Stockholder, or (ii) that is not a natural Person, to an Affiliate of such Other Stockholder, as applicable.

**2.3     Additional Right of First Offer**

(a)     After [     ]⁵, no Other Stockholder shall Transfer any of its Stockholder Shares, unless such Other Stockholder shall first have delivered a written offer (an "Additional Sale Offer") to each Additional Offeree offering to Transfer to the Additional Offerees the Stockholder Shares identified in the Additional Sale Offer ("Additional Offered Shares") on the terms set forth therein. The Additional Sale Offer shall specify (i) that such Other Stockholder (the "Additional Transferring Stockholder") desires to Transfer all or a portion of its Stockholder Shares (and the amount of such portion), (ii) the proposed sale price of the Additional Offered Shares (the "Additional Sale Price") and (iii) any other material terms and conditions of the proposed Transfer. Upon delivery of an Additional Sale Offer, such Additional Sale Offer shall

---

⁵ Date that is 18 months after the Effective Date.

be irrevocable unless and until the right of first offer provided for herein shall have been waived by each Additional Offeree or shall have expired in accordance with the terms hereof.

(b)     Within five (5) Business Days following its receipt of an Additional Sale Offer (the "Additional Offer Period"), each Additional Offeree shall have the right to deliver a written notice (the "Additional Offer to Purchase") to the Additional Transferring Stockholder agreeing (i) to purchase the number of Additional Offered Shares up to its Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not Additional Offerees) of the total number or amount of Additional Offered Shares and (ii) to offer to purchase up to its Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not Additional Offerees) of the Additional Offered Shares not subscribed for by other Additional Offerees (as further described below). Any Additional Offered Shares not purchased by an Additional Offeree shall be deemed to be re-offered to and accepted by the Additional Offerees exercising their options specified in clause (ii) of the immediately preceding sentence with respect to the lesser of (x) the amount specified in their respective Additional Offer to Purchase and (y) an amount equal to their respective Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not Additional Offerees and those held by Additional Offerees who have not exercised their option specified in clause (ii) of the immediately preceding sentence) with respect to such deemed re-offer. Such deemed re-offer and acceptance procedures described in the immediately preceding sentence shall be deemed to be repeated until either (i) all of the Additional Offered Shares are accepted by the Additional Offerees or (ii) no Additional Offeree desires to subscribe for more of the Additional Offered Shares. The Additional Transferring Stockholder shall notify (the "Additional Offer Final Notice") each Additional Offeree within five (5) Business Days following the expiration of the Additional Offer Period of the number of Additional Offered Shares which such Additional Offeree has agreed to purchase pursuant to the foregoing.

(c)     Following receipt of an Additional Offer to Purchase, the Additional Offerees and the Additional Transferring Stockholder shall consummate the transaction contemplated by the Sale Offer within forty (40) days after receipt of the Additional Offer Final Notice. At the closing of such Transfer, the Additional Offerees and the Additional Transferring Stockholder shall execute such documents as are otherwise necessary or appropriate to effectuate the Transfer.

(d)     If no Additional Offer to Purchase has been timely delivered under Section 2.3(b) or the Additional Offerees have agreed to purchase less than all of the Additional Offered Shares, the Additional Transferring Stockholder shall be permitted to Transfer all, but not less than all, of the Additional Offered Shares not subject to an Additional Offer to Purchase on the terms and conditions set forth in the Additional Sale Offer (an "Additional Third Party Sale"); provided, that such Additional Third Party Sale is consummated within forty (40) days (as tolled in accordance with the succeeding sentence) after the earlier to occur of (x) the waiver by all of Additional Offerees of their option to purchase Additional Offered Shares and (y) the expiration of the five (5) Business Day period permitted for delivery of the Additional Offer to Purchase. If such Additional Third Party Sale is not consummated within such forty (40) day period for any reason (provided that if such reason is an Excusable Closing Delay, such forty (40) day period shall be tolled for each day during which the consummation of the Additional Third Party Sale is

delayed as a result of the Excusable Closing Delay), then the restrictions provided for in this Section 2.3 shall again become effective, and no Transfer of Additional Offered Shares may be made thereafter by the Additional Transferring Stockholder without again offering the same to the Additional Offerees in accordance with this Section 2.3.

(e)     The restrictions set forth in this Section 2.3 shall not apply to any Transfer of Stockholder Shares by an Other Stockholder (i) that is not a natural person, to a Permitted Family Transferee of such Other Stockholder, or (ii) that is not a natural Person, to an Affiliate of such Other Stockholder, as applicable.

**2.4     Tag Along Rights**

(a)     If at any time the Avenue Stockholders propose to Transfer any Stockholder Shares to any Person other than an Affiliate of the Avenue Stockholders then at least ten (10) Business Days prior to the closing of such Transfer, the Avenue Stockholders shall deliver a written notice (the "Co-Sale Notice") to all Other Stockholders offering such Other Stockholders the option to participate in such proposed Transfer by Transferring the same Adjusted Percentage Ownership of Stockholder Shares held by each such Other Stockholders as the Adjusted Percentage Ownership of Stockholder Shares proposed to be sold by the Avenue Stockholders. Such Co-Sale Notice shall specify in reasonable detail the identity of the prospective Transferee, the terms and conditions of the Transfer and the class and amount of Stockholder Shares proposed to be Transferred.

(b)     Any Other Stockholder shall, within five (5) Business Days of the receipt of a Co-Sale Notice, have the right to deliver written notice (each, a "Tag-Along Notice") to the Avenue Stockholders stating that such Other Stockholder wishes to participate in such proposed Transfer by Transferring a number of Stockholder Shares (excluding, other than in connection with the Sale of the Company, Equity Incentive Shares) up to its Adjusted Percentage Ownership of Stockholder Shares proposed to be sold by the Avenue Stockholders. Such Other Stockholder shall propose to include only Stockholder Shares (excluding, other than in connection with the Sale of the Company, Equity Incentive Shares) of the same class of Stockholder Shares being transferred by the Avenue Stockholders.

(c)     If no Other Stockholder gives the Avenue Stockholders a timely Tag-Along Notice with respect to the Transfer proposed in the Co-Sale Notice, the Avenue Stockholders may thereafter Transfer the Stockholder Shares specified in the Co-Sale Notice on the terms and conditions set forth therein. If one or more Other Stockholders give the Avenue Stockholders timely Tag-Along Notices, then the Avenue Stockholders shall use reasonable efforts to cause the prospective Transferee(s) to agree to acquire all Stockholder Shares identified in all Tag-Along Notices that are given to the Avenue Stockholders in accordance with the terms of this Section 2.4, upon the same terms and conditions as applicable to the Avenue Stockholders' Stockholder Shares. If the prospective Transferee(s) are unwilling or unable to acquire all Stockholder Shares proposed to be included in such sale upon such terms, then the Avenue Stockholders may elect either to cancel such proposed Transfer or to allocate the maximum number of Stockholder Shares that each prospective Transferee is willing to purchase among the Avenue Stockholders and the Other Stockholders giving timely Tag-Along Notices in proportion to each such Stockholders' applicable Adjusted Percentage Ownership (excluding for

the purposes of such calculation the Stockholder Shares held by the Stockholders who have not timely delivered a Tag-Along Notice).

(d)     This Section 2.4 shall not apply to any sale of Stockholder Shares pursuant to a Public Offering.

**2.5     Required Sale in Connection with a Sale By The Avenue Stockholders**

(a)     If the Avenue Stockholders propose to Transfer more than twenty-five percent (25.0%) of their Stockholder Shares to any Person pursuant to an Approved Sale, the Avenue Stockholders shall have the right, at their option to require the Other Stockholders to join in such Approved Sale by Transferring the same Adjusted Percentage Ownership of Stockholder Shares as the Adjusted Percentage Ownership of Stockholder Shares proposed to be sold by the Avenue Stockholders. Each Other Stockholder shall consent to and raise no objections against (and, in any stockholder vote required with the respect to such Approved Sale other than a Majority Stockholder Vote required by the definition of Approved Sale, shall affirmatively vote all of its Stockholder Shares in favor of) the Approved Sale, and if the Approved Sale is structured as a sale of the issued and outstanding equity Securities of the Company (whether by merger, recapitalization, consolidation or Transfer of Stockholder Shares or other Securities or otherwise), then each Other Stockholder shall waive any dissenters rights, appraisal rights or similar rights in connection with such Approved Sale (if applicable) and each Other Stockholder shall agree to sell his, her or its Stockholder Shares on the terms and conditions approved by the Stockholders pursuant to the Majority Stockholder Vote, if expressly required hereunder, and otherwise on such terms and conditions as may be approved by the Avenue Stockholders. Each Other Stockholder shall take all necessary and desirable actions in connection with the consummation of the Approved Sale, including, but not limited to, the execution of such agreements and instruments and other actions necessary to provide the representations, warranties, indemnities, covenants, conditions, escrow agreement and other provisions and agreements relating to such Approved Sale. In the event that any Other Stockholder fails for any reason to take any of the foregoing actions after reasonable notice thereof, he, she or it hereby grants an irrevocable power of attorney and proxy to the Avenue Stockholders to take all necessary actions and execute and deliver all documents deemed necessary or desirable by such Person to effectuate the terms of this Section 2.5. Notwithstanding anything to the contrary contained herein, Sections 2.1, 2.2, 2.3 and 2.4 and Articles III and V shall not apply in connection with an Approved Sale.

(b)     The Avenue Stockholders shall deliver written notice to each Other Stockholder setting forth in reasonable detail the terms (including price, time and form of payment) of any Approved Sale (the "Approved Sale Notice") at least ten (10) Business Days prior to the consummation of such Approved Sale. Within five (5) Business Days following receipt of the Approved Sale Notice, each Other Stockholder shall deliver to the Avenue Stockholders written notice (in form and substance reasonably satisfactory to the Avenue Stockholders) setting forth such Other Stockholder's agreement to consent to and raise no objections against, or impediments to, the Approved Sale (including, waiving all dissenter's and similar rights, if applicable) and if the Approved Sale is structured as a sale of stock, to sell its Stockholder Shares on the terms and conditions set forth in the Approved Sale Notice; provided, however, that the failure by any Other Stockholder to deliver such written notice and/or consent

to the Avenue Stockholders shall not in any manner relieve or otherwise affect the obligations of each Other Stockholder pursuant to this Section 2.5.

(c)     The obligations of the Other Stockholders to participate in any Approved Sale pursuant to this Section 2.5 are subject to the satisfaction of the following conditions:

(i)     upon the consummation of the Approved Sale, each Stockholder shall receive the same proportion of the aggregate consideration from such Approved Sale that such holder would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in the Certificate as in effect immediately prior to such Approved Sale;

(ii)     if any Stockholder is given an option as to the form and amount of consideration to be received with respect to Securities in a class, all Stockholders of such class will be given the same option;

(iii)     no Stockholder shall be obligated to pay more than his, her or its pro rata amount of reasonable expenses incurred in connection with a consummated Approved Sale to the extent such expenses are incurred for the benefit of all Stockholders and are not otherwise paid by the Company or the acquiring party (expenses incurred by or on behalf of an Other Stockholder for its or his sole benefit not being considered expenses incurred for the benefit of all Stockholders); and

(iv)     any indemnification obligations for breaches of representations, warranties and covenants made by the Company and its Subsidiaries shall be pro-rata among the Stockholders based on the aggregate consideration received with respect to the Stockholder Shares.

(d)     To the extent the Approved Sale is structured as a sale of all or substantially all of the assets of the Company on a consolidated basis, each Other Stockholder shall consent to and raise no objections against (and, in any stockholder vote required with respect to such Approved Sale other than a Majority Stockholder Vote required by the definition of Approved Sale, shall affirmatively vote all of its Stockholder Shares in favor of) such transaction and shall waive any dissenters rights, appraisal rights or similar rights in connection with such transaction.

**2.6     Certain Affiliate Transactions.**

No Stockholder shall intentionally avoid its obligation under this Agreement by making one or more Transfers of Stockholder Shares to its Affiliate and then disposing of all or any portion of such Stockholders' interest in any such Affiliate (or a direct or indirect parent thereof).

### ARTICLE III

### RIGHTS TO SUBSCRIBE FOR SECURITIES

## 3.1   General

(a)   In the event that the Company proposes to issue any equity Securities (the "Offered Securities"), other than Excluded Securities, the Company shall deliver to each Eligible Stockholder written notice (which notice shall state the number or amount of the Offered Securities proposed to be issued, the purchase price therefor and any other material terms or conditions of the proposed issuance, including any linked or grouped Securities which comprise Offered Securities) of such issuance (the "Preemptive Offer Notice") at least ten (10) Business Days prior to the date of the proposed issuance (the "Preemptive Offer Period").

(b)   Each Eligible Stockholder shall have the option, exercisable at any time during the Preemptive Offer Period by delivering written notice to the Company (a "Preemptive Offer Acceptance Notice"), (i) to subscribe for the number or amount of such Offered Securities up to its Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not Eligible Stockholders) of the total number or amount of Offered Securities proposed to be issued and (ii) to offer to subscribe for up to its Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not Eligible Stockholders) of the Offered Securities not subscribed for by other Eligible Stockholders (as further described below). Any Offered Securities not subscribed for by an Eligible Stockholder shall be deemed to be re-offered to and accepted by the Eligible Stockholders exercising their options specified in clause (ii) of the immediately preceding sentence with respect to the lesser of (x) the amount specified in their respective Preemptive Offer Acceptance Notices and (y) an amount equal to their respective Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not Eligible Stockholders and those held by Eligible Stockholders who have not exercised their option specified in clause (ii) of the immediately preceding sentence) with respect to such deemed re-offer. Such deemed re-offer and acceptance procedures described in the immediately preceding sentence shall be deemed to be repeated until either (A) all of the Offered Securities are accepted by the Eligible Stockholders or (B) no Eligible Stockholders desire to subscribe for more Offered Securities. The Company shall notify each Eligible Stockholder within five (5) Business Days following the expiration of the Preemptive Offer Period of the number or amount of Offered Securities which such Eligible Stockholder has subscribed to purchase.

(c)   If Preemptive Offer Acceptance Notices are not given by the Eligible Stockholders for all the Offered Securities, the Company may issue the part of such Offered Securities as to which Preemptive Offer Acceptances Notices have not been given by the Eligible Stockholders (the "Refused Securities") to any Person (a "New Investor") in accordance with the terms and conditions set forth in the Preemptive Offer Notice. Any Refused Securities not purchased by one or more New Investors in accordance with this Section 3.1 within forty (40) days after the date of the Preemptive Offer Notice may not be sold or otherwise disposed of until they are again offered to the Eligible Stockholders under the procedures specified in this Section 3.1.

(d)   Notwithstanding anything to the contrary contained herein, the Company may, in order to expedite the issuance of the Offered Securities hereunder, issue all or a portion of the Offered Securities to one or more Persons (each, an "Initial Subscribing Stockholder"),

without complying with the provisions of Section 3.1, provided that, prior to such issuance, either (i) each Initial Subscribing Stockholder agrees to offer to sell to each Eligible Stockholder who is not an Initial Subscribing Stockholder (each such Stockholder, an "Other Eligible Stockholder") such Other Eligible Stockholder's respective Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not Eligible Stockholders) of such Offered Securities on the same terms and conditions as issued to the Initial Subscribing Stockholders and in a manner which provides such Other Eligible Stockholder with rights substantially similar to the rights outlined in Sections 3.1(b) and 3.1(c) or (ii) the Company shall offer to sell an additional amount of Offered Securities to each Other Eligible Stockholder only in an amount and manner which provides such Other Eligible Stockholder with rights substantially similar to the rights outlined in Sections 3.1(b) and 3.1(c). The Initial Subscribing Stockholders or the Company, as applicable, shall offer to sell such Offered Securities to each Other Eligible Stockholder within five (5) days after the closing of the purchase of the Offered Securities by the Initial Subscribing Stockholders.

**3.2    Excluded Securities**

The rights of the Eligible Stockholders under Section 3.1 shall not apply to the following Securities issued by the Company at any time (the "Excluded Securities"):

(a)    Securities issued pursuant to any Equity Incentive Plan;

(b)    Securities issued to a bank or other financial institution in connection with a debt financing by the Company or its Subsidiaries;

(c)    Securities issued as a stock dividend or distribution or upon any stock split, recapitalization or other subdivision or combination of Securities;

(d)    Securities issued upon the exercise, conversion or exchange of any options, warrants (including the Restructuring Warrants) or any other derivative Securities of the Company issued in compliance with (or not otherwise in violation of) this Article III; and

(e)    Securities issued in connection with (i) the funding of an acquisition (whether by stock sale, merger, recapitalization, asset purchase or otherwise) of another Person (or portion thereof), (ii) a joint venture or strategic alliance with another Person and (iii) an Approved Sale.

**ARTICLE IV**

**BOARD**

**4.1    Election of Directors; Voting**

(a)    Each holder of Stockholder Shares hereby covenants and agrees to vote all of his, her or its Stockholder Shares to cause the number of directors constituting the Board to be five (5); provided, however, that the number of directors constituting the Board may be increased or decreased with the prior consent of the Avenue Stockholders (for so long as the Avenue Stockholders have the right to designate a director to the Board in accordance with this Section

4.1(a)) and the ACGN Stockholders (for so long as the ACGN Stockholders have the right to designate a director to the Board in accordance with this Section 4.1(a)). At each annual meeting of the holders of any class of Stockholder Shares, and at each special meeting of the holders of any class of Stockholder Shares called for the purpose of electing directors of the Company, and at any time at which holders of any class of Stockholder Shares shall have the right to vote for or consent in writing to the election of directors of the Company, then, and in each such event, each Stockholder shall vote all of the Stockholder Shares owned by them for, or consent in writing with respect to such shares in favor of, the election of a Board constituted as follows:

        (i)     (A) prior to the Reduction Date, three (3) individuals designated by the Avenue Stockholders and (B) following the Reduction Date and for so long as the Avenue Stockholders have a Total Percentage Ownership of at least five percent (5.0%), one (1) individual designated by the Avenue Stockholders;

        (ii)    for so long as the ACGN Stockholders have a Total Percentage Ownership of at least five percent (5.0%), one (1) individual designated by the ACGN Stockholders; and

        (iii)   the individual holding the office of Chief Executive Officer of the Company from time to time.

    (b)    If the Avenue Stockholders or the ACGN Stockholders, as applicable, lose the right to designate one or more directors of the Board, as applicable, pursuant to Section 4.1(a), any director vacancy created by such event shall be filled in accordance with the Bylaws.

    (c)    Prior to the Reduction Date, the Avenue Stockholders shall have the right to designate two (2) directors to serve on each committee of the Board. After the Reduction Date, the Avenue Stockholders shall have the right to designate one (1) director to serve on each committee of the Board for so long as the Avenue Stockholders have the right to designate a director to the Board in accordance with Section 4.1(a). The ACGN Stockholders shall have the right to designate one (1) director to serve on each committee of the Board for so long as the ACGN Stockholders have the right to designate a director to the Board in accordance with Section 4.1(a).

    (d)    The Avenue Stockholders and the ACGN Stockholders shall have the exclusive right to remove and appoint their respective representatives to the Board as well as the exclusive right to fill vacancies created by reason of death, disability, removal or resignation of their respective representatives to the Board. The Stockholders shall vote their shares (i) to remove any director whose removal is requested by the Avenue Stockholders or ACGN Stockholders in accordance with Section 4.1(d) and (ii) to promptly fill any vacancy created by the death, disability, removal, or resignation of a director, in each case for the election of a new director designated by the Avenue Stockholders or the ACGN Stockholders, as applicable, in accordance with the provisions of this Section 4.1(d). The Company and the Stockholders shall fill any vacancies of the Board, in accordance with this Section 4.1, as soon as practicable following the date such vacancy is created.

(e)     The Company shall pay all fees, charges and expenses (including travel and related expenses) incurred by each of the members of the Board in connection with (i) attending the meetings of the Board and all committees thereof and (ii) conducting any other Company business requested by the Company.

(f)     For so long as the ACGN Stockholders have a Total Percentage Ownership of at least one percent (1.0%), the ACGN Stockholders shall have the right to have one (1) representative (the "Observer") present at all meetings of the Board. The Company will give the Observer reasonable prior notice (it being agreed that substantially the same prior notice given to the members of the Board shall be deemed reasonable prior notice) of the time and place of any proposed meeting of the Board. The Company will deliver to the Observer copies of all material documentation distributed from time to time to the members of the Board, at such time as such documents are so distributed to them, including copies of any written consent. The Company reserves the right to withhold any information and to exclude the Observer from any meeting or portion thereof if the Company reasonably determines in good faith that (i) access to such information or attendance at such meeting could be reasonably expected to adversely affect the attorney-client privilege between the Company and its counsel or (ii) such disclosure is prohibited by an agreement with a third party; provided that in the case of this clause (ii), the Company will use commercially reasonable efforts to provide such information or allow the Observer to attend such meeting, which requirement shall be satisfied if the Observer is offered the opportunity to obtain such information or attend such meeting by undertaking to be bound by confidentiality restrictions on substantially the same terms as are applicable to the Company. Notwithstanding anything to the contrary contained in this Agreement, the Observer may not use or disclose any confidential information received by the Observer, except to the extent required by applicable law. The Company shall reimburse the Observer for all reasonable out-of-pocket expenses incurred by the Observer in connection with attending any in-person meetings of the Board.

**4.2     Further Assurances**

If requested by the Avenue Stockholders, the Company and each Stockholder shall take all action possible to ensure that at all times the board of directors, board of managers and all committees thereof of each Subsidiary of the Company shall have the exact composition as the Board and committees thereof, as applicable, set forth in Section 4.1.

## 4.3    Certificate Amendment

No Stockholder will vote its Stockholder Shares to amend, alter, change or repeal Article FIFTH or Annex A of the Certificate, without the prior consent of each of the Avenue Stockholders (for so long as they own at least fifty percent (50.0%) of the Common Stock held by them on the Effective Date), Goldman Stockholders (for so long as they own at least fifty percent (50.0%) of the Common Stock held by them on the Effective Date), and TCW Stockholders (for so long as they own at least fifty percent (50.0%) of the Common Stock held by them on the Effective Date).

## ARTICLE V

## LIMITATION ON TRANSACTIONS WITH AFFILIATES

So long as the Avenue Stockholders have the right to designate a majority of the Board pursuant to Section 4.1, any transaction between any Avenue Related Party and the Company or its Subsidiaries may not be consummated unless either (a) (i) an Acceptable Investment Bank issues a written opinion that such transaction is fair from a financial perspective to the Company and (ii) the approval of the stockholders of the Company having a Total Percentage Ownership of at least sixty percent (60.0%) is obtained, or (b) such transaction is approved by a majority of the disinterested members of the Board (and, with respect to clause (b) only, for so long as the Board is comprised of five (5) members, of which three (3) members are designated by the Avenue Stockholders, one (1) is designated by the ACGN Stockholders and one (1) member who is the Chief Executive Officer of the Company from time to time, then such transaction is approved by the member designated by the ACGN Stockholders and the member who is the Chief Executive Officer of the Company). Any director appointed by the Avenue Stockholders shall be deemed to be "interested" solely for the purposes of voting on any matter described in the foregoing clause (b). For the avoidance of doubt, any transaction between any Avenue Related Party and the Company or its Subsidiaries not approved by a majority of the disinterested directors as contemplated by the foregoing clause (b) shall nonetheless be permitted if it otherwise satisfies the requirements of the foregoing clause (a).

Notwithstanding anything to the contrary contained herein, any transaction between any Avenue Related Party and the Company and its Subsidiaries contemplated by any agreement approved pursuant to the Joint Plans shall be excluded from the limitations set forth in this Article V.

## ARTICLE VI

## REGISTRATION RIGHTS

## 6.1    Required Registration.

(a)    Except as limited by Sections 6.1(b) and 6.1(e), if, at any time after the Initial Public Offering, the Company shall be requested in writing by any of the Avenue Stockholders, the Goldman Stockholders or the TCW Stockholders to effect the registration under the Securities Act of an offering of Registrable Shares held by such Stockholders (a

"Demand Registration Request"), then the Company shall promptly give written notice to all Stockholders of its intention to register the Registrable Shares subject to the Demand Registration Request and, upon the written request of any Stockholder (given within ten (10) Business Days after delivery of any such notice to each Stockholder by the Company) to include in such registration any of its Registrable Shares (which request shall specify the number of Registrable Shares proposed to be included in such registration), the Company shall, promptly use its best efforts to effect a registration under the Securities Act of an offering of all the Registrable Shares that the Company has been so requested to register for sale in accordance with this Section 6.1.

(b)     Anything contained in Section 6.1(a) to the contrary notwithstanding, the Company shall not be obligated to use its best efforts to file and cause to become effective any Registration Statement (i) during any period in which any other registration statement (other than on Form S-4 or Form S-8) pursuant to which Primary Shares are to be or were offered and sold has been filed and not withdrawn or has been declared effective within the prior ninety (90) days (180 days in the case of the Initial Public Offering) or (ii) if there exists a material development with respect to or involving the Company or its Subsidiaries that would require disclosure in the in the Prospectus for such offering, which disclosure, in the reasonable judgment of the Board, would be premature or otherwise inadvisable at such time and would reasonably be expected to be materially prejudicial to the Company or its Subsidiaries; provided, however, that the Company may not exercise its rights in this Section 6.1(b)(ii) more than once in each 12 month period.

(c)     With respect to any registration pursuant to Section 6.1(a), the Company may include in such registration any Primary Shares or Other Shares; provided, however, that if the managing underwriter advises the Company that the inclusion of all Registrable Shares, Primary Shares and Other Shares proposed to be included in such registration would materially adversely affect the offering and sale (including pricing) of all such Securities, then the number of Registrable Shares, Primary Shares and Other Shares proposed to be included in such registration shall be included in the following order:

(i)     first, the Registrable Shares (excluding Equity Incentive Shares) owned by the Stockholders, pro rata based upon the number of Registrable Shares (excluding Equity Incentive Shares) owned by each such Stockholder at the time of such registration; provided, however, the Registrable Shares held by Management Stockholders shall be further cut back on a pro rata basis if the Board, in consultation with the underwriter, determines in good faith that the participation of such Management Stockholders would adversely affect the marketability or offering price of the other Registrable Shares to be sold;

(ii)     second, the Equity Incentive Shares owned by the Stockholders;

(iii)     third, the Primary Shares; and

(iv)     fourth, the Other Shares.

(d)     If any offering pursuant to a Demand Registration Request involves an underwritten offering, the Company shall select the managing underwriter or underwriters to administer the offering, which managing underwriters shall be a firm of nationally recognized standing.

(e)     (i) For so long as the Avenue Stockholders have a Fully Diluted Percentage Ownership of at least twenty percent (20.0%), the Avenue Stockholders may make an unlimited number of Demand Registration Requests; (ii) for so long as the Avenue Stockholders have a Fully Diluted Percentage Ownership of less than twenty percent (20.0%), but more than two and one-half percent (2.5%) thereof, then the Avenue Stockholders may make two (2) Demand Registration Requests per 12-month period; provided, that the offering size relating to such Demand Registration Request must be at least $3.0 million; (iii) for so long as the Goldman Stockholders have a Fully Diluted Percentage Ownership of more than two and one-half percent (2.5%), the Goldman Stockholders may make one (1) Demand Registration Request per 12-month period; provided, that the offering size relating to such Demand Registration Request must be at least $3.0 million; and (iv) for so long as the TCW Stockholders have a Fully Diluted Percentage Ownership of more than two and one-half percent (2.5%), the TCW Stockholders may make one (1) Demand Registration Request per 12-month period; provided, that the offering size relating to such Demand Registration Request must be at least $3.0 million.

(f)     A registration undertaken by the Company pursuant to a Demand Registration Request will not count as a Demand Registration Request for purposes of Section 6.1(e) if, the Stockholder making the Demand Registration Request withdraws the Demand Registration Request and promptly reimburses the Company for all fees, costs and expenses incurred by the Company in connection with such withdrawn Demand Registration Request.

## 6.2     Piggyback Registration.

(a)     If the Company at any time proposes for any reason to register Primary Shares or Other Shares under the Securities Act (other than on Form S-4 or Form S-8), it shall promptly give written notice to each Stockholder of its intention to register the Primary Shares or Other Shares and, upon the written request of any Stockholder (given within ten (10) Business Days after delivery of any such notice to each Stockholder by the Company) to include in such registration Registrable Shares (which request shall specify the number of Registrable Shares proposed to be included in such registration), the Company shall use its best efforts to cause all such Registrable Shares requested to be included in such registration to be included on the same terms and conditions as the Securities otherwise being sold in such registration; provided, however, that if the managing underwriter advises the Company that the inclusion of all Registrable Shares or Other Shares proposed to be included in such registration would interfere with the successful offering and sale (including pricing) of Primary Shares proposed to be offered and sold by the Company, then the number of Primary Shares, Registrable Shares and Other Shares proposed to be included in such registration shall be included in the following order:

(i)     first, the Primary Shares;

(ii)     second, the Registrable Shares (excluding Equity Incentive Shares) owned by the Stockholders requesting that their Registrable Shares be included in such registration pursuant to the terms of this Section 6.2, pro rata based upon the number of Registrable Shares (excluding Equity Incentive Shares) owned by each such Stockholder at the time of such registration; provided, however, that the Registrable Shares held by Management Stockholders shall be further cut back on a pro rata basis if the Board, in consultation with the underwriter, determines in good faith that the participation of such Management Stockholders would adversely affect the marketability or offering price of the other Securities to be sold;

(iii)    third, the Equity Incentive Shares owned by the Stockholders; and

(iv)    fourth, the Other Shares.

**6.3     Holdback Agreement.**

If the Company at any time shall register an offering and sale of shares of Common Stock under the Securities Act in an underwritten offering pursuant to an Initial Public Offering, the Stockholders shall not sell, make any short sale of, grant any option for the purchase of, or otherwise Transfer any Securities of the Company (other than (i) those Registrable Shares included in such registration pursuant to Section 6.1 or 6.2, (ii) a Transfer to an Affiliate or (iii) subject to the consent of the underwriters, a Permitted Transfer) without the prior written consent of the Company for a period as shall be determined by the managing underwriters, which period cannot begin more than seven (7) days prior to the effectiveness of such Registration Statement and cannot last more than one-hundred eighty days after the effective date of such Registration Statement.

**6.4     Preparation and Filing.**

If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to use its best efforts to effect the registration of an offering and sale of any Registrable Shares, the Company shall, as expeditiously as practicable:

(a)     use its best efforts to cause a Registration Statement that registers such offering of Registrable Shares to become and remain effective for a period of 180 days or until all of such Registrable Shares have been disposed of (if earlier);

(b)     furnish, at least five (5) Business Days before filing a Registration Statement that registers such Registrable Shares, a Prospectus relating thereto and any amendments or supplements relating to such Registration Statement or Prospectus, to one counsel (the "Stockholders' Counsel") selected by the Avenue Stockholders, copies of all such documents proposed to be filed (it being understood that such five (5) Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to such counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances), and shall use its reasonable best efforts to reflect in each such document, when so filed with the Commission, such comments as the Stockholders whose Registrable Shares are to be covered by such Registration Statement may reasonably propose;

(c)     prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for a period of at least 180 days or until all of such Registrable Shares have been disposed of (if earlier) and to comply with the provisions of the Securities Act with respect to the offering and sale or other disposition of such Registrable Shares;

(d)     notify the Stockholders' Counsel promptly in writing of (i) any comments by the Commission with respect to such Registration Statement or Prospectus, or any request by the Commission for the amending or supplementing thereof or for additional information with respect thereto; (ii) the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement or Prospectus or any amendment or supplement thereto or the initiation of any proceedings for that purpose; and (iii) the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Shares for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes;

(e)     use its best efforts to register or qualify such Registrable Shares under such other securities or "blue sky" laws of such jurisdictions as any seller of Registrable Shares reasonably requests and do any and all other acts and things that may reasonably be necessary or advisable to enable such seller of Registrable Shares to consummate the disposition in such jurisdictions of the Registrable Shares owned by such seller; provided, however, that the Company will not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this Section 6.4(e);

(f)     furnish to each seller of such Registrable Shares such number of copies of a summary Prospectus or other Prospectus, including a preliminary Prospectus, in conformity with the requirements of the Securities Act, and such other documents as such seller of Registrable Shares may reasonably request in order to facilitate the public offering and sale or other disposition of such Registrable Shares;

(g)     use its best efforts to cause such offering and sale of Registrable Shares to be registered with or approved by such other Governmental Authority as may be necessary by virtue of the business and operations of the Company to enable the seller or sellers thereof to consummate the disposition of such Registrable Shares;

(h)     notify on a timely basis each seller of such Registrable Shares at any time when a Prospectus relating to such Registrable Shares is required to be delivered under the Securities Act within the appropriate period mentioned in Section 6.4(b) of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing and, at the request of such seller, prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offerees of such shares, such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated

therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(i)     make available for inspection by any seller of such Registrable Shares, any underwriter participating in any disposition pursuant to such Registration Statement and any attorney, accountant or other agent retained by any such seller or underwriter (collectively, the "Inspectors"), all pertinent financial, business and other records, pertinent corporate documents and properties of the Company (collectively, the "Records"), as shall reasonably be necessary to enable them to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information (together with the Records, the "Information") reasonably requested by any such Inspector in connection with such Registration Statement (and any of the Information that the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless (i) the disclosure of such Information is necessary to avoid or correct a misstatement or omission in the Registration Statement; (ii) the release of such Information is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; (iii) such Information has been made generally available to the public; or (iv) the seller of Registrable Shares agrees that it will, upon learning that disclosure of such Information is sought in a court of competent jurisdiction, give notice to the Company and allow the Company, at the Company's expense, to undertake appropriate action to prevent disclosure of the Information deemed confidential);

(j)     use its best efforts to obtain from its independent certified public accountants a "cold comfort" letter in customary form and covering such matters of the type customarily covered by cold comfort letters;

(k)     use its best efforts to obtain, from its counsel, an opinion or opinions in customary form;

(l)     provide a transfer agent and registrar (which may be the same entity and which may be the Company) for such Registrable Shares;

(m)     issue to any underwriter to which any seller of Registrable Shares may sell shares in such offering certificates evidencing such Registrable Shares;

(n)     list such Registrable Shares on any national securities exchange on which any shares of the Common Stock are listed or, if the Common Stock is not listed on a national securities exchange, use its best efforts to qualify such Registrable Shares for quotation on such national securities exchange as the holders of a majority of such Registrable Shares included in such registration shall request;

(o)     otherwise use its best efforts to comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable but not later than eighteen (18) months after the effective date, earnings statements (which need not be audited) covering a period of twelve (12) months beginning within three (3) months after the effective date of the Registration Statement, which earnings statements shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder; and

(p)     use its best efforts to take all other steps necessary to effect the registration of such Registrable Shares contemplated hereby.

## 6.5     Expenses.

Except as set forth in Section 6.1(f), all expenses incident to the Company's performance of or compliance with Sections 6.1, 6.2, 6.4 and 6.9, including without limitation (a) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange and the Commission; (b) all fees and expenses of compliance with state securities or "blue sky" laws (including fees and disbursements of counsel for the underwriters or Stockholders in connection with "blue sky" qualifications of the Registrable Shares and determination of their eligibility for investment under the laws of such jurisdictions as the managing underwriters may designate); (c) all printing and related messenger and delivery expenses (including expenses of printing certificates for the Registrable Shares in a form eligible for deposit with The Depository Trust Company) and of printing prospectuses, (d) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the issuer (including the expenses of any special audit and "cold comfort" letters required by or incident to such performance); (e) Securities Act liability insurance if the Company so desires or the underwriters so require; (f) all fees and expenses incurred in connection with the listing of the Registrable Shares on any securities exchange and all rating agency fees; (g) all reasonable fees and disbursements of the Stockholders' Counsel to represent such Persons in connection with such registration; (h) all fees and disbursements of underwriters customarily paid by the issuer or sellers of Securities, excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters (other than such fees and disbursements incurred in connection with any registration or qualification of Registrable Shares under the securities or "blue sky" laws of any state); and (i) fees and expenses of other Persons retained by the Company (all such expenses being herein called "Registration Expenses"), will be borne by the Company, regardless of whether the Registration Statement becomes effective. In addition, the Company will, in any event, pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any audit and the fees and expenses of any Person, including special experts, retained by the Company.

## 6.6     Indemnification.

(a)     In connection with any registration of any offering and sale of Registrable Shares under the Securities Act pursuant to this Agreement, the Company shall indemnify and hold harmless the seller of such Registrable Shares, each underwriter, broker or any other Person acting on behalf of such seller, each other Person, if any, who controls any of the foregoing Persons within the meaning of the Securities Act and each Representative of any of the foregoing Persons, against any losses, claims, damages or liabilities, joint or several, to which any of the foregoing Persons may become subject, whether commenced or threatened, under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Registration Statement under which such Registrable Shares were registered, any preliminary Prospectus or final Prospectus contained therein, any amendment or supplement thereto or any document incident to registration or qualification of any offering and

sale of any Registrable Shares, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading or, with respect to any Prospectus, necessary to make the statements therein in light of the circumstances under which they were made not misleading, or any violation by the Company of the Securities Act or state securities or "blue sky" laws applicable to the Company and relating to action or inaction required of the Company in connection with such registration or qualification under such state securities or "blue sky" laws, and the Company shall promptly reimburse such seller, underwriter, broker, controlling Person or Representative for any legal or other expenses incurred by any of them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable to any such Person to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in said Registration Statement, preliminary Prospectus, amendment thereto, or any document incident to registration or qualification of any Registrable Shares in reliance upon and in conformity with written information furnished to the Company through an instrument duly executed by such Person, or a Person duly acting on their behalf, specifically for use in the preparation thereof.

(b)     In connection with any registration of an offering and sale of Registrable Shares under the Securities Act pursuant to this Agreement, each seller of Registrable Shares shall indemnify and hold harmless (in the same manner and to the same extent as set forth in Section 6.6(a)) the Company, each underwriter or broker involved in such offering, each other seller of Registrable Shares under such Registration Statement, each Person who controls any of the foregoing Persons within the meaning of the Securities Act and any Representative of the foregoing Persons with respect to any untrue statement or allegedly untrue statement in or omission or alleged omission from such Registration Statement, any preliminary Prospectus or final Prospectus contained therein, any amendment or supplement thereto or any document incident to registration or qualification of any such offering and sale of Registrable Shares, if such statement or omission was made in reliance upon and in conformity with written information furnished to the Company or such underwriter through an instrument duly executed by such seller or a Person duly acting on such Seller's behalf specifically for use in connection with the preparation of such Registration Statement, preliminary Prospectus, final Prospectus, amendment or supplement; provided, however, that the maximum amount of liability in respect of such indemnification shall be limited, in the case of each seller of Registrable Shares, to an amount equal to the net proceeds actually received by such seller from the sale of Registrable Shares effected pursuant to such registration.

(c)     Promptly after receipt by an indemnified party of notice of the commencement of any action involving a claim referred to in the preceding paragraphs of this Section 6.6, such indemnified party will, if a claim in respect thereof is made against an indemnifying party, give written notice to the latter of the commencement of such action (provided, however, that an indemnified party's failure to give such notice in a timely manner shall only relieve the indemnification obligations of an indemnifying party to the extent such indemnifying party is materially prejudiced by such failure). In case any such action is brought against an indemnified party, the indemnifying party will be entitled to participate in and to assume the defense thereof, jointly with any other indemnifying party similarly notified to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after

notice from the indemnifying party to such indemnified party of its election to assume the defense thereof, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof; provided, however, that if any indemnified party shall have reasonably concluded that there may be one or more legal or equitable defenses available to such indemnified party which are in addition to or in conflict with those available to the indemnifying party, or that such claim or litigation involves or could have an effect upon matters beyond the scope of the indemnity agreement provided in this Section 6.6, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party and such indemnifying party shall reimburse such indemnified party and any Person controlling such indemnified party for that portion of the fees and expenses of any one lead counsel (plus appropriate special and local counsel) retained by the indemnified party that are reasonably related to the matters covered by the indemnity agreement provided in this Section 6.6.

(d)     If the indemnification provided for in this Section 6.6 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, claim, damage or liability referred to herein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amounts paid or payable by such indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other hand in connection with the statements or omissions that resulted in such loss, claim, damage or liability as well as any other relevant equitable considerations; provided, however, that the maximum amount of liability in respect of such contribution shall be limited, in the case of each seller of Registrable Shares, to an amount equal to the net proceeds actually received by such seller from the sale of Registrable Shares effected pursuant to such registration. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. No Person guilty of fraud shall be entitled to indemnification or contribution hereunder.

(e)     The indemnification and contribution provided for under this Agreement will remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party and will survive the transfer of Registrable Shares.

**6.7     Underwriting Agreement.**

(a)     Notwithstanding the provisions of this Article VI, to the extent that the Stockholders selling Registrable Shares in a proposed registration shall enter into an underwriting or similar agreement that contains provisions covering one or more issues addressed in such Sections of this Agreement, the provisions contained in such Sections of this Agreement addressing such issue or issues shall be of no force or effect with respect to such registration, but this provision shall not apply to the Company if the Company is not a party to the underwriting or similar agreement.

(b)     If any registration pursuant to Sections 6.1 or 6.2 is requested to be an underwritten offering, the Company shall negotiate in good faith to enter into a reasonable and customary underwriting agreement with the underwriters thereof. The Company shall be entitled to receive indemnities from lead institutions, underwriters, selling brokers, dealer managers and similar securities industry professionals participating in the distribution, to the same extent as provided above with respect to information so furnished in writing by such Persons specifically for inclusion in any Prospectus or Registration Statement and to the extent customarily given their role in such distribution.

(c)     No Stockholder may participate in any registration hereunder that is underwritten unless such Stockholder agrees (i) to sell such Stockholder's Registrable Shares proposed to be included therein on the basis provided in any underwriting arrangements acceptable to the Company in the case of an offering of Primary Shares, or, in the case of a Demand Registration offering pursuant to Section 6.1 hereof, the Stockholder requesting Demand Registration pursuant to Section 6.2 and (ii) as expeditiously as possible, to notify the Company of the occurrence of any event concerning such Stockholder as a result of which the Prospectus relating to such registration contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

**6.8     Information by Holder.**

Each holder of Registrable Shares to be included in any registration shall furnish to the Company and the managing underwriter such written information regarding such holder and the distribution proposed by such holder as the Company or the managing underwriter may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification or compliance referred to in this Agreement.

**6.9     Exchange Act Compliance.**

From and after the Registration Date or such earlier date as a registration statement filed by the Company pursuant to the Exchange Act relating to any class of the Company's Securities shall have become effective, the Company shall comply with all of the reporting requirements of the Exchange Act (whether or not it shall be required to do so) and shall comply with all other public information reporting requirements of the Commission but, in each case, only to the extent that such reporting requirements are conditions to the availability of Rule 144 for the sale of the Common Stock. The Company shall cooperate with each Stockholder in supplying such information as may be necessary for such Stockholder to complete and file any information reporting forms presently or hereafter required by the Commission as a condition to the availability of Rule 144.

**ARTICLE VII**

**CONFIDENTIALITY; ACCESS TO INFORMATION**

**7.1** **Confidentiality.**

Except as otherwise required by law, each Stockholder shall, and shall use commercially reasonable efforts to cause its Representatives to, hold in confidence all confidential information of the Company provided or made available to such Stockholder and its Representatives until such time as such information has become publicly available other than as a consequence of any breach by such Stockholder or Representative of its confidentiality obligations hereunder (provided that such information may be disclosed to a Transferee in a Permitted Transfer so long as such Person executes and delivers to the Company a Confidentiality Undertaking prior to receipt of such Information).

**7.2** **Access to Information.**

Upon receipt of a Confidentiality Undertaking from any prospective purchaser of indebtedness or equity Securities of the Company identified by a Stockholder, the Company will provide the information set forth on Exhibit B hereto to such Stockholder and prospective purchaser; provided, however, that the Company will not be obligated to provide any Person with such information if it reasonably determines, in good faith, that such Person is a competitor of the Company and promptly thereafter notifies such Stockholder of such determination.

**ARTICLE VIII**

**LEGEND**

To the extent any Stockholder requests that the Company issue a certificate evidencing such Stockholders' ownership of Stockholder Shares, such certificate shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A STOCKHOLDERS' AGREEMENT DATED AS OF [_____], 2008 (AS AMENDED, MODIFIED, SUPPLEMENTED OR RESTATED FROM TIME TO TIME, THE "AGREEMENT"), AMONG THE ISSUER OF SUCH SECURITIES (THE "COMPANY") AND CERTAIN OF THE COMPANY'S STOCKHOLDERS. THE TERMS OF SUCH AGREEMENT INCLUDE, AMONG OTHER THINGS, RESTRICTIONS ON TRANSFERS. A COPY OF THE AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

**ARTICLE IX**

**AMENDMENT AND WAIVER**

**9.1** **Amendment.**

Except as otherwise set forth herein, the terms and provisions of this Agreement may not be amended, modified, restated, supplemented or waived except pursuant to a writing signed by (a) the Avenue Stockholders (for so long as they own at least fifty percent (50.0%) of the Common Stock held by it on the Effective Date, as adjusted for stock splits, combinations,

recapitalizations, stock dividends and the like); (b) the Goldman Stockholders (for so long as they own at least fifty percent (50.0%) of the Common Stock held by them on the Effective Date, as adjusted for stock splits, combinations, recapitalizations, stock dividends and the like); (c) the TCW Stockholders (for so long as they own at least fifty percent (50.0%) of the Common Stock held by them on the Effective Date, as adjusted for stock splits, combinations, recapitaliztions, stock dividends and the like); and (d) Stockholders holding a majority of the Common Stock subject to this Agreement; [provided, however, that Section 2.3 of this Agreement may not be amended without the prior written consent of the JPM Stockholder for so long as the JPM Stockholder own at least fifty (50.0%) of the Common Stock held by them on the Effective Date (as adjusted for stock splits, combinations, recapitalizations, stock dividends and the like), unless the terms and conditions of such amendment similarly affect the Avenue Stockholders in a like manner.][6]

**9.2** **Waiver.**

No course of dealing between the Company and the Stockholders (or any of them) or any delay in exercising any rights hereunder will operate as a waiver of any rights of any party to this Agreement. The failure of any party to enforce any of the provisions of this Agreement will in no way be construed as a waiver of such provisions and will not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

## ARTICLE X

## TERMINATION

The provisions of this Agreement, except as otherwise expressly provided herein, shall terminate upon the first to occur of (a) the dissolution, liquidation or winding-up of the Company; (b) a Sale of the Company; (c) the consummation of an Initial Public Offering; or (d) the approval of such termination by the Company, the Avenue Stockholders, the Goldman Stockholders and the TCW Stockholders; provided, however, that in the case of clause (c), all the provisions set forth in Article VI relating to registration rights (and all definitions and "Miscellaneous" provisions related thereto) shall continue without interruption. Anything contained herein to the contrary notwithstanding, as to any particular Stockholder, this Agreement shall no longer be binding or of further force or effect as to such Stockholder, except as otherwise expressly provided herein, as of the date such Stockholder has Transferred all of such Stockholder's Stockholder Shares in accordance with the terms hereof.

## ARTICLE XI

## MISCELLANEOUS

---

[6] To be added only if JPMorgan signs this Agreement.

**11.1**    **Severability.**

It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**11.2**    **Entire Agreement.**

This Agreement and the other agreements referred to herein and to be executed and delivered in connection herewith embody the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and thereof and supersede and preempt any and all prior and contemporaneous understandings, agreements, arrangements or representations by or among the parties, written or oral, which may relate to the subject matter hereof or thereof in any way.

**11.3**    **Independence of Agreements and Covenants**

All agreements and covenants hereunder shall be given independent effect so that if a certain action or condition constitutes a default under a certain agreement or covenant, the fact that such action or condition is permitted by another agreement or covenant shall not affect the occurrence of such default.

**11.4**    **Successors and Assigns.**

Except as otherwise provided herein, this Agreement will bind and inure to the benefit of and be enforceable by the Company and its successors and permitted assigns and the Stockholders and any subsequent holders of Stockholder Shares and the respective successors and permitted assigns of each of them, so long as they own Stockholder Shares. No Stockholder may assign its rights hereunder in violation of this Agreement and any such attempted assignment shall be void ab initio.

**11.5**    **Counterparts; Facsimile Signatures; Validity.**

This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by facsimile or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature hereupon delivered by facsimile shall be deemed for all purposes as constituting good and valid execution and delivery of this Agreement by such party.

**11.6    Remedies.**

(a)    Each Stockholder shall have (i) all rights and remedies reserved for such Stockholder pursuant to this Agreement, (ii) all rights and remedies which such holder has been granted at any time under any other agreement or contract and (iii) all of the rights which such holder has under any law or equity. Any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law or equity.

(b)    It is acknowledged that it will be impossible to measure in money the damages that would be suffered by any party hereto if any other Person party hereto fails to comply with any of the obligations imposed on it upon them in this Agreement and that in the event of any such failure, the aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such aggrieved party shall, therefore, be entitled to equitable relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

**11.7    Notices.**

All notices, amendments, waivers or other communications pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telecopied, sent by nationally recognized overnight courier or mailed by registered or certified mail with postage prepaid, return receipt requested, to the parties hereto at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)    if to the Company, to:

Vertis Holdings, Inc.
4775 Walnut Street, Suite D1
Boulder, Colorado  80301
Attention:  Chief Legal Officer
Telephone: (410) 361-8347
Facsimile: (410) 454-8460

(b)    if to any Stockholder to it at its address set forth on Schedule I attached hereto.

Any such notice or communication shall be deemed to have been given and received (a) when delivered, if personally delivered; (b) when sent, if sent by telecopy on a Business Day (or, if not sent on a Business Day, on the next Business Day after the date sent by telecopy); (c) on the next Business Day after dispatch, if sent by nationally recognized overnight courier guaranteeing next Business Day delivery; and (d) on the fifth Business Day following the date on which the piece of mail containing such communication is posted, if sent by mail.

**11.8  Governing Law; Jurisdiction.**

EXCEPT AS SET FORTH BELOW, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO THE CONFLICTS OF LAWS OR PRINCIPLES THEREOF THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE. WITH RESPECT TO ANY LAWSUIT OR PROCEEDING ARISING OUT OF OR BROUGHT WITH RESPECT TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY, EACH OF THE PARTIES HERETO IRREVOCABLY (a) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES FEDERAL AND DELAWARE STATE COURTS LOCATED IN THE COUNTY OF NEW CASTLE IN THE STATE OF DELAWARE; (b) WAIVES ANY OBJECTION IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT; (c) WAIVES ANY CLAIM THAT SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM; AND (d) FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDINGS, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.

**11.9  Waiver of Jury Trial.**

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF. EACH OF THE PARTIES HERETO ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND THAT MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE OTHER PARTY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT. EACH OF THE PARTIES HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED OR HAD THE OPPORTUNITY TO REVIEW THIS WAIVER WITH ITS RESPECTIVE LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**11.10  Further Assurances.**

Each party hereto shall do and perform or cause to be done and performed all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments, and documents as any other party hereto reasonably may request in order to carry out the provisions of this Agreement and the consummation of the transaction contemplated hereby.

## 11.11  Third Party Reliance.

(a)     Anything contained herein to the contrary notwithstanding, the covenants of the Company contained in this Agreement (i) are being given by the Company as an inducement to the Stockholders to enter into this Agreement (and the Company acknowledges that the Stockholders have expressly relied thereon) and (ii) are solely for the benefit of the Stockholders.  Accordingly, no third party (including, without limitation, any holder of equity Securities who is not a Stockholder and any holder of any other Securities of the Company) or anyone acting on behalf of any thereof other than the Stockholders, shall be a third party or other beneficiary of such covenants and no such third party shall have any rights of contribution against the Stockholders or the Company with respect to such covenants or any matter subject to or resulting in indemnification under this Agreement or otherwise.

(b)     None of the provisions hereof shall create, or be construed or deemed to create, any right to employment in favor of any Person by the Company or any of its Subsidiaries.

*******

**IN WITNESS WHEREOF**, the undersigned have duly executed this Stockholders' Agreement as of the date first written above.

**VERTIS HOLDINGS, INC.**

By:_____
   Name: _____
   Title: _____

**STOCKHOLDERS**

**AVENUE INVESTMENTS, LP**

By:_____
   Name: _____
   Title: _____

_____

_____

_____

**Stockholders**

**Name and Address of Stockholders**

## JOINDER AGREEMENT

The undersigned is executing and delivering this Joinder Agreement pursuant to the Stockholders' Agreement dated as of [    ], 2008 (as amended, modified, restated or supplemented from time to time, the "Stockholders' Agreement"), among Vertis Holdings, Inc., a Delaware corporation (the "Company"), and its stockholders named therein.

By executing and delivering this Joinder Agreement to the Company, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the Stockholders' Agreement in the same manner as if the undersigned were an original signatory to such agreement.

The undersigned acknowledges and agrees that the undersigned shall be a "Stockholder", as such term is defined in the Stockholders' Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of _____.


_____

*Signature of Stockholder*


_____

*Print Name of Stockholder*


_____

_____


_____

*Address*


_____

*Facsimile*


_____

*Telephone*

## ACCESS TO INFORMATION

1. Within one-hundred (100) days of the end of each of the Company's fiscal years commencing after [       ], audited year end financial statements of the Company and its Subsidiaries, together with an MD&A.

2. Within fifty (50) days of the end of each of the Company's first three (3) fiscal quarters commencing after [       ], unaudited quarterly financial statements of the Company and its Subsidiaries, together with an MD&A.

3. Within five (5) Business Days of the occurrence of the following events:

    - change in the executive officers or directors of the Company;

    - any incurrence of any material long-term indebtedness by the Company or its Subsidiaries;

    - acceleration of any indebtedness of the Company or its Subsidiaries;

    - any issuance by the Company of its equity Securities (excluding pursuant to any Equity Incentive Plan) generating net cash proceeds greater than $10.0 million;

    - entry into a definite agreement by the Company or its Subsidiaries relating to a transaction that has or may reasonably be expected to result in a Sale of the Company;

    - any resignation or termination of the Company's independent accountants or any new engagement of independent accountants;

    - any determination by the Company or the receipt of advice or notice by the Company from its independent accountants relating to non-reliance on previously issued financial statements, a related audit opinion or a completed interim review; and

    - the completion by the Company and its Subsidiaries of the acquisition or disposition of a significant amount of assets,

    in each case, solely to the extent such information would be required to be filed on a Form 8-K by an SEC registrant; provided there shall be no obligation to provide financial statement or pro forma financial statements with respect to any business acquired or disposed of by the Company or its Subsidiaries.

4. A summary budget prepared once a year commencing with the 2009 fiscal year, consisting of annual sales, adjusted EBITDA, and free cash flow of the Company and its Subsidiaries (the "Annual Budget"). The Company shall not have an obligation to update any Annual Budget previously provided to any Person. Notwithstanding anything to the contrary contained herein, no Annual Budget shall be required to be posted on any website maintained by the Company.

Exhibit C

# FORM
# OF
# CONFIDENTIALITY UNDERTAKING

[To be attached]