# EXHIBIT N

**Avenue Advisory Services Agreement**

# ADVISORY SERVICES AGREEMENT

This ADVISORY SERVICES AGREEMENT, dated as of [_____], 2008 (this "*Agreement*"), is entered into by and among VERTIS HOLDINGS, INC., a Delaware corporation ("*Vertis Holdings*"), VERTIS, INC., a Delaware corporation ("*Vertis*"), the subsidiaries of Vertis signatory hereto (together with Vertis Holdings and Vertis, the "*Companies*"), and Avenue Investments, L.P., a Delaware limited partnership (the "*Advisor*" and together with the Companies, the "*Parties*").

WHEREAS, the Companies desire to benefit from the Advisor's expertise and thus have requested that the Advisor review and analyze certain financial and other transactions and provide certain consulting and investment advisory services related to the business and affairs of the Companies and their subsidiaries. The Advisor and the Companies agree that it is in their respective best interests to enter into this Agreement under which, for the consideration specified herein, the Advisor shall provide the services specified herein as an independent consultant to the Companies.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, the Companies and the Advisor agree as follows:

**Section 1.    Defined Terms.**

(a) As used in this Agreement the following terms have the meanings set forth below.

(i) "*Affiliate*" shall mean, in respect of any specified person, any other person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified person, whether through the ownership of voting securities, by contract or otherwise, and shall include any principal, member, manager, director, partner, stockholder, officer or employee of any of the foregoing. For all purposes of this Agreement, the Companies and their subsidiaries shall not be deemed to be Affiliates of the Advisor or its Affiliates.

(ii) "*Common Stock*" means Vertis Holdings common stock, par value $0.001 per share.

(iii) "*Effective Date*" means [_____], 2008.

(iv) "**Non-Employee Directors**" means members of the Board who are not employees of Vertis Holdings or any of the other Companies.

(v) "*Qualified IPO*" means a public offering and sale of equity securities of Vertis Holdings (or any successor entity) in any transaction or series of related transactions, pursuant to an effective registration statement (other than on Form S-4, S-8 or their equivalents) filed under the United States Securities Act of 1933, as amended that results in gross cash proceeds to Vertis Holdings (prior to deducting applicable underwriting discounts and commissions) of not less than $100.0 million.

(vi) "*Sale*" shall mean (A) any direct or indirect sale or other transfer, in one or a series of related transactions, of all or substantially all of the property and assets of Vertis Holdings and its subsidiaries on a consolidated basis, (B) any merger or consolidation to which Vertis Holdings is a party and which the holders of the voting securities of Vertis Holdings immediately prior thereto own less than a majority of the outstanding voting securities of the surviving entity immediately following such transaction, or (C) (i) any person other than the Advisor (or any of its Affiliates), shall beneficially own (as defined in Rule 13d-3 under the Exchange Act) securities of Vertis Holdings representing more than 50.0% of the voting securities of Vertis Holdings then outstanding and (ii) the Advisor, together with its Affiliates, shall beneficially own (as defined in Rule 13d-3 under the Exchange Act) securities of Vertis Holdings representing less than 9.99% of the voting securities of Vertis Holdings then outstanding. For purposes of the preceding sentence, "voting securities" shall mean securities, the holders of which are ordinarily, in the absence of contingencies, entitled to elect the corporate directors (or persons performing similar functions).

(vii) "*Second Lien Indenture*" means that certain Indenture dated [_____], 2008 among Vertis as Issuer, the Guarantors party thereto and Wilmington Trust Company, as Indenture Trustee, relating to the Second Lien Notes.

(viii) "*Second Lien Notes*" means the 16% Senior Secured Second Lien Notes due 2012 issued pursuant to the Second Lien Indenture.

**Section 2. Retention of the Advisor.**

The Companies hereby retain the Advisor, and the Advisor accepts such retention, upon the terms and conditions set forth in this Agreement. The Parties expressly acknowledge that the Advisor and its Affiliates, and funds managed or advised by the Advisor and/or its Affiliates, directly or indirectly hold shares of Common Stock in and have made (or may in the future make) loans to, the Companies. Additionally, the Parties expressly acknowledge that principals and/or employees of the Advisor and its Affiliates currently serve, and may, in the future, serve, as members of the Board of Directors of Vertis Holdings (the "*Board*") and as members of the boards of directors (or boards of managers, as applicable) of the other Companies. It is understood that (i) the Advisor's rights and obligations hereunder shall be independent of the relationship between the Vertis Holdings, the Advisor and its Affiliates, and the respective boards of directors (or boards of managers, as applicable) of Vertis Holdings and the other Companies, (ii) in performing its services hereunder, the Advisor is not acting in the capacity of an equity holder of or lender to any of the Companies or as a member of the Board or the board of directors (or board of managers, as applicable) of any of the Companies, and (iii) the Advisor shall have no duties including, without limitation, any fiduciary duties, to any the Companies or to any other person except as specifically set forth in this Agreement.

**Section 3. Term.**

This Agreement shall commence on the date hereof and continue until the earliest of (a) the ten-year anniversary of the date hereof, (b) such time as the Advisor and its Affiliates own in the aggregate less than 5% of the Common Stock then-outstanding and (c) a Sale or Qualified

IPO (the "*Term*"). The provisions set forth in Sections 5 through 17 shall survive any termination of this Agreement.

### Section 4. Consulting Services.

(a) The Advisor shall advise the Companies concerning such matters that relate to proposed financial transactions, acquisitions, investments and financial related matters of the Companies and their subsidiaries and Affiliates, in each case as the Companies shall reasonably and specifically request by way of notice to the Advisor, which notice shall specify the services required of the Advisor and shall include all background material necessary for the Advisor to complete such services. If requested to provide such services, the Advisor shall devote such time to any such written request as the Advisor shall deem, in its sole discretion, necessary. Such consulting services, in the Advisor's sole discretion, shall be rendered in person or by telephone or other communication. The Advisor shall have no obligation to the Companies as to the manner and time of rendering its services hereunder, and the Companies shall not have any right to dictate or direct the details of the services rendered hereunder.

(b) The Advisor shall perform all services to be provided hereunder as an independent contractor to the Companies and not as an employee, agent or representative of the Companies. The Advisor shall have no authority to act for or to bind any of the Companies without such Company's prior written consent.

(c) This Agreement shall in no way prohibit the Advisor or any of its Affiliates from engaging in other activities, whether or not competitive with any business of the Companies or any of their respective Affiliates.

(d) It is the intention of the parties that this Agreement is not entered into in respect of services in connection with the Companies' day-to-day business affairs.

(e) Notwithstanding the foregoing Sections 4(a)-(d), nothing in this Agreement shall require the Advisor to render any services if it would require the Advisor to be licensed, registered or qualified in any jurisdiction or under any laws or regulations where or under which it is not at the time of execution of this Agreement so licensed, registered or qualified. The Parties intend that any advice (whether written or oral) rendered by or at the direction of the Advisor pursuant to this Agreement shall be solely for the benefit and use of the Companies, and the Companies agree that such advice may not be relied upon by any other person, used for any other purpose, or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose. In rendering the services described in Sections 4(a) – (d) to the Companies hereunder, the Advisor is not assuming (and its Affiliates are not assuming) any responsibility for the Companies underlying business decision to pursue any business strategy or to effect any transaction.

### Section 5. Compensation.

(a) Advisory Fee. As consideration for the Advisor's agreement to render the services set forth in Section 4(a) and as compensation for any such services rendered by the Advisor, the Companies, jointly and severally, agree to pay the Advisor an aggregate annual fee (subject to Section 5(c), the "*Consulting Fee*") equal to $750,000 per calendar year

commencing on the Effective Date. The Consulting Fee shall be deferred and shall accrue during the period in which the Second Lien Notes are outstanding. The accrued but unpaid amount of the Consulting Fee shall be paid in full when all obligations under the Second Lien Indenture including any premiums, fees or other charges (but excluding any contingent obligations for which no claim has been asserted, the "*Second Lien Obligations*") are refinanced or no longer outstanding (a "*Pay-off Event*"). The Consulting Fee for each calendar year shall be payable in advance (subject to the accrual provisions above), and deemed fully earned, in equal quarterly installments due on January 1st, April 1st, July 1st and October 1st of such year. The Consulting Fee payable for the 2008 calendar year shall be pro rated for the period commencing on the date hereof and shall be deemed fully earned on such date.

(b) <u>Expenses</u>. Upon presentation by the Advisor to the Companies of such documentation as may be reasonably requested by the Companies, the Companies shall reimburse the Advisor for all reasonable out-of-pocket expenses, including, without limitation, legal fees and expenses, and other disbursements incurred by the Advisor or its Affiliates in the performance of the Advisor's obligations hereunder.

(c) <u>Contribution to Indemnity</u>. In the event that any person serving on the Board or on the board of directors or board of managers of any of the other Companies is entitled to indemnification in his or her capacity as a director or member of the board of directors or the board of managers, as applicable, by any of the Companies or their Affiliates, whether pursuant to any agreement, the governing or constituent documents of any entity or by applicable law, and such person is also entitled to, or has received, indemnification by the Advisor or any of its Affiliates (whether by way of payment or reimbursement to a director of any such amounts), whether pursuant to any agreement, the governing or constituent documents of any entity or by applicable law, then (i) the Companies acknowledge and agree that, as between the Companies or their Affiliates, on the one hand, and the Advisor and its Affiliates, on the other hand, the indemnification obligations of the Companies or their Affiliates shall be a primary obligation and the indemnification obligation of the Advisor or its Affiliates shall be a secondary obligation; and (ii) the Advisor and its Affiliates shall be subrogated to the rights of the director against the Companies or any of their Affiliates, as the case may be, with respect to any amounts paid by the Advisor or its Affiliates in connection with any such indemnification obligation.

(d) <u>Non-Exclusive</u>. Nothing in this Agreement shall have the effect of prohibiting the Advisor or any of its Affiliates from receiving from the Companies or any of their subsidiaries or Affiliates any other fees.

**Section 6. Other Agreements.**

(a) <u>Investment Opportunities</u>. The Companies acknowledge and agree that the Advisor, its Affiliates, and funds managed or advised by the Advisor and its Affiliates, are engaged in the business of investing in, acquiring and/or managing businesses for the Advisor's own account, for the account of the Advisor's Affiliates and associates and funds managed or advised by the Advisor and/or its Affiliates, and for the account of other unaffiliated parties, and understand that the Advisor and its Affiliates plan to continue to be engaged in such business (and other business or investment activities) during the term of this Agreement. No aspect or element of such activities shall be deemed to be engaged in for the benefit of the Companies or to constitute a conflict of interest.

(b) <u>Corporate Opportunities</u>.  In recognition and anticipation that (i) certain Authorized Representatives (as defined below) of the Advisor and its Affiliates may serve as directors or officers of Vertis Holdings and the other Companies and (ii) the Advisor, the Non-Employee Directors and each of their respective Affiliates, may now engage, may continue to engage, or may in the future decide to engage, in the same or similar activities or related lines of business as those in which the Companies, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Companies, directly or indirectly, may engage, the provisions of this <u>Section 6(b)</u> are set forth to regulate and define the conduct of certain affairs of the Companies with respect to certain classes or categories of business opportunities as they may involve (x) the Advisor, its Affiliates and any funds managed or advised by the Advisor and/or its Affiliates, (y) the Non-Employee Directors and their respective Affiliates, and (z) the powers, rights, duties and liabilities of the Companies and their respective directors, members, managers, officers and stockholders in connection therewith.  Solely for purposes of this <u>Section 6(b)</u>, the meaning of "*Affiliate*" shall be limited as follows (and only as limited in (A) and (B) as immediately follows):  (A) in respect of a Non-Employee Director, it shall only include any person that, directly or indirectly, is controlled by such Non-Employee Director (other than Vertis Holdings and any entity that is controlled by Vertis Holdings) and (B) in respect of Vertis Holdings, it shall only include any person that, directly or indirectly, is controlled by Vertis Holdings.

(i) None of the Advisor, any Non-Employee Director or any of their respective Affiliates, or any funds managed or advised by the Advisor and/or its Affiliates (each such person, an "*Identified Person*" and collectively, the "*Identified Persons*") shall have any duty to refrain, directly or indirectly, from (x) engaging in a corporate opportunity in the same or similar business activities or lines of business in which Vertis Holdings or any of its Affiliates now engages or proposes to engage or (y) otherwise competing with Vertis Holdings or any of its Affiliates, and, to the fullest extent permitted by the Delaware General Corporation Law (the "*DGCL*"), no Identified Person shall be liable to Vertis Holdings or any of its Affiliates or their respective stockholders for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities or lines of business.  The Companies hereby renounce any interest or expectancy in, or in being offered an opportunity to participate in, any business opportunity which may be a corporate opportunity for both an Identified Person and Vertis Holdings or any of its Affiliates, except as specifically provided in clause (iii) of this <u>Section 6(b)</u>.

(ii) In the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity both for itself or him/herself, as applicable, and Vertis Holdings or any of its Affiliates, such Identified Person shall have no duty to communicate or offer such transaction or other business opportunity to Vertis Holdings or any of its Affiliates and, to the fullest extent permitted by the DGCL, shall not be liable to Vertis Holdings or any of its Affiliates or their respective stockholders for breach of any fiduciary duty as a stockholder, director or officer of the Companies solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself or him/herself, or offers or directs such corporate opportunity to another person.

(iii) The Companies do not renounce their interest in any corporate opportunity offered to any Non-Employee Director if such opportunity is expressly offered to such person solely in his or her capacity as a director of any of the Companies and the provisions of clauses (i) and (ii) of this Section 6(b) shall not apply to any such corporate opportunity.

(iv) In addition to and notwithstanding the foregoing provisions of this Section 6(b), a corporate opportunity shall be deemed not to be a potential corporate opportunity for the Companies if it is a business opportunity that the Companies and their Affiliates are not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Companies' and their Affiliates' business or is of no practical advantage to the Companies and their Affiliates or is one in which they have no interest or reasonable expectancy.

**Section 7. Indemnification.**

(a) Standard of Care. The Advisor and its Affiliates shall not be liable for any mistakes of fact, for errors of judgment, for losses sustained by the Companies, or for any acts or omissions of any kind (including acts or omissions of such persons), unless it is finally determined by a court of competent jurisdiction and then, only to the extent thereof that the Advisor or its Affiliates, as applicable, acted in a manner that constitutes fraud or willful misconduct or bad faith. The Advisor makes no representations or warranties, express or implied, in respect of any of the services to be provided by it hereunder.

(b) Indemnification. The Companies hereby agree that they shall jointly and severally indemnify and hold harmless the Advisor and its Affiliates (each such person, an "*Indemnified Party*") from and against any and all losses, claims, damages, liabilities, costs and expenses, including in connection with seeking indemnification pursuant to this Section 7, whether joint or several (the "*Liabilities*"), related to, arising out of or in connection with the services contemplated by this Agreement or the engagement of the Advisor pursuant to, and the Advisor's performance of the services contemplated by, this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party thereto, whether or not resulting in any liability to such Indemnified Party and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by the Companies. The Companies shall reimburse any Indemnified Party for all reasonable costs and expenses (including reasonable attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which such Indemnified Party would be entitled to indemnification under this Section 7, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Companies shall not be liable under this Section 7 with respect to any particular Liability of an Indemnified Party to the extent that such Liability is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the willful misconduct or bad faith of such Indemnified Party. The Companies shall pay the attorneys' fees and other expenses of an Indemnified Party as they are incurred upon receipt of an agreement by or on behalf of an Indemnified Party to repay such amounts if such Indemnified Party is finally judicially determined that the Liabilities in question resulted primarily from the willful misconduct or bad faith of such Indemnified Party.

**Section 8. Accuracy of Information; Confidentiality.**

(a) The Companies shall furnish or cause to be furnished to the Advisor such information as the Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement and to comply with Securities and Exchange Commission and all other legal requirements relating to the beneficial ownership of securities of the Company (all such information so furnished, the "*Information*"). The Company recognizes and confirms that the Advisor (i) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (ii) does not assume responsibility for the accuracy or completeness of the Information and such other information and (iii) is entitled to rely upon the Information without independent verification.

(b) Except as otherwise required by law, the Advisor shall, and shall use commercially reasonable efforts to cause its employees, counsel and authorized representatives (collectively, "*Authorized Representatives*") to, hold in confidence all nonpublic information of the Companies provided or made available to the Advisor and its Authorized Representatives until such time as such information has become publicly available other than as a consequence of any breach by the Advisor or its Authorized Representatives of its confidentiality obligations hereunder.

**Section 9. Notices.**

All notices, requests, consents and other communications hereunder shall be in writing and shall be deemed sufficient if personally delivered, sent by nationally-recognized overnight courier, by telecopy, or by registered or certified mail, return receipt requested and postage prepaid, addressed as follows:

(a) if to the Advisor, to:

> [Avenue Management Capital II, LP]
> 535 Madison Avenue, 14th Floor
> New York, New York 10022
> Attention: Mike Elkins
> Telephone: (212) 878-3521

> with a copy to:

> Akin Gump Strauss Hauer & Feld LLP
> 590 Madison Avenue
> New York, New York 10022-2524
> Attention: Ira Dizengoff
> Telephone: (212) 872-1000

(b)   if to the Companies, to:

>   Vertis, Inc.
>   4775 Walnut Street, Suite D1
>   Boulder, CO 80301
>   Attention: Chief Legal Officer
>   Telephone: (410) 361-8347;

or to such other address as the party to whom notice is to be given may have furnished to each other party in writing in accordance herewith. Any such notice or communication shall be deemed to have been received (i) in the case of personal delivery, on the date of such delivery, (ii) in the case of nationally-recognized overnight courier guaranteeing next day delivery, on the next business day after the date when sent, (iii) in the case of telecopy transmission, when received and (iv) in the case of mailing, on the 5th business day following that on which the piece of mail containing such communication is posted.

### Section 10.   Benefits of Agreement.

This Agreement shall bind and inure to the benefit of the Advisor, the Companies, the Indemnified Persons and any successors to or assigns of the Advisor and the Companies; *provided, however*, that this Agreement may not be assigned by the Companies without the Advisor's prior written consent; *provided further, however*, that the Advisor may transfer its rights and delegate its obligations hereunder to one or more of its controlled Affiliates.

### Section 11.   Governing Law.

EXCEPT AS SET FORTH BELOW, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO THE CONFLICTS OF LAWS OR PRINCIPLES THEREOF THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE. WITH RESPECT TO ANY LAWSUIT OR PROCEEDING ARISING OUT OF OR BROUGHT WITH RESPECT TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY, EACH OF THE PARTIES HERETO IRREVOCABLY (a) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES FEDERAL AND DELAWARE STATE COURTS LOCATED IN THE COUNTY OF NEW CASTLE IN THE STATE OF DELAWARE; (b) WAIVES ANY OBJECTION IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT; (c) WAIVES ANY CLAIM THAT SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM; AND (d) FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDINGS, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.

### Section 12.   Waiver of Jury Trial.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF.

EACH OF THE PARTIES HERETO ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND THAT MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE OTHER PARTY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT. EACH OF THE PARTIES HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED OR HAD THE OPPORTUNITY TO REVIEW THIS WAIVER WITH ITS RESPECTIVE LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

### Section 13. Headings.

Section headings are used for convenience only and shall in no way affect the construction of this Agreement.

### Section 14. Entire Agreement; Amendments.

This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements with respect to such subject matter, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement signed by each of the parties hereto.

### Section 15. Counterparts.

This Agreement may be executed in counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

### Section 16. Waivers.

No waiver of any of the provisions herein shall be effective unless in writing signed by the person against whom such waiver is to be enforced. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

### Section 17. Further Assurances

The Companies and the Advisor shall execute such documents and other papers and take such further actions as the other parties may reasonably request in order to carry out the provisions hereof and provide the services hereunder.

*******

IN WITNESS WHEREOF, the parties have duly executed this Advisory Services Agreement as of the date first above written.

**VERTIS HOLDINGS, INC.**

By: _____
    Name:
    Title:

**VERTIS, INC.**

By: _____
    Name:
    Title:

**USA DIRECT, LLC**

By: _____
    Name:
    Title:

**VERTIS MAILING, LLC**

By: _____
    Name:
    Title:

**WEBCRAFT CHEMICALS, LLC**

By: _____
    Name:
    Title:

**WEBCRAFT, LLC**

By: _____
    Name:
    Title:

**ENTERON GROUP LLC**

By: _____
    Name:
    Title:

**ACG HOLDINGS, INC.**

By: _____
    Name:
    Title:

**AMERICAN COLOR GRAPHICS, INC.**

By: _____
    Name:
    Title:

**SULLIVAN MARKETING, INC.**

By: _____
    Name:
    Title:

AMERICAN IMAGES OF NORTH AMERICA, INC.

By: _____
    Name:
    Title:

SULLIVAN MEDIA CORPORATION

By: _____
    Name:
    Title:

AVENUE INVESTMENTS, LP

By:[_____]

  By:[_____]

    By: _____
       Name:
       Title: